# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| **W.R. GRACE & CO.,** *et. al.*, | : | **CIVIL ACTION NO. 11-199 (Lead Case)** |
| | : | **CIVIL ACTION NO. 11-200** |
| | : | **CIVIL ACTION NO. 11-201** |
| **Debtors.** | : | **CIVIL ACTION NO. 11-202** |
| | : | **CIVIL ACTION NO. 11-203** |
| | : | **CIVIL ACTION NO. 11-207** |
| | : | **CIVIL ACTION NO. 11-208** |
| | : | **CIVIL ACTION NO. 09-644** |
| | : | **CIVIL ACTION NO. 09-807** |
| | : | |
| | : | |
| | : | *Procedurally Consolidated.* |
| | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

RONALD L. BUCKWALTER, S. J.[1]                                January 30, 2012

This Memorandum Opinion now addresses the appeals of final judgments of the United States

Bankruptcy Court for the District of Delaware ("the Bankruptcy Court") related to the United States

Bankruptcy Code Chapter 11 reorganization of Appellee W.R. Grace & Co., *et. al.* ("Grace").[2]  By

Orders dated May 19, 2009,[3] January 22, 2011,[4] and January 31, 2011,[5] the Honorable Judith K.

---

[1] Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[2] Appellee Grace consists of sixty-two separate corporate entities.  For clarity and ease of reference, the debtors are collectively referred to hereinafter as "Grace."

[3] (See Bankr. No. 01-1139, Doc. No. 21747, 05/19/09, Memorandum Opinion and Order Sustaining Debtors' Objection to Unsecured Claims insofar as Claims Include Postpetition

Fitzgerald, the United States Bankruptcy Judge presiding over Appellee's reorganization case for approximately ten years, entered and/or approved the Settlement Agreement between Grace and Continental Casualty Company and Continental Insurance Company ("CNA Companies" or "CNA"),[6] and the Joint Plan of Reorganization ("the Joint Plan" or "the Plan") of Debtor Grace under Chapter 11. In support of these Orders, Judge Fitzgerald provided over 100 pages of careful analysis of the Settlement Agreement and the Joint Plan (itself consisting of 152 pages) in her Memorandum Opinions and adjoining Findings of Fact and Conclusions of Law.

Presently before the Court are two separate but related matters: (1) approval of the aforementioned Settlement Agreement; and (2) confirmation of the Joint Plan. The Court has carefully and fully considered the parties' objections and has completed an extensive review of nine separate court dockets, approximately 2,000 pages of party briefing, 460 pages of oral argument testimony before this Court, and several thousand pages of the supporting record. The Court now

---

Interest at the Contract Default Rate.)

[4] (See Bankr. No. 01-1139, Doc. No. 26106, 01/22/11, Order Pursuant to Section 105, 363, 1107, and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Companies.)

[5] (See Bankr. No. 01-1139, Doc. No. 26154, 26155, 01/31/11, Memorandum Opinion Regarding Objections to Confirmation of First Amended Joint Plan of Reorganization and Recommended Supplemental Findings of Fact and Conclusions of Law.)

[6] The CNA Companies consist of several insurance companies joined together over the course of this litigation as a result of mergers and successions, including: Continental Casualty Company, Continental Insurance Company, Pacific Insurance Company, Boston Old Colony Insurance Company, Harbor Insurance Company, Buffalo Insurance Company, Buffalo Reinsurance Company, and London Guarantee & Accident Company of New York. For clarity and ease of reference, these insurance entities are collectively referred to hereinafter as the "CNA Companies."

finds that the parties' Objections are denied, and (1) the Settlement Agreement between Grace and the CNA Companies is approved; and (2) the Joint Plan is confirmed in its entirety.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Appellee Grace is an expansive corporation engaged in the manufacture of chemicals and construction materials. Grace operates in both the domestic and global markets, and has diversified and extensive business activities. One component of its business involves the physical extraction of natural resources from the earth. Grace also refines these natural resources, and converts them through a process known as "expansion" into manufactured materials utilized for building construction and insulation. Despite its vast size and multifarious business activities, Grace has experienced serious financial difficulty as a result of its involvement in multiple tracks of extensive and expensive protracted litigation over the years, which cumulatively lead to Grace filing for Chapter 11 bankruptcy in 2001.

### A. The Personal Injury Asbestos Litigation

From 1963 until 1990, Grace owned and operated a mine in Montana. The mine was located seven miles northeast of Libby, a small town situated in a narrow valley enclosed by tall mountains. Miners at the Libby mine extracted vermiculite, a natural mineral composed of shiny flakes that has since been linked to an especially carcinogenic form of asbestos. Following extraction, the vermiculite was processed using a procedure that generated a substantial degree of airborne dust. It was subsequently determined that the milling process used at the Libby mine emitted up to 5,000 pounds of asbestos per day into the atmosphere. The Libby residents were significantly exposed to asbestos due to the town's close proximity to the mine and its geographic location in a valley, which had the effect of concentrating vermiculite particles in the atmosphere. As a result, a significant

3

number of both Libby residents and former Grace miners developed a plethora of pleural abnormalities.[7]   The town was subsequently declared a Public Health Emergency Area by the Environmental Protection Agency ("EPA"), and continues to have the highest death rate of pleural disease related to asbestos of all counties in the United States.

Beginning in the 1970s, persons alleging injuries from exposure to asbestos in Libby (hereinafter collectively referred to as the "Libby Claimants")  filed suit against Grace.  The volume and amount demanded on such claims drastically surged between 1999 and 2000, due to a series of events in the tort system that highlighted Grace as a litigation defendant.[8]   By 2001, Grace was involved in over 65,000 asbestos-related personal injury lawsuits involving over 129,000 claims.

---

[7] Pleural disease encompasses many different medical conditions caused by an inflammation of the tissue surrounding the lungs and lining the chest cavity.

[8] Specifically, several other major corporations (many of which were Grace competitors) filed for Chapter 11 bankruptcy as a result of their own asbestos liability, which caused an increased focus on Grace as a mass tort litigation defendant. This time period of asbestos litigation bankruptcy filings is summarized in the chart below, as originally seen in In re Asbestos Litigation, No. 0001, 2002 WL 1305991, at *2 (Pa. D. & C.4th June 11, 2002), rev'd on other grounds Ieropoli v. AC&S Corp., 842 A.2d 919 (Pa. 2004).

| Company | Bankruptcy Petition Date |
|---|---|
| Babcock & Wilcox | February 2000 |
| Pittsburgh Corning | April 2000 |
| Owens Corning | October 2000 |
| Armstrong World Industries | December 2000 |
| G-I Holdings | January 2001 |
| **W.R. Grace** | **April 2001** |
| U.S. Gypsum | June 2001 |
| United States Mineral Products | July 2001 |

The asbestos litigation had a drastic effect on Grace's financial stability and corporate profitability. As time went on and more claims were filed, Grace faced the likelihood of not being able to satisfy any claims filed against it both presently and in the future.

**B.    The State of Montana Duty to Warn Litigation**

The State of Montana ("Montana") conducted various state inspections over the course of the mine's operation to monitor the site's safety and health conditions. The Libby mine failed every state inspection between 1956 and 1974, and state inspectors found that the mine exhibited unsafe and unsanitary conditions. During these failed inspections, Montana allegedly informed Grace of the dangers of asbestos and its connection to pleural disease. A majority of Libby residents and Grace employees, however, remained unaware of the potential danger. As a result, Montana has been named as a defendant in over 180 cases filed in various Montana state courts, alleging that the State undertook affirmative duties when it performed the inspections and failed to warn former Grace employees and Libby residents of the asbestos risks associated with the nearby mine. More than fifty of these lawsuits allege that Montana "aided and abetted" Grace in its operation of the mine.

On or about March 25, 2003, Montana began to file Proofs of Claims against Grace's bankruptcy estate before the Bankruptcy Court for contribution and indemnification related to the pending state court actions. On December 14, 2004, the Montana Supreme Court held that under state law, Montana had a duty to provide Libby residents with public health-related information, and remanded the case to the state trial court to determine whether Montana had in fact breached that duty. See Orr v. State, 324 Mont. 391, 401; 106. P.3d 100, 107 (Mont. 2004). Not wanting to be the sole bearer of asbestos liability, on June 9, 2005, Montana requested the Bankruptcy Court to exempt it from the automatic stay of litigation against Grace so that it could implead Grace as a third-party

defendant in the Montana state court actions.[9]  In response, Grace filed a motion requesting the Bankruptcy Court to expand the injunction so as to encompass actions brought against Montana because the two parties shared an identity of interests.  The Bankruptcy Court denied Grace's motion on the grounds that it lacked "related-to" subject matter jurisdiction to enjoin the state-court proceedings since Grace's bankruptcy estate would not be directly affected by the outcome of the Montana proceedings.  See In re W.R. Grace & Co., 366 B.R. 295, 301 (Bankr. D. Del. 2007). Specifically, the Bankruptcy Court found that "Montana must first be found liable in state court and then pursue its claim for indemnification in bankruptcy court."[10]  Id.  In August of 2008, this Court affirmed.  See In re W.R. Grace & Co., No. Civ. A. 08-246, 2008 WL 3522453, at *6 (D. Del. Aug. 12, 2008).  The United States Court of Appeals for the Third Circuit upheld this Court's holding in 2009.  See In re W.R. Grace & Co., 591 F.3d 164, 172–73 (3d Cir. 2009).  Montana maintains, however, that its claims are derivative of Grace's liability and that Grace therefore presently owes it indemnity and contribution.

---

[9] When Grace filed its bankruptcy petition in 2001, it was granted an automatic stay against all ongoing and future legal proceedings.  This injunctive relief, available under § 362 of the Bankruptcy Code, is awarded to all Chapter 11 petitioners.  See 11 U.S.C. § 362(a) (stating that the filing of a bankruptcy petition results in the automatic stay of all "judicial, administrative, or other action or proceeding against the debtor[.]").  Grace's bankruptcy petition is more fully discussed, *infra*.

[10] The Bankruptcy Court reasoned that if the state court did not find that Montana breached its duty, then indemnification and/or contribution would not be permissible.  It went on to note that even if a breach of duty were found, Montana would still have to bring entirely separate proceedings to receive any indemnification or contribution from Grace.  See id.

### C.    BNSF Railway Company Litigation

Burlington Northern Santa Fe Railway ("BNSF") is a railroad company that entered into leases and agreements with Grace over the years related to operation of the Libby mine and shipment of Grace's asbestos-contaminated products.  Specifically, BNSF leased property to Grace that was adjacent to the railroad.  On this BNSF property, Grace built a suspension bridge and loading dock, which it used to transport vermiculite from the mine to railroad cars.  Once the vermiculite was loaded onto the cars, it was shipped throughout the country on tracks owned by BNSF.  Moreover, under the terms of several of the aforementioned leases and agreements, Grace agreed to indemnify BNSF for any asbestos-related personal injury claims that could be asserted against BNSF.

After the harmful effects of the vermiculite were discovered in Libby, personal injury claims were filed against BNSF, claiming that it should be held strictly liable for Grace's handling of asbestos-contaminated materials on BNSF property, or, in the alternative, that BNSF negligently allowed Grace to handle hazardous materials on its property.   BNSF now contends that it has the right to be fully indemnified for the claims and defense costs stemming from this litigation.

### D.    The Property Damage Litigation

Grace has also been involved in numerous property damage class action disputes related to asbestos.  This litigation is of two different types: (1) "traditional" property damage claims; and (2) Zonolite Attic Insulation ("ZAI") property damage claims.

Traditional property damage claimants allege that building and insulation materials manufactured by Grace contained asbestos and were used in the foundational structure of many public and private buildings.  Over 4,000 such traditional property damage claims were filed against Grace alleging damages for costs incurred in the removal and replacement of asbestos products from

buildings. Over a period of many years, Grace attempted to settle the traditional property damage claims. Approximately 1,136 of the initially filed 4,000 claims were withdrawn or dismissed as improperly filed. Litigation ultimately reduced the remaining amount of claims, and Grace was able to negotiate and settle approximately 407 claims for a total of $147 million.[11] To date, these settlements remain outstanding because they are contingent upon approval of the Joint Plan at issue. Appellant Anderson Memorial Hospital ("AMH"), a class of property owners of a hospital complex based in Anderson, South Carolina that utilized Grace products in its building construction, remains the only traditional property damage claimant that has not yet reached an agreement with Grace.

The second type of asbestos property damage litigation is ZAI property damage claims. The basis of these claims is that Grace manufactured a loose-fill insulation product containing traces of asbestos, ZAI, that was subsequently used in the attics of many private homes. The affected class of plaintiffs claim damages for allegedly reduced property values and costs associated with the removal of ZAI from their homes. The ZAI property damage litigation has proven to be extremely time-consuming and expensive, including a separate "science trial" to determine certain highly-technical scientific claims.

E.     The Canadian Class Action Litigation

Grace's ZAI insulation products were also used in buildings in Canada. There are currently ten class action suits pending in Canada that relate to: (1) the cost of removal of asbestos from homes and buildings, diminutions of property values, and economic loss caused by ZAI products; and (2)

_____

[11] Specifically, Grace entered into the following settlements: (1) California State University and University of California for $1.4 million; (2) Pacific Freeholds Ltd., Inc. for $9,043,375; (3) various hospitals and healthcare facilities for $576,250; (4) several private commercial building owners in the United States for $16 million; and (5) building owners in Canada for $2.5 million.

personal injuries allegedly caused by exposure to ZAI. Additionally, the Canadian Province of Manitoba has brought suit for healthcare costs incurred or to be incurred in relation to the treatment of class members that were exposed to ZAI products. Both Grace and Her Majesty the Queen in the Right of Canada (hereinafter "the Crown" or "Canada") have been named as defendants in these class actions. The proposed representative class action plaintiffs allege, *inter alia*, that the Crown breached its duty to warn them of the dangers associated with ZAI products and asbestos.

Recognizing their similar interests in the case at hand, Montana and the Crown have jointly presented a majority of their arguments to this Court. Several sections of both parties' appellate briefs mirror each other, and the two appellants chose to argue together at Oral Argument before this Court on June 28–29, 2011. As such, the Court will address their claims together below.

## F. Estate Asset and Fraudulent Conveyance Litigation with Grace Subsidiaries

In the 1990s, Grace spun off various of its business activities to two of its subsidiary corporations, Sealed Air Corporation and Cryovac, Inc. ("Sealed Air") and Fresenius Medical Care Holdings, Inc. ("Fresenius"). Both companies were involved in litigation alongside Grace alleging successor liability and fraudulent transfer of estate assets from Grace to its subsidiaries. Specifically, it was alleged that Grace had fraudulently transferred its assets to Sealed Air and Fresenius to the detriment of creditors holding asbestos claims against Grace. The amount of disputed assets totaled billions of dollars. Additionally, both Sealed Air and Fresenius were also named as co-defendants alongside Grace in thousands of ongoing asbestos personal injury cases nationwide, and both subsidiaries sought indemnification from Grace pursuant to their parent-subsidiary contracts.

Grace and its subsidiaries entered into settlements shortly after Grace filed its bankruptcy petition in 2001. Under the terms of the settlements, Sealed Air and Fresenius agreed to contribute

over $1.1 billion to Grace's bankruptcy estate in exchange for their release from any future liability related to Grace's asbestos litigation.

### G. Garlock Sealing Technologies Litigation

Garlock Sealing Technologies LLC ("Garlock") is a manufacturer of engineered industrial products. Some products that Garlock previously manufactured contained asbestos. These products were utilized by several large corporations, including Grace.

When the harmful effects of asbestos were discovered, Garlock was named as a defendant alongside Grace in thousands of personal injury lawsuits claiming liability for asbestos-related injuries. Garlock has expended millions of dollars in defense costs and settlement agreements, paid approximately $1.37 billion in indemnity payments, and exhausted over $1 billion in insurance coverage. To date, approximately 100,000 asbestos personal injury claims remain pending against Garlock.

Garlock is seeking indemnity and contribution from Grace for many of these claims in which both corporations serve as co-defendants. When Grace filed for bankruptcy in 2001, Garlock's attempts to recover these funds were stayed pending Grace's corporate reorganization. Unable to satisfy its massive liabilities, Garlock filed its own Chapter 11 bankruptcy petition in 2010.

### H. Insurance Coverage Litigation

Grace has also experienced a multitude of other ongoing business and financial litigation, including disputes with its insurers: the CNA Companies, Government Employees Insurance Company ("GEICO"), Republic Insurance Company n/k/a Starr Indemnity & Liability Company ("Republic"), AXA Belgium, as Successor to Royale Belge SA ("AXA Belgium"), Maryland Casualty Company ("MCC"), Arrowood Indemnity Company ("Arrowood"), and Travelers Casualty

and Surety Company ("Travelers"). Grace previously claimed that these insurers owed it coverage for its asbestos-related liability under its various insurance policies. This resulted in extensive litigation during which the extent and timing of the insurers' obligations under the policies were vehemently contested. Finally, after years of intensive negotiations and litigation, Grace and its insurers entered into various settlement agreements after Grace filed for bankruptcy. Under these settlements, Grace relinquished its claims for coverage in return for its insurers furnishing substantial consideration, including the contribution of millions of dollars to Grace's bankruptcy estate to be used to settle claims with asbestos personal injury claimants. Moreover, the settlements provided that the insurers would be categorized as "Settled Asbestos Insurance Companies" under the Joint Plan, meaning that they would receive injunctive protection.

### 1. The Grace–CNA Settlement Agreement

Particularly relevant to the present litigation is the Settlement Agreement entered into between Grace and the CNA Companies in 2010. Over the years, the CNA Companies were among the many insurance entities that issued primary and excess liability insurance coverage to Grace. CNA issued primary liability insurance policies to Grace granting coverage for asbestos claims between June 30, 1973 to at least June 30, 1985. These primary policies provided coverage for both "products-completed operations claims" ("products claims"), and "premises operation claims" ("non-products claims"). Products claims were subject to both per-occurrence and aggregate limits, while non-products claims were only subject to a per-occurrence limit. CNA also issued sixteen excess liability insurance policies at various attachment levels to Grace during this timeframe. These excess policies

provided coverage for when the specified limits of the underlying policies were exhausted.[12]

For nearly three decades, both before and after Grace's bankruptcy petition, Grace and the CNA Companies have been engaged in various disputes regarding CNA's coverage under its insurance policies related to asbestos liability. Over the course of the years, the two companies entered into several agreements to settle these disputes. Prior to Grace's 2001 bankruptcy petition, Grace and CNA settled their disputes related to coverage for products claims under the primary policies. The parties had not, however, resolved their differences regarding coverage for non-products claims prior to Grace filing for bankruptcy. As a result of Grace's bankruptcy declaration, all litigation regarding non-products coverage was stayed pursuant to 11 U.S.C. § 362. During its corporate reorganization, Grace[13] and the CNA Companies engaged in extensive negotiations to settle their remaining disputes. A Settlement Agreement was finally reached in November of 2010. The Settlement Agreement purports to resolve all remaining disputes between the parties related to insurance coverage and party obligations, as well as outstanding liabilities related to asbestos claims. The Settlement confers numerous monetary and transactional benefits upon Grace's bankruptcy estate. In exchange, Grace has agreed to release CNA from its previous obligations under the terms of the Settlement.

Grace moved for approval of the Settlement Agreement pursuant to Federal Rule of Bankruptcy 9019 in November 2010. The Libby Claimants and BNSF objected to entry of the

---

[12] All sixteen of CNA's excess policies to Grace attach at or above $75 million in excess of primary coverage, and a majority of these sixteen policies attach at or above $150 million in excess of the primary coverage.

[13] Also engaged in the negotiations were the Asbestos Personal Injury Committee and the Asbestos Personal Injury Future Claims Representative ("PI FCR").

Settlement Agreement. The disputes were fully briefed and litigated before the Bankruptcy Court in January 2011. On January 22, 2011, the Bankruptcy Court issued an Approval Order in conjunction with findings of fact and conclusions of law approving the Settlement Agreement. Nevertheless, the Libby Claimants and BNSF retain objections to entry of the Settlement Agreement.

### 2. AXA Belgium, GEICO, and Republic Excess General Liability Insurance Policies with Grace

Over the course of several years prior to Grace's bankruptcy petition, insurance companies AXA Belgium, GEICO, and Republic[14] all issued high level excess general liability insurance coverage to Grace.[15] Each policy contained an anti-assignment provision stating that the insurers would not be bound by any assignments unless they have consented to do so. AXA Belgium further claims that its policies contained provisions that required Grace to cooperate with it and prohibited settlements without its consent. When Grace filed for bankruptcy in 2001, it sought to assign its rights and interests under these policies to fund its bankruptcy estate. Whether or not it is actually legally permitted to do so has been the subject of much litigation, and is now before this Court for resolution.

---

[14] GEICO and Republic have consolidated their arguments together for presentation to this Court. Given the parties' decision to jointly present their arguments, the Court will address their claims together below.

[15] High level excess general liability insurance is a specific type of insurance coverage that provides additional coverage beyond that of the underlying insurance policy. This type of insurance coverage has commonly been referred to as an "umbrella policy." For example, if an insured is sued for $1 million and its primary insurance policy only covers $500,000 of the claim, the excess policy would cover the remaining $500,000 of the claim. See generally Michael Knoerzer, *Introduction to Excess Insurance and Reinsurance*, 652 PLI/Lit 115, 119 (Apr. 2001).

## I. Bank Lender Pre-Petition Litigation

In 1998 and 1999, Grace entered into two Credit Agreements with a consortium of bank credit facilities (collectively referred to hereinafter as the "Bank Lenders"). Under these Credit Agreements, Grace owed the Bank Lenders an aggregate principal of $500 million, plus interest accruing thereon.[16] The 1998 Agreement had a set maturity date of May 16, 2003, and the 1999 Agreement was set to mature on May 2, 2001. The non-default interest rate under these Agreements was LIBOR (plus the Applicable Margin).[17] The default rate, which is applicable under certain defined events of default, was LIBOR (plus the Applicable Margin) plus 2%. Additionally, both Credit Agreements called for Grace's payment of facility and attorney's fees.

## J. Grace's Bankruptcy Petition and The Joint Plan of Reorganization

As a result of all these legal disputes and its massive liabilities, Grace's financial stability as a corporation was seriously impaired. No longer able to satisfy the claims asserted against it, Grace ultimately filed a Chapter 11 bankruptcy petition on April 2, 2001. In filing the bankruptcy petition, Grace sought to reorganize its basic corporate structure so that it could better handle its outstanding liabilities, as well as its ongoing and future litigation, while moving forward as a "going concern."

Shortly after Grace filed its bankruptcy petition, it began to negotiate the basic structure of its reorganization plan. Grace therefore requested that the Bankruptcy Court grant it injunctive relief

---

[16] Grace entered into the first Credit Agreement on May 14, 1998, under which it borrowed $250 million. On May 5, 1999, Grace also borrowed $250 million under the second Credit Agreement.

[17] LIBOR is a commonly-used acronym in financial affairs that stands for "London Interbank Offered Rate." The LIBOR is the average interest rate that leading banks in London charge when lending to other banks. The LIBOR serves as a benchmark for financial institutions worldwide, which adjust their own interest rates based upon the LIBOR figure. For more information on this subject, see generally Ernest T. Patrikis, *Federal Reserve Capital Adequacy Guidelines as Applied to SWAPS*, 689 PLI/CORP 627, 694–98 (May 1990).

from its ongoing and future asbestos litigation liabilities while it underwent corporate reorganization. On May 3, 2001, the Bankruptcy Court entered a preliminary injunction barring the commencement of new actions related to Grace's asbestos liability. In January of 2002, the Bankruptcy Court modified the injunction to include additional parties and claims, and appointed a legal representative for all future asbestos-related personal injury claims to protect the interests of persons who may later assert claims against Grace. The Official Committee of Equity Security Holders ("Equity Committee") and the Official Committee of Asbestos Personal Injury Claimants ("Asbestos PI Committee") were also formed at approximately the same time.

The Joint Plan went through several preliminary versions and revisions over the years. Notably, proposed Plans were initially filed in 2004 and 2005, but neither proposed Plan was confirmed. After several years of extensive discovery, complex litigation, and negotiations, the parties filed the present Joint Plan of Reorganization on September 19, 2008. The Plan was thereafter again modified, and its finalized version was filed on February 27, 2009. The final version of the Joint Plan, which is now on appeal before this Court, was confirmed by the Bankruptcy Court on January 31, 2011.

The Joint Plan sets forth detailed procedures for how and when claims are to be submitted, valued, and paid, and includes mechanisms that allow for future claimant recovery. The central tenants of the Joint Plan are two trusts, the Asbestos Personal Injury Trust (hereinafter "PI Trust" or "personal injury trust") and the Asbestos Property Damage Trust (hereinafter "PD Trust" or "property damage trust"), and corresponding channeling injunctions that enjoin all present and future asbestos-related claims against Grace and its protected third parties. It has been agreed that injunctive relief should extend to all parties that made contributions to the trust.

Under the Joint Plan, claimants are divided into nine classes (one of which, Class 7, is comprised of two subclasses). Each of these nine classes is further delineated as either an "impaired" or "unimpaired" class.[18] Six of the nine classes and subclass 7A are labeled as unimpaired.[19] The unimpaired classes voted almost unanimously in favor of the Joint Plan.[20] The remaining classes and subclass 7B are labeled as impaired, and also voted in support of the Joint Plan.[21]

### K.    Bank Lender Post-Petition Litigation

At the time of Grace's bankruptcy petition, Grace still owed the Bank Lenders the $500 million principal of its loans, as well as several million dollars in accrued pre-petition interest, an amount which remains in dispute between the parties.[22] Grace could not pay either the outstanding

---

[18] In its most simple interpretation, members of the "impaired" classes under the Joint Plan are those persons and entities that will not necessarily have their claims paid in full according to the Plan's terms. Conversely, members of the "unimpaired" classes are those persons and entities whose claims are definitively set to be paid in full under the Joint Plan. Delineation as an impaired or unimpaired class also affects creditor voting rights. This subject is discussed extensively, *infra*.

[19] Unimpaired classes under the Joint Plan include: Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (Employee Benefit Claims), Class 4 (Workers' Compensation Claims), Class 5 (Intercompany Claims), Class 7A (Asbestos Property Damage Claims (excluding US ZAI Property Damage Claims)), Class 9 (General Unsecured Claims), Class 11 (Equity Interests in Debtors Other than the Parent).

[20] Class 9, an unimpaired class comprised of all holders of non-asbestos-related general unsecured claims, voted 92.54% in favor of the Joint Plan. However, the Bank Lenders, a small subset of Class 9, are not in favor of the Joint Plan. Their arguments are considered further, *infra*.

[21] Impaired classes under the Joint Plan include: Class 6 (Asbestos Personal Injury Claims), Class 7B (American ZAI Property Damage Claims), Class 8 (Canadian ZAI Claims), and Class 10 (Equity Interests in the Parent). All impaired classes voted overwhelmingly in favor of the Joint Plan. The only opponents of the Joint Plan in Class 6 are the Libby Claimants. Their argument is further discussed, *infra*.

[22] The parties assert different amounts as to the pre-petition interest that is owed. Grace claims that it owed approximately $2.5 million in accrued pre-petition interest at this time.

principal or interest amounts when they became due in 2001 and 2003, and allegedly failed to perform several of its other obligations under the Credit Agreements.[23]  The Bank Lenders submitted Proofs of Claims against Grace's bankruptcy estate on March 27, 2003, requesting the amounts owed to them under the Credit Agreements.

The Bank Lenders are general unsecured creditors of Grace.  Under the Joint Plan, the Bank Lenders are classified in Class 9—the General Unsecured Creditors class—along with all other generally unsecured creditors of Grace.  As part of Grace's reorganization, the United States Trustee created and appointed The Official Committee of Unsecured Creditors ("the Committee") to represent the interests and negotiate on behalf of Grace's general unsecured creditors.  Mr. Thomas Maher was appointed as Chairperson of the Committee. Mr. Maher also served as the Bank Lenders' Administrative Agent.

In 2004, Grace began to focus its reorganization efforts on garnering the full support of its general unsecured creditors and equity holders for the Joint Plan.  In January of 2005, Grace began to negotiate with the Committee in an attempt to reach an agreement on the rate and computation of interest that Grace would pay its general unsecured creditors under the Plan.  After several years of

_____

(Grace Br. at 5.)  The Bank Lenders, on the other hand, contend that approximately $3.1 million in accrued pre-petition was still outstanding at this point in time.  (Bank Lender Br. at 9.)  The Court need not determine which monetary figure is correct, however, because it is undisputed that Grace was current with its interest payments as of the Petition Date and that there thus was no pre-petition default.  Only post-petition interest is relevant to the instant litigation.

[23] In addition to not paying the principal and accrued interest, the Bank Lenders also claim that Grace failed to furnish certificates and other information and notices, as required by the Credit Agreements.  As a result, the Bank Lenders contend that these failures to adhere to the terms of the Credit Agreements constituted an "event of default," entitling them to accelerate the entire outstanding amount of loans and notes due to the time period immediately following Grace's bankruptcy petition.  Grace does not dispute that it did not furnish the certificates and other information and notices, but contends that noncompliance with these terms does not constitute an event of default.

negotiations, an agreement was ultimately reached in 2005, and was memorialized in a Letter Agreement ("the 2005 Letter Agreement").  Under the 2005 Letter Agreement, Grace agreed to pay post-petition interest to the Bank Lenders at a rate of 6.09%, compounded quarterly, and at a rate of 4.19%, or their contracted-for non-default rate, to all other general unsecured creditors.  The 6.09% Bank Lender rate was higher than the non-default rate set under the Credit Agreements and the federal judgment rate,[24] but lower than the set default rate under the Credit Agreements.  Grace immediately amended its Joint Plan to reflect the terms of the 2005 Letter Agreement.  Under the 2005 version of the Plan, all general secured creditors in Class 9 would have received 85% of their payment in cash and 15% in Grace's Common Stock.

In late 2005, Mr. Maher contacted Grace requesting an amendment to the Letter Agreement based on a national upward trend in short-term interest rates.  Following a new round of negotiations,

---

[24] The federal judgment rate is governed by 28 U.S.C. § 1961, which provides in relevant part that:

> (a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

28 U.S.C. § 1961.  The rate of interest used in calculating the amount of post-judgment interest is the weekly average 1-year constant maturity (nominal) Treasury yield.  This rate is published every Monday by the Federal Reserve System.  See http://www.uscourts.gov/FormsAndFees/Fees/PostJudgementInterestRates.aspx.  In a bankruptcy case, the applicable rate is the federal judgment rate reflected on the day that the debtor filed its bankruptcy petition.  See In re Wash. Mut., Inc., Bankr. No. 08-12229, 2011 WL 4090757, at *35 (Bankr. D. Del. Sept. 13, 2011); In re Chiapetta, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993).  At the time of Grace's bankruptcy petition, the federal judgment rate was 4.19%.

a modified agreement was reached in 2006, and was also memorialized in a Letter Agreement ("the 2006 Letter Agreement"). Under the 2006 Letter Agreement, Grace modified the post-petition interest rate for the Bank Lenders so that the 6.09% rate would convert to a floating Prime Rate of interest on January 1, 2006. The previously-negotiated interest rates for the other general unsecured creditors were unaffected by the 2006 Letter Agreement. It remains in dispute whether the terms of the 2005 and 2006 Letter Agreements were meant to bind the Bank Lenders. The Bank Lenders contend that they do not. Grace, on the other hand, claims that the Bank Lenders were bound by the Agreements, and that it therefore repeatedly and publicly relied upon the Letter Agreements, including adjusting its internal books and records, SEC filings, monthly operating reports submitted to the Bankruptcy Court, and settlements, to reflect the terms of the Letter Agreements.

Throughout 2007 and 2008, Grace focused its reorganization efforts on resolving its asbestos liabilities. This required negotiations with major constituencies[25] and several estimation trials, during which Grace sought to determine its outstanding asbestos liabilities and how much money would be needed to fund an asbestos trust that would pay all these liabilities in full. Grace's liability and solvency were also vehemently contested during the estimation trials. During this time, the Bank Lenders never contested either the 2005 or 2006 Letter Agreements. At the beginning of April of 2008, Grace and the constituencies entered into a settlement, entitled the Term Sheet For Resolution of Asbestos Personal Injury Claims ("the Term Sheet"), which served as an underlying rubric for the current version of the Joint Plan. Under the Term Sheet, the Bank Lenders would be paid their principal in full, and would receive the post-petition interest rates reflected in the 2006 Letter Agreement. Shortly thereafter, the Bank Lenders objected to the rate of post-petition interest in the

---

[25] The involved constituencies were the Official Committee of Asbestos Personal Injury ("PI") Claimants appointed by the U.S. Trustee, the Asbestos PI Future Claimants' Representative appointed to protect interests of future personal injury claimants, and the Official Committee of Equity Security Holders appointed by the U.S. Trustee.

Term Sheet and demanded to be paid the higher default interest rate.

Entitlement to the default interest rate was litigated before the Bankruptcy Court in September of 2008. On May 19, 2009, the Bankruptcy Court issued its decision on the issue, finding that the Bank Lenders had no legal right to the post-petition default rate under the Credit Agreements. <u>See In re W.R. Grace & Co.</u>, Bankr. No. 01-1139, 2009 WL 1469831, at *1 (Bankr. D. Del. May 19, 2009). In addition to the Bank Lenders' plan confirmation objections, the findings of fact and conclusions of law reached in the May 2009 decision are also presently on appeal before this Court.

### L. The Bankruptcy Court Proceedings

After five hearings and the resolution of numerous objections, the Bankruptcy Court initially approved the Joint Plan on March 9, 2009. The Bankruptcy Court then held a Confirmation Hearing so that all parties could have the opportunity to be heard and raise any additional objections. Forty-three objections were filed by thirty-nine parties at this time. After a sixteen-day hearing and the review of over 1,100 pages of objections, the Bankruptcy Court entered an order confirming the Joint Plan on January 31, 2011. In issuing its confirmation order and accompanying memorandum, the Bankruptcy Court resolved a substantial majority of the original forty-three objections to the Joint Plan. Presently before the Court are the remaining unresolved objections to the Joint Plan.

## II.    STANDARD OF REVIEW

### A.    Standard of Review Regarding Approval of the Settlement Agreement[26]

Bankruptcy Rule 8013 provides that a district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. "An abuse of discretion standard applies where the Bankruptcy Court has exercised discretion in making its determination, such as in approving a proposed settlement."    In re Hudson's Coffee, Inc., No. Civ. A. 08-cv-5133, 2009 WL 1795833, at *2 (D.N.J. June 22, 2009) (internal citations omitted); see also Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); Hopkins v. McDonnell, No. Civ. A. 06-683, 2006 WL 2241646, at *2 (D.N.J. Aug. 4, 2006).  Under this standard, the bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo.  See In re Sharon Steel Corp., 871 F.2d 1217, 1222–23 (3d Cir. 1989) (internal citations omitted); In re Morrissey, 717 F.2d 100, 104 (3d Cir.1983) (internal citations omitted);  Hudson's Coffee, 2009 WL 1795833, at *2 (internal citations omitted).  In bankruptcy appellate litigation, the abuse of discretion standard is highly deferential to the judgment of the bankruptcy court, and the reviewing court should not disturb the findings of the bankruptcy court absent a "definite and firm conviction" that the bankruptcy court committed a clear error.  Hudson's Coffee, 2009 WL 1795833, at *2 (quoting In re Nutraquest, Inc., 434 F.3d 639, 645 (3d Cir. 2006)) (internal quotations omitted).

The Bankruptcy Court's order approving the Settlement Agreement between Grace and the CNA Companies constitutes a final order, and thus will be reviewed under the abuse of discretion

---

[26] District courts have jurisdiction to hear appeals of "final judgments, orders, and decrees" of the bankruptcy courts.  See  28 U.S.C. §158(a);  see also Fed. R. Bankr. P. 8001(a). A bankruptcy court's approval of a settlement agreement is considered a final order.  See In re Nutraquest, Inc., 434 F.3d 639, 643 (3d Cir. 2006).  Thus, this Court has jurisdiction pursuant to 28 U.S.C. §§ 158(a) and 1334(b).

standard.  All parties to the Settlement Agreement and those objecting to its entry agree that this is the applicable standard of review here.  Accordingly, this Court will review the Bankruptcy Court's findings and determine whether it abused its discretion based on "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  Id.  The Court will examine the Bankruptcy Court's findings of fact for clear error, and its conclusions of law de novo.

### B.     Standard of Review Regarding Confirmation of the Joint Plan[27]

The parties dispute the proper standard of review to be applied by this Court in reviewing the Bankruptcy Court's confirmation of the Joint Plan.  Grace contends that this Court should apply the clear error test to the Bankruptcy Court's findings of fact, but should review its conclusions of law de novo.  Four of the twelve Appellants disagree, claiming that the proper standard of review is de novo review of both the Bankruptcy Court's findings of fact and conclusions of law because entry of a channeling injunction is a non-core matter under 28 U.S.C. § 157.

Section 157 of the United States Code provides that "[b]ankruptcy judges may hear and determine . . . all core proceedings arising under title 11[.]" 28 U.S.C. § 157(b)(1).  The Third Circuit has held that "[i]n core matters, the District Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo."  In re Anes, 195 F. 3d 177, 180 (3d Cir. 1999) (citing Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir. 1992)).  A matter is considered "core" if it "involves a right created by the federal bankruptcy law" or involves a proceeding "that would only arise in bankruptcy[.]"  In re Guild & Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996) (quoting In re Wood, 825 F. 2d 90, 97 (5th Cir. 1987)).  The Third Circuit has found that "[c]onfirmation of a proposed bankruptcy plan is a core bankruptcy matter" under the United States

---

[27] The Bankruptcy Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and this Court has appellate jurisdiction over the Bankruptcy Court decision under 28 U.S.C. §§ 158(a) and 1334(b).

Code. <u>Anes</u>, 195 F.3d at 180 (citing 28 U.S.C. § 157(b)(2)(L)).

In line with this Third Circuit precedent, the Court finds that appellate analysis of Grace's proposed Joint Plan is a core matter under Title 11. Review of the Joint Plan is the type of proceeding "that would only arise in bankruptcy." <u>Guild & Gallery</u>, 72 F.3d at 1178. As such, the Court will review the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.

## III.    THE GRACE AND CNA COMPANIES' SETTLEMENT AGREEMENT

The Court first considers the objections filed in response to the Bankruptcy Court's approval

of the Settlement Agreement reached between Grace and the CNA Companies.  The Court considers

this matter first because certain provisions of the Joint Plan rely on terms and conditions reached in

the aforementioned Settlement Agreement.  Thus, confirmation of the Joint Plan cannot be

accomplished absent a full and accurate consideration of the Settlement Agreement.

As previously mentioned, Grace and the CNA Companies entered into a Settlement

Agreement in November 2010.[28]  The Agreement purports to resolve all disputes related to the

remaining coverage and outstanding obligations of both Grace and CNA.[29]  Moreover, the Settlement

resolves all remaining disputes between the parties regarding asbestos-related claims.  Specifically,

under the terms of the Settlement Agreement, CNA will make a payment of up to $84 million to the

---

[28] The Bankruptcy Court approved the Settlement Agreement on January 22, 2011.  Nine days later on January 31, 2011, the Bankruptcy Court issued a Confirmation Order confirming the Joint Plan.  Approval of a settlement agreement and confirmation of a reorganization plan are two entirely distinct matters, governed by different provisions of law and sections of the Bankruptcy Code.

Nonetheless, in filing their present objections, the Libby Claimants and BNSF conflate these distinct matters and argue, *inter alia*, that the Settlement Agreement cannot be approved because the Bankruptcy Court erred, for various reasons, in enjoining asbestos-related claims against CNA pursuant to 11 U.S.C. § 524(g).  The Libby Claimants' and BNSF's objections to entry of the injunction are related to confirmation of the Joint Plan and are irrelevant to the present discussion regarding the Settlement Agreement.  The Settlement Agreement does not alter the scope or clarity of the injunction in the Joint Plan, but rather merely provides that upon approval of the Settlement, CNA will be designated as a "Settled Asbestos Insurance Company" entitled to § 524(g) injunctive relief under the terms of the Joint Plan.  Thus, to the extent that the Appellants make arguments based upon entry, extension, or clarity of the channeling injunction, those arguments are properly considered separately, *infra*, in this Court's analysis of confirmation of the Joint Plan.

[29] The relevant insurance policies covered by the Agreement include all known and unknown, full or portions of, policies issued to Grace prior to June 30, 1985 by which CNA provided insurance coverage for asbestos-related claims.

PI Trust over a period of six years for the benefit of asbestos personal injury claimants. Furthermore, CNA will release Grace from its prior obligations, under pre-petition settlement agreements or otherwise, for payment of retrospective premiums and indemnification for asbestos-related claims asserted against CNA. CNA also relinquishes its right to assert "indirect claims" against the PI Trust seeking indemnity and contribution from Grace, gives up numerous defenses to coverage under both the primary and excess policies, consents to the assignment of its insurance rights to the PI Trust, and agrees to withdraw, without prejudice, any Proofs of Claims it filed against the PI Trust, as well as its objections to the Joint Plan. In return, Grace will release CNA from claims under the policies for coverage of any asbestos-related claims. Moreover, the Settlement Agreement calls for CNA to be designated as a "Settled Asbestos Insurance Company" under Grace's Joint Plan.[30]

After extensive briefing and oral argument, the Bankruptcy Court approved the Settlement Agreement on January 22, 2011. In entering its Approval Order and corresponding findings of fact and conclusions of law, the Bankruptcy Court found that the Settlement fully satisfied the requirements of both Third Circuit precedent and relevant provisions of the Bankruptcy Code.

---

[30] The benefit of being designated as a Settled Asbestos Insurance Company is that, under Grace's Joint Plan, the channeling injunction issued pursuant to 11 U.S.C. § 524(g) will extend to enjoin any asbestos-related personal injury claims brought against CNA, up to a limit of $1 million in litigation costs. If for some reason such claims are not enjoined under the terms of the Joint Plan, or have not already been addressed by the Settlement Agreement, then the PI Trust will indemnify CNA for any judgments rendered against it or any settlements it entered into with a third party, up to a maximum of $13 million.

The Settlement Agreement, however, only calls for CNA to be *designated* as such a party under the Joint Plan. The corresponding channeling injunction was not issued as part of the Bankruptcy Court's approval of the Settlement Agreement, but rather as part of the Bankruptcy Court's subsequent confirmation of the Joint Plan. Any challenges related to the substance of this designation or extension of injunctive relief to CNA, therefore, are relevant to the terms and conditions of the Joint Plan and are properly categorized as objections to the Confirmation Order, not the Settlement Agreement Approval Order. These objections are addressed by the Court in its discussion related to the confirmation of the Plan, *infra*.

Nevertheless, Appellants BNSF and the Libby Claimants object to the Settlement Agreement. Specifically, both Appellants claim that they are entitled to the proceeds of Grace's insurance policies with CNA, and that they therefore have additional rights that are infringed upon by entry of the Settlement Agreement.

### A.    Application of the __Martin__ Factors

Rule 9019 of the Federal Rules of Bankruptcy Procedure provides that, after appropriate notice and a hearing, the court may approve a compromise or settlement. See Fed. R. Bankr. P. 9019(a).[31] Compromises are favored in bankruptcy proceedings because they minimize litigation and expedite the administration of the bankruptcy estate. Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)). Prior to approving a compromise or settlement, however, the court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Martin, 91 F.3d at 393. The standard for ascertaining these values is determined by a consideration of four factors, commonly known collectively as "the Martin factors":

> (1) the probability of success in litigation; (2) the likely difficulties in collection;
> (3) the complexity of the litigation involved, and the expense, inconvenience,
> and delay necessarily attending it; and (4) the paramount interest of the creditors.

See id. (internal citations omitted).[32] In analyzing the compromise or settlement agreement under

---

[31] Rule 9019 states in full that: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a).

[32] The question of whether the Bankruptcy Court applied the proper legal test is a conclusion of law, and is therefore reviewed de novo. See In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006).

the Martin factors, courts should not "have a 'mini-trial' on the merits," In re Jasmine, Ltd., 258 B.R. 119, 123 (Bankr. D.N.J. 2000) (quoting In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E. D. Pa. 1986)); but rather should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. Civ. A. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing Jasmine, 258 B.R. at 123 ); see also In re Pa. Truck Lines, Inc., 150 BR. 595, 598 (E.D.Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993).

In applying the four Martin factors to the instant dispute, it is evident to the Court that the Bankruptcy Court properly applied and analyzed the Settlement Agreement under the applicable legal standard, and, more importantly, did not abuse its discretion because "on balance, the settlement benefits the estate." In re Hudson's Coffee, Inc., No. Civ. A. 08-cv-5133, 2009 WL 1795833, at *3 (D.N.J. June 22, 2009) (internal citations and quotations omitted). Under the first factor, the Court is required to consider the likelihood of successful litigation if Grace and CNA continued to litigate their disputes outside the framework of the Settlement Agreement. For practical purposes, this factor is considered in conjunction with Martin's third factor—the complexity, expense, inconvenience, and delay of the litigation involved—because "[t]he balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." Nutraquest, 434 F.3d at 646 (internal citation omitted). The evidence of record indicating the complexity of this case and the inevitable delay that would occur if the Settlement Agreement was thwarted and litigation were allowed to continue clearly weigh in favor of approving the Settlement. Further litigation of this dispute would be riddled with complexities, particularly given the number of parties involved and the interpretation of approximately nineteen different insurance policies with various

coverage provisions.  See Hudson's Coffee, 2009 WL 1795833, at *3 (noting that the number of parties involved, various theories of recovery, and the factual records required to support those theories should all be considered when analyzing the complexity of litigation under the third Martin factor).  The Settlement Agreement obviates the need to further rehash these complex issues in costly and drawn-out litigation.  Moreover, the continuation of litigation between Grace and CNA would inevitably create significant burdens and expenses, both monetary and non-monetary, for both parties, and "would only result in an unnecessary drain of estate resources."  Jasmine, 258 B.R. at 127.  Both Grace and CNA would need to expend significant costs and attorney's fees to conduct discovery, file and respond to motions, and further litigate their disputes regarding insurance coverage at trial.  See id.  Under these circumstances, it would not be long until "the attorneys' fees and costs [incurred and] paid . . . would very soon reach the value of the proposed settlement itself."  Id.  Finally, continuing litigation would lead to an inevitable delay in distribution of Grace's bankruptcy estate, with an unlikely probability that litigation would even succeed.  Grace and CNA have been involved in protracted litigation for over three decades.  The Settlement Agreement would finally put an end to these disputes.  It ensures that the PI Trust, and thereby Grace's bankruptcy estate, receive significant monetary and non-monetary contributions that will be distributed to Grace's creditors.  It also eliminates the high degree of uncertainty that would accompany continued litigation.  At the very least, the Settlement will allow Grace's creditors to recover funds much sooner than they otherwise could have done.  Thus, the Court finds that the first and third Martin factors are satisfied in this case.

The second Martin factor requires the Court to consider the likely difficulties surrounding the collection of any recovery.  Grace is no longer a highly solvent company, but rather has only limited assets available to satisfy all of its outstanding liabilities.  If the Settlement Agreement was not in

place, the parties would continue to litigate and Grace would need to overcome significant roadblocks to recover any proceeds of the insurance policies. It is uncertain when, if ever, Grace would see the proceeds from this collection. The Settlement Agreement, however, provides for Grace's guaranteed collection of up to $84 million to fund its PI Trust. Thus, the Court further finds that the second Martin factor is satisfied.

Finally, under the fourth and final Martin factor, the Court must consider the effect that the Settlement would have on the creditors of Grace's bankruptcy estate. On this particular point, BNSF claims that the Settlement does not treat it fairly, and thus is not in its best interest, because the injunction that would be called for upon approval of the Settlement may enjoin claims against CNA that BNSF could assert. On this point, the Court first notes that the reach of the channeling injunction is an issue that relates to confirmation of the Joint Plan, not approval of the Settlement. Even with this fact aside, however, BNSF's argument still fails because "[w]hile the objectors' status as creditors is to be taken into consideration, it is not, by itself, determinative of the fairness of the proposed settlement." Jasmine, 258 B.R. at 128. Rather, this point should be balanced against the other three Martin factors, as well as the benefit being awarded to all creditors—not just the objecting parties—by the Settlement. See Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco, 688 F.2d 615, 628 (9th Cir. 1982) (providing that in analyzing the fairness of a settlement, "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness"). Under the terms of the Settlement Agreement, Grace stands to gain substantial monetary and non-monetary benefits. In particular, the PI Trust will be infused with millions of dollars, and CNA will relinquish its rights to pursue Proofs of Claims against Grace, confirmation objections, claims regarding retrospective premiums, asbestos-related claims for

indemnity and contribution, and any pending legal actions regarding coverage disputes. A resolution of all these issues is highly valuable to Grace because it injects its bankruptcy estate with much-needed funding and "abstract" non-monetary value, which consequently help Grace to reorganize itself under Chapter 11. This infusion of tangible and abstract value into Grace's bankruptcy estate, in turn, is in the paramount interest of Grace's creditors because it enlarges the pool of funds available to *all* creditors and ensures greater guaranteed recovery. Thus, while BNSF may individually disagree, the Court sees no basis to find that the Settlement as a whole is not in the paramount interest of all of Grace's creditors.

Based on the above reasoning, it is evident to the Court that the Bankruptcy Court exercised good judgment—far from an abuse of discretion—in its analysis of the <u>Martin</u> factors regarding approval of the Settlement Agreement, and was correct in determining that all four factors were satisfied.

**B.      Fairness of the Settlement Agreement Related to Appellants' Purported Rights to the Disputed Insurance Policies**

Despite the fact that all four <u>Martin</u> factors are satisfied, the Libby Claimants and BNSF maintain that the Bankruptcy Court abused its discretion in approving the Settlement Agreement based on their purported rights as "additional insureds" under Grace's insurance policies.

**1.      BNSF's Objections**

Over the years, BNSF and Grace entered into several contracts and leases by which Grace agreed to fully indemnify BNSF for any asbestos-related liability it may incur due to exposure to Grace Asbestos.[33] Grace also purchased separate insurance policies for BNSF that specifically named BNSF as an insured. During this same time period, Grace and CNA entered into various insurance

_____

[33] These contracts and leases are more fully discussed, *infra*, in the Court's analysis regarding confirmation of the Joint Plan.

agreements of their own that are currently at issue in this dispute. BNSF claims that several of Grace's insurance policies with CNA included generic endorsements providing insurance for losses relating to any contractual indemnification agreement entered into by Grace. Thus, BNSF asserts that it falls within the scope of the coverage provided to Grace by CNA's insurance, and that the Settlement Agreement thereby affects its rights as an "additional insured" under the policies.

The Court, however, disagrees with BNSF's assertion that it is an "additional insured" under Grace's insurance policies with CNA. The Grace-CNA insurance agreements make no mention of BNSF as a named recipient of insurance proceeds under the policies. BNSF was not a subsidiary or employee of Grace. Nor did it ever own a financial interest in Grace or engage in any type of transaction in which Grace would have owed it some type of legal duty. While BNSF did have contractual indemnification agreements in place with Grace, these contracts make no mention of BNSF as an intended beneficiary of *Grace's* insurance coverage. Rather, it appears that Grace's insurance was merely intended to benefit Grace, not unnamed third parties, in the event it incurred any liabilities for which it would be responsible. Thus, the Court agrees with the Bankruptcy Court's assessment that BNSF is not an "additional insured" to any of the insurances policies between Grace and CNA.[34]

Moreover, the Court notes that Grace previously purchased entirely separate insurance policies awarding insurance to BNSF under which BNSF was explicitly named as a recipient of insurance proceeds. BNSF has provided no explanation to the Court as to why Grace would provide it with

---

[34] BNSF further asserts that, as an "additional insured" under the Grace–CNA insurance policies, Montana law dictates that Grace owes it a duty to defend it under a liability policy—a duty that is broader and independent from a duty to indemnify, and that cannot be waived by any entity other than BNSF. CNA argues that New York state law would apply on this point. Given the Court's finding that BNSF's is not an "additional insured" under the Grace–CNA policies, however, this argument is moot and the Court need not engage in a lengthy choice-of-law analysis to determine BNSF's alleged contractual rights under either state's law.

duplicative coverage in its own insurance policies with CNA, or why it would directly name BNSF as a named insured under one policy but not the other. The record is devoid of any evidence that Grace intended to do so.[35] In fact, the record indicates that Bankruptcy Court's Approval Order specifically accounts for BNSF's separate insurance policies, and provides that any rights BNSF may have under those policies will not be affected by the Settlement Agreement.[36] Therefore, given that BNSF is not an additional insured under Grace's insurance agreements with CNA, it has no right to complain that its rights are affected by the Settlement Agreement reached between Grace and CNA.

---

[35] Although relevant to confirmation of substantive provisions of the Joint Plan, the Court notes that the Plan Proponents and Bankruptcy Court specifically modified the Joint Plan to ensure that the channeling injunction would not impact BNSF's rights to pursue claims against its own insurance coverage. Section 8.2.2 of the Joint Plan provides that:

> [T]he Asbestos PI Channeling Injunction . . . shall not enjoin:
> (e) BNSF from asserting any claim . . . for insurance coverage as an insured or an additional insured under an insurance policy (or part of a policy) that is not identified as being the subject of any Asbestos Insurance Settlement Agreement in Exhibit 5[.]

Joint Plan § 8.2.2. This Section of the Joint Plan specifically precludes BNSF from asserting claims under any of the insurance policies listed in Exhibit 5. This list includes the Grace–CNA insurance policies. Thus, consideration of this provision in the Joint Plan further implies that Grace had no intention of including BNSF as an additional insured under its policies with CNA.

[36] The Bankruptcy Court's Approval Order explicitly states:

> For the avoidance of doubt, the insurance policies identified in Exhibits A, B, and C to BNSF's Objections to Approval of the Settlement Agreement . . . are not Subject Policies for purposes of the Settlement Agreement. All parties reserve their rights regarding such policies, including with respect to the existence and terms of such policies.

(Bankr. No. 01-1139, Doc. No. 26106, 01/22/11, Order Pursuant to Sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Companies ("Approval Order"), at 8–9, ¶ 5.)

## 2.    The Libby Claimants' Objections

The Libby Claimants allege that under Montana state law they have rights to Grace's insurance coverage that "vested" at the time of their injuries, and that such "vested rights" cannot be terminated by the Settlement reached between Grace and CNA. For the following reasons, the Court disagrees with this assertion.

"It has long been the rule in th[e] [Third] Circuit that insurance policies are considered part of the property of a bankruptcy estate." ACandS, Inc. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) (citing Estate of Lellock v. The Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3d Cir. 1987); Tringali v. Hathaway Mach. Co., 796 F.2d 553, 560 (1st Cir. 1986)). Therefore, when Grace filed for bankruptcy in 2001, its insurance policies with CNA became part of its bankruptcy estate, subject to distribution under a Chapter 11 plan of reorganization.

The Libby Claimants assert that, while the Grace–CNA insurance policies became part of Grace's estate upon filing for bankruptcy, the *proceeds* of these policies are not property of the estate, and the Libby Claimants are entitled to collect a portion of these insurance proceeds. This assertion, however, directly contradicts the general rule followed by most jurisdictions, including the Third Circuit, that the proceeds of a debtor's liability insurance policies are considered property of its bankruptcy estate. See In re Nutraquest, Inc., 434 F.3d 639, 647 n.4 (3d Cir. 2006) (citing Am. Bankers Ins. Co. of Fla. v. Maness, 101 F.3d 358, 362 (4th Cir. 1996); St. Clare's Hosp. & Health Ctr. v. Ins. Co. of N. Am., 934 F.2d 15, 18–19 (2d Cir. 1991); Tringali, 796 F.2d at 560)); see also Maertin v. Armstrong World Ind., Inc., 241 F. Supp.2d 434, 447 (D.N.J. 2002) ("[T]his Court must follow the general rule and find that the debtor's liability insurance policies and their proceeds are property of [the debtor's] estate."); In re Salem Baptist Church of Jenkintown, 455 B.R. 857, 867–68 (Bankr. E.D. Pa. 2011); In re World Health Alt., Inc., 369 B.R. 805, 810 (Bankr. D. Del. 2007) ("When an insurance policy provides coverage only to the debtor, courts will generally rule that the proceeds are

property of the estate.") (internal citations omitted). The Court finds no unique circumstances present in the instant case that indicate why the general rule should not apply.

Moreover, the Libby Claimants' reliance on the holdings of Houston v. Edgeworth, 993 F.2d 51 (5th Cir. 1993) and In re Louisiana World Exposition, 832 F.2d 1391 (5th Cir. 1987) to support their argument that proceeds of a liability policy are not property of the bankruptcy estate is misplaced. Contrary to Appellants' assertion, neither Edgeworth nor Louisiana World stands for this proposition. Rather, while the Edgeworth Court did find that the policy proceeds were not part of the bankruptcy estate under the circumstances present in that case,[37] it explicitly recognized that, in general, "[p]roceeds of . . . insurance policies, if made payable to the debtor rather than a third party such as a creditor, are part of the estate[.]" Id. at 56. Moreover, in a footnote, the Fifth Circuit noted the common decision of courts in mass tort bankruptcies cases to include insurance proceeds as property of the estate to avoid a "free-for-all against the insurer[.]" Id. at 56, n.21. Likewise, while the Fifth Circuit in Louisiana World also found that the insurance policy proceeds were not part of the debtor's estate in that case, this exclusion was predicated on the fact that the insurance policies in question only named the corporation's directors and officers as named insureds and did not extend such coverage to the debtor. Louisiana World, 832 F.2d at 1399–1400. Subsequent courts have upheld and positively cited to these general principles of law. See Matter of Vitek, Inc., 51 F.3d 530, 534 n.17 (5th Cir. 1995) ("[T]he vast majority of courts do not bother to distinguish ownership of insurance policies from the ownership of the proceeds of those policies, but treat that the two go hand-in-hand.") (citing Edgeworth); Salem Baptist Church, 455 B.R. at 868–69 (engaging in a

---

[37] Specifically, the Fifth Circuit stated that the debtor must first establish a "legally cognizable claim" to the insurance proceeds in order for them to be included in the bankruptcy estate. Id. at 56. Given that the debtor in Edgeworth was not named as an intended beneficiary under the policy, the court found that the insurance policy proceeds were not part of the debtor's estate. Id.

thorough analysis and positive affirmation of both <u>Edgeworth</u> and <u>Louisiana World</u>); <u>see also</u> <u>In re</u> <u>Adelphia Commc'n Corp.</u>, 302 B.R. 439, 448 n.15 (Bankr. S.D.N.Y. 2003) (detailing other cases on this point of law); <u>In re Downey Fin. Corp.</u>, 428 B.R. 595, 603–04 (Bankr. D. Del. 2010).

In the present case, the proceeds of the Grace–CNA insurance policies are payable to Grace, *not* the Libby Claimants. The Libby Claimants are not listed as named insureds under any of these policies. Moreover, the Libby Claimants were in no way involved in the contract negotiations, purchasing of, or decisions to continue this insurance coverage. All such decisions were solely made between Grace and CNA. Thus, the Libby Claimants' citation to these cases actually undermines its argument, and its reliance on them to establish its rights to the insurance proceeds of the Settlement Agreement is summarily incorrect.

Alternatively, the Libby Claimants maintain that, regardless of whether the proceeds of the Grace–CNA insurance policies are included in the bankruptcy estate, they have a "vested right" under Montana state law to collect a portion of these proceeds,[38] and that entry of the Settlement Agreement will negatively impact their ability to do so. Given that the Libby Claimants are not named as insureds or intended beneficiaries under any of the Grace–CNA policies and there is no evidence on the record indicating that the policies were purchased for their benefit, the Libby Claimants hold no direct rights to the insurance proceeds. Thus, in order for the Libby Claimants to be able to obtain any portion of these proceeds, they need to establish that they have a legal right to this collection. Such a legal right could be established pursuant to, *inter alia*: (1) a state statute crafted by the legislature conferring a right upon the parties to pursue a direct action for the proceeds, (2) a judicial

---

[38] The Libby Claimants base their argument on Montana state law. In a footnote, the Plan Proponents make clear that they do not concede that Montana law applies, but rather claim that a choice-of-law analysis makes no difference to the outcome of the present dispute. Given that both parties fully briefed their arguments premised upon Montana state law, the Court will likewise apply that state's law to any choice-of-law inquiry in regards to the present matter.

opinion of the state's judicial system, or (3) a public policy of particular importance to the state.

The Libby Claimants primarily rely on the Montana Supreme Court's forty-four-year-old decision in McLane v. Farmers, 150 Mont. 116, 432 P.2d 98 (Mont. 1967) to establish that they have state-law rights to the insurance proceeds that vested at the time of their injuries, *i.e.*, at the time when they were exposed to Grace Asbestos. McLane involved an automobile liability insurer's right to void an insurance policy that it had issued. Id. at 118. On May 22, 1964, Gerald Roberts purchased an automobile liability insurance policy from the defendant, Farmers Insurance Exchange. Id. at 117. Shortly thereafter, on June 7, 1964, Roberts was involved in an automobile collision with Dennis McLane. Id. By June 17 of that same year, Farmers had reason to believe that Roberts made certain misrepresentations on the insurance policy he purchased, but nonetheless continued to accept premium payments from him and paid certain claims arising from his accident with McLane. Id. Then, on July 10, 1964, Farmers rescinded its insurance policy and declared it void due to Robert's misrepresentations. Id. at 117–18.

Meanwhile, McLane had filed suit against Roberts on June 24, 1964 seeking compensation for liability related to the collision. Id. at 117. On July 22, McLane was granted a judgment against Roberts, and sought to recover the amount of the judgment from Farmers. Id. at 118. Farmers counterclaimed against Roberts, asserting that he was liable based on the misrepresentations. Id. Two years later, on February 4, 1966, Farmers received a default judgment against Roberts, which effectively terminated the policy between both parties. Id. On appeal, the issue before the Montana Supreme Court was whether Farmers' actions after it first had notice of Roberts' misrepresentations amounted to an implied waiver of its right to rescind the insurance policy. Id. The court found that Farmers' actions did constitute an implied waiver, and, as a result, McLane could recover the insurance proceeds from Farmers. Id. at 119–20. Specifically, the court held that McLane's right to

these insurance proceeds vested prior to the attempted rescission.  Id. at 119.  However, the court refrained from finding when exactly McLane's rights vested, but rather stated that the vesting could have occurred "at either the time of the accident or at the time of the implied waiver of the right to rescind.  Exactly which of the two possible times th[e] court need not decide."  Id. at 119–20.

The findings in McLane, however, substantially differ from the present scenario for three primary reasons.  First, it is important to note that the Montana Supreme Court did not explicitly hold that a third party's rights to insurance proceeds vest at the time of injury, but rather merely stated that the rights vested before Farmers attempted to rescind the coverage.  The court left open to inquiry whether this vesting occurred at the time of injury *or* at the time of Farmer's actions implying waiver.  Thus, the Libby Claimants' firm reliance on McLane to establish that their state law rights to the insurance proceeds vested at the time of their injuries is based upon nothing more than indecisive dicta by the Montana Supreme Court.

Second, and more importantly, in McLane, the injured party claiming against the insurance company had obtained a judgment entitling him to the insurance proceeds.  It is a well-recognized principle that "[i]n the liability insurance context . . . a tort plaintiff must first establish the liability of the debtor before the insurer becomes [ ] obligated to make any payment."  Edgeworth, 993 F.2d at 53–54; see also Salem Baptist Church, 455 B.R. at 868 (finding that a party's lack of a judgment to enforce its malpractice claims indicated that it had no right to the insurance proceeds).[39]  The Libby

---

[39] The Libby Claimants attempt to refute this principle of law by asserting that "direct actions [against an insurer] and vesting of an injured party's rights have nothing to do with each other."  (Libby Br. at 11.)  The two legal principles are actually very much interrelated.  Insurance companies do not merely dole out free proceeds to any party that files an insurance claim.  Rather, to avoid fraud, conserve resources, and streamline policies, the claiming party must show that it has a right to the insurance proceeds because the insured is in some way liable to the claimant.  This liability can be established in many ways: in accordance with proceeds owed to a party specifically identified as an intended beneficiary in an insurance contract, by

Claimants have never secured a comparable judgment that would entitle them to the insurance proceeds. Nor have the Libby Claimants entered into a post-bankruptcy settlement agreement of their own upon which liability could be premised. As such, their reliance on the holding of McLane is again misplaced for this reason.

The Court instead finds guidance on this point from the language of the court in In re Dow Corning Corp., 198 B.R. 214 (Bankr. E.D. Mich. 1996). Dow Corning also involved a mass tort bankruptcy related to allegedly defective breast implants. The court in that case considered whether an injured party's rights to insurance are independent from those of the insured, and, if so, whether those rights can interfere with the debtor's rights to finalize settlement agreements post-bankruptcy. Id. at 240. The court found that while an injured party's claim against an insured is a vested property interest entitled to constitutional protection, the injured party has no more than an expectation that he/she will be able to collect from the insured prior to obtaining a judgment. Id. In analyzing this issue in the context of mass tort bankruptcies, the court opined that:

> Even more troubling is the situation . . . where at the time of the proposed settlement there are injured party claimants who are not yet known. If each unknown claimant could later sue the insurer and not be estopped by a fully litigated judgment against its insured or by a fair and equitable settlement, there would be no finality to litigation and no realistic likelihood of settlement.

Id. at 242. The Court finds this language to be highly persuasive. Just like in Dow Corning, there are hundreds of claims that may be asserted against Grace in the future but that are not yet known or

---

provisions in a settlement, or, most relevant to the instant case, by obtaining a judgment against the tortfeasor. Absent liability, the claimant has no right to collect the proceeds. And since the claimant has no rights in the first place, there would be no rights that could vest. As such, the Libby Claimants' attempt to distinguish direct actions against an insurer from vesting principles is without merit. See Dow Corning, 198 B.R. at 240 ("[P]rior to obtaining and enforcing a judgment, an injured person merely has an expectation of recovery that is contingent upon the occurrence of future events, and such expectation does not rise to the level of a vested property right.").

able to be ascertained. Meanwhile, there is only a limited amount of funds available to satisfy both present and future claims. Prior to the entry of this Settlement Agreement, Grace and CNA were involved in expensive and time-consuming litigation for over three decades. Rather than expending more funds on this litigation that could be included in the pool of recovery for personal injury claimants, the Settlement Agreement would put an end to these disputes and infuse the trust with over $84 million. Thus, not only can the Libby Claimants not cite to any judgment upon which entitlement to the insurance proceeds could be premised, but they also cannot argue that the Settlement Agreement would not be in their best interests as personal injury claimants.

A third critical difference between the holding of <u>McLane</u> and the circumstances present in this case is the fact that <u>McLane</u> was based upon a motor vehicle liability policy, while the Libby Claimants' argument is based upon general liability insurance policies. The two are not the same. Party liability under motor vehicle insurance policies in Montana is codified in a state statute, Montana State Code Annotated ("MCA") § 61-6-103, which provides that the liability of the insurer becomes absolute when the injury or damage covered by the *motor vehicle* liability policy takes place.[40] (emphasis added.) The Supreme Court of Montana has interpreted this statutory provision

---

[40] The statute states, in relevant part, that:

(5)(a) The liability of the insurance carrier with respect to the insurance required by this part becomes absolute whenever injury or damage covered by the motor vehicle liability policy occurs. The policy may not be canceled or annulled as to the liability by any agreement between the insurance carrier and the insured after the occurrence of the injury or damage.

\* \* \*

(6) A motor vehicle policy is not subject to cancellation, termination, nonrenewal, or premium increase due to injury or damage incurred by the insured or operator unless the insured or operator is found to have violated a traffic law or ordinance of the state or a city, is found negligent or contributorily negligent in a court of law or by [ ] arbitration proceedings[.]

as "freez[ing] the liability of the insurance carrier at the point where injury or damage . . . occurs." Ulrigg v. Jones, 274 Mont. 215, 225, 907 P.2d 937, 944 (Mont. 1995). The Supreme Court has also, however, stated that "[t]here is nothing in the cited code section . . . that obviates the tort claimant's obligation to first establish that the insured was liable for the injuries or damages for which coverage under the policy is claimed. Simply put, unless and until the tort claimant establishes the liability of the tortfeasor, then there are no injuries or damages 'covered by the policy.'" Id. Thus, while Montana's motor vehicle insurance liability statute provides that liability "freezes" at the time of injury or damage, it remains directly in line with the general principle of law that a third-party claimant cannot file an action against an insurance carrier until after the underlying claim has been settled or a judgment has been entered in favor of the claimant. See id.; see also Harman v. MIA Serv. Contracts, 260 Mont. 67, 73, 858 P.2d 19, 23 (Mont. 1993); Safeco Ins. Co. of Illinois v. Montana Eighth Judicial Dist. Court, Cascade Cnty., 300 Mont. 123, 129–30, 2 P.2d 834, 838–39 (Mont. 2000). On the other hand, the Libby Claimants have not cited to, nor has the Court through its own independent search found, any comparable Montana state statute related to an insurer's liability under a general liability policy. Absent a comparable statute indicating to the contrary, the Court applies the general rule here that a third-party claimant must first establish the insured's liability prior to recovering anything from the insurer.

Finally, given that the Libby Claimants' alleged rights to the insurance proceeds cannot be premised on a state statutory provision or a judicial opinion, the Court considers whether Montana has a public policy that would favor such a finding. Montana has no public policy in place that protects individuals claiming third-party rights to insurance proceeds under a general liability policy

---

MONT. CODE ANN. § 61-6-103(5)(a); (6).

prior to obtaining a judgment or settlement upon which liability may be premised. Montana does, however, have a long-established public policy favoring settlements. See Miller v. State Farm Mut. Ins. Co., 337 Mont. 67, 71–72, 155 P.2d 1278, 1281–82 (Mont. 2007) ("The declared public policy of this State is to encourage settlement and avoid unnecessary litigation."); see also Durden v. Hydro Flame Corp., 295 Mont. 318, 324, 983 P.2d 943, 946–47 (Mont. 1999); Augustine v. Simonson, 283 Mont. 259, 266 (Mont. 1997) (internal citations omitted); Black v. Martin, 88 Mont. 256, 269–70, 292 P.2d 577, 581 (Mont. 1930). The benefits of settlement are numerous, including reducing litigation costs, stress, the risk of an extreme jury verdict, and conservation of judicial time and resources. See Durden, 295 Mont. at 324. As aptly noted by the court in Dow Corning, in the context of a mass tort bankruptcy:

> To grant an injured party more than an expectation before receipt of judgment would inhibit legitimate settlements. An insurer would never be able to settle a coverage suit with its insured without impleading the known injured party. It is axiomatic that the more parties involved, the more difficult it is to settle . . . Therefore, it is not surprising that there appears to be no case where a fair and reasonable settlement entered into in good faith between an insurer and insured was subsequently undone by a court.

Id. at 242. Nothing in the record indicates that Grace's Settlement Agreement with CNA was entered into in bad faith or for deceptive purposes. In fact, as discussed extensively above, the record highlights the numerous benefits, both monetary and non-monetary, that the Settlement will confer upon not only Grace and CNA, but also third parties such as personal injury claimants.

The Court therefore finds that the Libby Claimants are not entitled to the proceeds of Grace's insurance policies with CNA. They are not named insureds or intended beneficiaries under the policies. There is no Montana statute conferring a third-party right to the insurance proceeds upon them. The Libby Claimants have not cited to any judicial opinion that establishes their "vested rights" to the insurance. Moreover, there is no public policy in place in Montana that favors their position.

Therefore, given that the Libby Claimants have no rights to the insurance proceeds in the first place, it follows that the Grace–CNA Settlement Agreement in no way impairs their rights.

Based on all the above, the Court denies the appeals of BNSF and the Libby Claimants to the Grace–CNA Settlement Agreement, and finds that the Bankruptcy Court did not abuse its discretion in entering its Approval Order affirming the Settlement. The Settlement Agreement is therefore affirmed.

## IV.   CONFIRMATION OF THE JOINT PLAN

Various Appellants raise numerous objections to the Joint Plan's confirmation.  The Court considers each challenge separately below.

### A.   The Good Faith Requirement

Appellants AMH and Montana challenge the Joint Plan on the grounds that it was not proposed in good faith.  Under § 1129(a)(3) of the Bankruptcy Code, a court may only confirm a reorganization plan if it finds that the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  While the Bankruptcy Code does not define "good faith," it has been established that a determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal. Brite v. Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir. 1985).  However, such inquiries must be done on a case-by-case basis because good faith determinations are factually specific.  In re Mount Carbon Metro. Dist., 242 B.R. 18, 39 (Bankr. D. Colo. 1999); see also W. Homer Drake, Jr. & Christopher S. Strickland, *Commencing a Reorganization Case*, *available at* CH11 REORG. § 3:2. In assessing the totality of the circumstances, a court has "considerable discretion in finding good faith." In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001) (internal quotations omitted).  Moreover, the bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals.  Matter of Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988), aff'd in part, rev'd in part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F. 2d 964 (3d Cir. June 26, 1990).  Thus, district and circuit courts should carefully consider any recommendations from the bankruptcy courts on appeal.

The Third Circuit has stated that the "touchstone" of the good faith inquiry is "the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Frascella Enter., Inc., 360 B.R. 435, 446  (E.D. Pa. 2007) (quoting In re PWS Holding

Corp., 228 F. 3d 224, 242 (3d Cir. 2000)).  In its assessment, the Court should "keep[ ] in mind [that] the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." In re T-H New Orleans L.P., 116 F. 3d 790, 802 (5th Cir. 1997) (citing Sun Country).  The factors which a court should consider in determining a debtor's good faith include if the plan:

> (1) fosters a result consistent with the [Bankruptcy] Code's objectives, (citations omitted); (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, (citations omitted); and (3) [exhibited] a fundamental fairness in dealing with the creditors (citations omitted).

Genesis Health Ventures, Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001) (citations omitted).  In applying these three factors to the present case, it is apparent to the Court that the Joint Plan was proposed in good faith.

An analysis of the totality of the circumstances shows that the first factor—whether the reorganization plan is consistent with the general objectives of the Bankruptcy Code—has been satisfied.  The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as: (1) preserving going concerns; and (2) maximizing property available to satisfy creditors. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999); see also In re Integrated Telecom Express, Inc., 384 F. 3d 108, 119 (3d Cir. 2004) (same).  It cannot be disputed that Grace was placed in a financially precarious position as a result of its involvement in multiple tracks of extensive, protracted litigation over the years.  As a result, Grace was left with the choice of either readjusting its debt structure, or inevitably being unable to meet both its current and future financial obligations. Grace chose the former position so that it could "make a fresh start" and continue to operate on the market as a "going concern" able to satisfy its outstanding liabilities. This type of reorganization is exactly what Chapter 11 was designed to accomplish.

The second factor requires that the plan have been proposed with honesty and good intentions, and that it have "a reasonable hope of success." Sun Country, 764 F.2d at 408.  The Third Circuit

provides the Court with guidance on this point, stating that, "[a]t its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy[.]" Integrated Telecom Express, 384 F. 3d at 119. In analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists. See Sound Radio, 93 B.R. at 853 ("To find a lack of 'good faith' courts have examined whether the debtor intended to abuse the judicial process and the purposes of reorganization provisions."). AMH questions Grace's honesty and good intentions in its proposal of the Joint Plan. Specifically, AMH avers a lack of good faith because Grace chose not to present any evidence at the Confirmation Hearing regarding its good faith.[41] Moreover, AMH claims it was "repeatedly stymied" in its attempts to obtain discovery relevant to the issue of good faith. (AMH Br. 32.) On this point, the Court finds the case of Frascella to be particularly instructive. In re Frascella Enter., Inc., 360 B.R. 435 (Bankr. E.D. Pa 2007). In Frascella, the bankruptcy court held that the debtor's plan was not proposed in good faith due to its repeated failure to make full and complete disclosures until forced to do so by the court. Id. at 446. Moreover, the Frascella debtor's business transactions suggested it had manipulated important financial information. Id. at 449. Additionally, the debtor had failed to disclose that it was merging with a company that had six months earlier encumbered all of its assets to secure its obligations. Id. at 448. As a result, the creditors that voted in favor of the

---

[41] If the good faith of a debtor's proposed Chapter 11 plan is contested, then the debtor bears the burden of proof on the issue, and the standard of proof is the preponderance of the evidence standard. In re Barnes, 309 B.R. 888, 891 (Bankr. N.D. Tex. 2004). AMH has contested Grace's good faith both before the Bankruptcy Court and now before this Court. The burden of proof is therefore on Grace to show that it proposed the Joint Plan in good faith by a preponderance of the evidence. The Court finds that Grace satisfied its burden through the presentation of evidence and expert witness testimony at the Confirmation Hearing.

Frascella reorganization plan were not informed of this crucial information until the first day of confirmation proceedings. Id. The court believed that the failure to disclose such important information to creditors was clearly indicative of a debtor's bad faith.

In stark contrast to the debtor's actions in Frascella, however, nothing in the present record indicates that Grace has engaged in any such comparable behavior. There is no evidence that Grace was dishonest or had ulterior motives when it proposed the Joint Plan. Nor is there any indication that Grace intended to abuse the judicial process. Rather, the record shows that the Joint Plan was the result of years of litigation and extensive arms-length negotiations. See In re U.S. Mineral Prods. Co., Bankr. No. 01-2471, 2005 WL 5898300, at *6, 20 (Bankr. D. Del. Nov. 29, 2005) (noting that the parties' arm's-length negotiations were a significant factor in finding that a plan was proposed in good faith); Mount Carbon Metro., 242 B.R. at 41 (same). Moreover, as noted in Sound Radio, the Bankruptcy Court was in the best position to assess Grace's good faith. 93 B.R. at 853. It oversaw the management of this case for over ten years, and completed an extensive and exhaustive review of the voluminous record before it. After careful consideration of all issues, the Bankruptcy Court found that Grace proposed the Joint Plan with honesty and good intentions. The Court sees no reason to dispute this finding.

The third and final factor courts should consider when considering a debtor's good faith is if the debtor exhibited a fundamental unfairness when dealing with its creditors. In order to satisfy this requirement, the plan must treat all parties fairly and ensure that its confirmation comports with due process. See Mount Carbon Metro., 242 B.R. at 39.[42] Both AMH and Montana allege that the

---

[42] The Court notes that Mount Carbon Metro. dealt with the confirmation of a Chapter 9 bankruptcy plan, which addresses a municipality's debt structure under the Bankruptcy Code. However, because Chapter 11's plan requirements have been expressly incorporated into Chapter 9 by 11 U.S.C. § 901(a), a court may only confirm a Chapter 9 plan if all provisions of § 1129(a) have been met. Thus, a Chapter 9 plan will only be confirmed if the court finds that the plan was proposed in good faith and not by any means forbidden by law. Mount Carbon Metro., 242 B.R. at 39; see generally 8B C.J.S. Bankruptcy § 1121 (2011).

Joint Plan is fundamentally unfair. The Court considers each Appellant's argument in turn.

First, AMH asserts a lack of good faith and unfairness because it was allegedly singled out for disparate treatment by Grace in comparison to other property damage claimants. A lack of good faith is evident when "the debtor seeks to delay or frustrate the legitimate efforts of creditors to enforce their rights." Sound Radio, 93 B.R. at 853 (quoting In re Pikes Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985)). AMH has presented no evidence suggesting Grace intended to delay or frustrate its rights. In fact, it is apparent from the voluminous record that Grace proposed the Joint Plan with the legitimate purpose of restructuring itself so that it could emerge from bankruptcy able to operate as a going concern.

Moreover, courts have found that different treatment of a creditor, by itself, does not necessarily run afoul of the good faith standard. See Mount Carbon Metro., 242 B.R. at 42 (noting that favorable treatment of one particular creditor does not automatically indicate bad faith). In order to constitute bad faith, the differing treatment of the creditors would need to have a serious disparate effect on the parties.[43] This is not the case here. To the contrary, the Joint Plan as proposed would pay AMH's claim in full and leave it unimpaired. Consequently, the Court finds that AMH's argument on this point fails.

The Court next addresses Appellant Montana's claim that Grace did not act in good faith because the asbestos personal injury claims were settled without Montana's participation in settlement

---

[43] As noted above, Mount Carbon Metro. involved the confirmation of a Chapter 9 plan proposed by a municipality. Id. at 25–26. Under that plan's proposed structure, a particular creditor received favorable treatment. The court noted that while favorable treatment alone did not automatically constitute bad faith, in this particular case it had the greater effect of effectively stripping the municipality of its public function duties because it transferred almost all of its taxing and revenue-raising powers to a single creditor. Id. at 42. As such, the court found that the plan "ignor[ed] the District's current and future obligations as a governmental entity and in doing so both *unfairly* favor[ed] a single landowner [ ] and [fell] outside the policy and purposes of Chapter 9." Id. at 41 (emphasis added).

negotiations.[44]   However, as the Bankruptcy Court properly stated, the Bankruptcy Code does not require that all creditors participate in plan negotiations.  In re W.R. Grace & Co., 446 B.R. 96, 104 n.5 (Bankr. D. Del. 2011) ("There is no requirement in the Bankruptcy Code that all creditors participate in plan negotiations."); see also In re Wash. Mut., Inc., 442 B.R. 314, 364 (Bankr. D. Del. 2011) (holding that the fact that the debtor's equity committee did not participate in plan negotiations was not enough to constitute a lack of good faith under § 1129(a)(3)).  In fact, a debtor's plan may satisfy good faith even if it "may not be one which the creditors would themselves design and indeed may not be confirmable."  Frascella, 360 B.R. 435 (Bankr. E.D. Pa 2007) (citing Matter of Briscoe Enter., Ltd., II, 994 F.2d 1160, 1167 (5th Cir. 1993)).  The Bankruptcy Court was significantly involved in the settlement process.  It would not have approved these settlements or confirmed the Joint Plan if it had reason to believe that certain parties were not being treated fairly.  See In re W. Asbestos Co., 313 B.R. 832, 847 (Bankr. N.D. Cal. 2003) ("The Court would not have approved the settlements if it had believed they were being proposed in bad faith.").  The Court thus finds that Grace was not acting in bad faith simply due to Montana's absence in settlement negotiations.

Therefore, after a consideration of all three "good faith factors," the Court concludes that the Joint Plan was proposed in good faith.  The plan exhibits honesty, good intentions, and a reasonable expectation that reorganization can be achieved, and is fundamentally fair to all creditors.  Most importantly, its structure and purpose is consistent with the Bankruptcy Code.

---

[44] Montana also asserts the Joint Plan was not proposed in good faith because it disregarded the absolute priority rule, failed to comply with the Bankruptcy Code, and was unfairly discriminatory and infeasible.  Essentially, Montana argues that because the Joint Plan may fail for these reasons, it should automatically fail on good faith grounds as well.  These arguments, however, have no bearing on whether or not the Plan was proposed in good faith.  Instead, "[t]he only test of 'good faith' is whether the reorganization plan can succeed." Sound Radio, 93 B.R. at 853 (citing In re Texas Extrusion Corp., 68 B.R. 712, 723 (D.C.N.D. Tex. 1986)). Thus, the Court gives no merit to this claim.

## B.     Asbestos Liability Trusts Under Section 524(g)

The second issue addressed by the Court regards objections raised by AMH as a challenge to the two trust structure of Grace's Joint Plan. For purposes of clarity and completeness, the Court first generally reviews the basic structure of the trusts under the Joint Plan, and then considers the merits of AMH's objections.

### 1.     The Two Trust Structure of the Joint Plan

Section 524(g)[45] is a special provision of the Bankruptcy Code created by Congress to provide "supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability." In re Combustion Eng'g,, Inc., 391 F.3d 190, 234 (3d Cir. 2004). Under this law, a debtor's reorganization centers around a statutorily-created trust. The purpose of the trust is to preserve and facilitate the resolution of current asbestos claims, while simultaneously relieving the insolvent debtor from the uncertainty associated with impending future asbestos

---

[45] Section 524(g) states, in relevant part:

> (1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.
> (B) An injunction may be issued . . . to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust . . . . except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.
>
> *  *  *
>
> (2)(B)(i) [T]he injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization . . . (I) is to assume the liabilities of a debtor at which the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by . . . asbestos or asbestos-containing products[.]

11 U.S.C. § 524(g)(1–2)(I).

litigation. It is funded by the reorganized debtor's assets, stock, and any funds from contributions and settlements with third parties. The trust assumes the debtor's liabilities, which in turn gives the debtor the opportunity to restructure itself as an economically-viable entity able to satisfy its present and future asbestos-related liabilities. Combustion Eng'g, 391 F.3d at 234; In re G-I Holdings, 328 B.R. 691, 694–95 (D.N.J. 2005). In order to receive the benefits of the trust and channeling injunction, the debtor and any covered third parties must satisfy the explicit requirements of § 524(g).[46]

The central pillars of Grace's Joint Plan are two trusts—the Asbestos PI Trust (hereinafter "personal injury trust" or "PI Trust") and the Asbestos PD Trust (hereinafter "property damage trust" or "PD Trust"). The personal injury trust assumes all of Grace's liabilities related to personal injury claims. It is funded by Grace's own cash and stock, as well as third party cash settlements and reimbursement agreements.[47] The primary class affected by the PI Trust is the Class 6 personal injury class.

The PI Trust operates according to criteria established in a claims matrix. The matrix attempts to organize the personal injury claims brought against Grace by creating separate, delineated

---

[46] Section 524(g) lists these requirements, including that: (1) the debtor likely faces substantial future demands for payment of asbestos-related actions; (2) the amount, number, and timing of those demands are indeterminate; (3) the pursuit of demands outside of the plan would likely threaten its purpose of dealing equitably with all claims and future demands; (4) the terms of the injunction, including any provisions barring action against third parties, are set out in the plan and any disclosure statements; (5) at least 75% of the classes of claimants whose claims are handled by the trust voted in favor of the plan; and (6) the trust includes mechanisms that provide the court with reasonable assurance that it will value and be in a financial position to pay present and future claims in substantially the same manner. 11 U.S.C. § 524(g)(2)(B)(ii)(I)–(IV).

[47] Specifically, the trust is funded by Grace's contributions of: $250 million in cash (plus interest); $400 million of its insurance settlement proceeds, insurance reimbursement agreements, and its rights to pursue unsettled insurance; $1.55 billion of deferred cash payments secured by a majority of Grace's common stock post-reorganization; and several million dollars in stock and cash to be paid by Grace's subsidiaries, Sealed Air and Fresenius.

categories of pleural diseases related to asbestos, and assigning a set amount of recovery—known as a "Scheduled Value"—to each level. In this sense, the matrix is similar to a chart in which each claimant will receive a predetermined set value for his claim if the severity of his disease matches defined medical criteria in a category under the matrix. In addition to the Scheduled Value, the matrix also provides a "Maximum Value" for each claim within a particular category. To obtain the Maximum Value of a claim under the PI Trust, claimants need to meet certain individualized criteria (such as having numerous dependants or being a higher-wage earner) that would entitle them to more recovery. The intent in creating the Scheduled Value and Maximum Value scheme is to ensure that all personal injury claimants will receive an award under the trust roughly equal to the amount they would have received outside of bankruptcy.

The property damage trust is vastly similar to the personal injury trust. This second trust assumes Grace's liabilities related to property damage claims. It is funded by the assets of Reorganized Grace, as well as the proceeds of the settlement agreements reached between Grace and its subsidiaries, Sealed Air and Fresenius.[48] The primary class affected by the PD Trust is Class 7.

Under the structure of the PD Trust, traditional property damage claims in Class 7A are distributed in accordance with the Case Management Order ("CMO") put forth by the Bankruptcy Court in 2009, as amended in 2010. (Case Management Order for Class 7A Asbestos PD Claims ("CMO"), Ex. 25, Joint Appendix ("JA") 000804.) The CMO provides a centralized procedure for the resolution of all traditional property damage claims in Class 7A that were not previously resolved

---

[48] When the Joint Plan is confirmed, Sealed Air and Fresenius will pay $30 million in cash to the Asbestos PD Trust. In addition, Cryovac, Inc. (a subsidiary of Sealed Air) and Fresenius will pay the interest on this amount to the PD Trust. At this time, Grace will also deliver to the PD Trust a Deferred Payment Agreement obligating it to pay all Class 7A Claims allowed in the future. Once Grace has successfully reorganized, it will pay an additional $30 million to the PD Trust on the third anniversary of the Effective Date of the Joint Plan.

by settlements, as well as governing rules and timelines. American ZAI property damage claims in Class 7B follow a separate distribution procedure under the Plan. The Payment of American ZAI claims is governed by the Asbestos PD Trust Agreement and the ZAI TDP for Claims Agreement.

Through the procedures associated with these two trusts, the Joint Plan attempts to resolve Grace's current and future personal injury and property damage liabilities related to asbestos. With the two trusts assuming its liabilities, Grace is given some breathing room to reorganize itself and implement the terms of the Joint Plan so that it can emerge from bankruptcy as a going concern. The Bankruptcy Court oversaw the creation and implementation of both trusts under the Joint Plan. It approved the Joint Plan's structure, including both trusts, in its order confirming the Joint Plan on January 31, 2011, where it explicitly held that, "The Joint Plan [ ] complies, in all respects, with § 524(g)."

### 2. Requirements of a Proper Trust Under Section 524(g)

AMH, however, objects to the structure of the Joint Plan on the grounds that the property damage trust is not a "genuine" trust. AMH claims that the PD Trust lacks specific procedures for determining and valuing claims, and instead merely "operates as nothing other than a check-writing facility for Class 7A Claimants." (AMH Br. 49.) The Court disagrees.

Section 524(g) provides, in relevant part, that a trust created pursuant to a plan of reorganization must:

> (I) assume the liabilities of a debtor . . . [that] has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos-containing products; (II) be funded in whole or in part by the [debtor's] securities . . . ; (III) . . . own, or . . . be entitled to own if specified contingencies occur, a majority of the voting shares of: (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor ; and (IV) is to use

its assets or income to pay claims and demands[.]

11 U.S.C. § 524(g)(2)(B)(i). Only if a trust satisfies all four of these requirements will it be considered proper under the statute.

In the instant case, the Court finds that Grace's PD Trust satisfies all four requirements set forth under § 524(g). The first element is met because Grace is a corporate defendant involved in personal injury and property damage lawsuits related to asbestos exposure. Moreover, upon the Plan's execution, the trusts will assume Grace's liabilities for these legal actions. The second element is satisfied because the PD Trust is funded in part by its own securities. Specifically, the PD Trust is largely funded by the Class 7A Deferred Payment Agreement,[49] which constitutes a note for deferred payment. A note, in turn, meets the definitional requirements of a "security" under the Bankruptcy Code. See 11 U.S.C. 101(49)(A)(I) ("The term 'security' includes: [a] note[.]"); see also In re Burns & Roe, No. Civ. A. 08-4191, 2009 WL 438694, at *26, 31 (D.N.J. Feb. 23, 2009). Moreover, Grace satisfies the third element of § 524(g) because, upon the occurrence of certain specified contingencies,[50] both the PI and PD Trusts will own a majority share of Reorganized Grace. Finally, the fourth element is met because the assets in the PD Trust will be used to pay Grace's claims and demands related to its outstanding asbestos liabilities. As such, Grace's PD Trust constitutes a "genuine" trust that meets all the requirements set forth in § 524(g).

---

[49] The Class 7A Deferred Payment Agreement is a payment agreement entered into between Grace and the PD Trust, on behalf of property damage claimants. The Agreement outlines the terms and conditions for payment distributions from the PD Trust. (See Deferred Payment Agreement (Class 7A PD), Ex. 27, JA 000859.)

[50] These contingent events are provided and described in extensive detail in Grace's Share Issuance Agreement. (See Share Issuance Agreement, Ex. 20., JA 000626–42. )

## C.    The Section 524(g) Channeling Injunction

The next set of objections that the Court considers involves the injunction within Grace's Joint Plan that will channel all asbestos-related claims to the aforementioned trusts.

In conjunction with the creation of a trust under § 524(g), the bankruptcy court issues an injunction that acts as a nationwide stay against both current and future litigation in federal and state court related to the debtor's asbestos liability.  During the period of corporate reorganization, creditors of the corporation can file proofs of claims in the bankruptcy court within the time frame specified by court order or the Federal Rules of Bankruptcy Procedure.  <u>See</u> 11 U.S.C. § 501 (giving creditors authority to file proofs of claims); Fed. R. Bankr. P. 3003 (listing requirements for filing a proof of claim in a Chapter 11 reorganization case).  Rather than asserting claims against the debtor corporation itself, however, the injunction "channels" all claimants to pursue any remedies that they may have against the trust, which will be resolved in accordance with the debtor's plan of reorganization.  <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190, 234 (3d Cir. 2005); <u>In re G-I Holdings, Inc.</u>, 328 B.R. 691, 694–95 (D.N.J. 2005).  Under certain limited circumstances, the channeling injunction can extend to enjoin claims against third parties that are directly or indirectly involved in the asbestos litigation.  <u>See</u> 11 U.S.C. 524(g)(4)(A)(ii); <u>see also</u> <u>Combustion Eng'g</u>, 391 F.3d at 234–35 (stating that § 524(g) injunctions can bar actions directed at identifiable third parties that are directly or indirectly liable for the conduct, claims against, or demands of the debtor); <u>G-I Holdings</u>, 328 B.R. at 695 ("[T]he debtor, its predecessors and successors in interest, and any affiliates [can] receive broad protection from any asbestos-related claims through the bankruptcy court's issuance of a 'channeling injunction[.]'") (internal citation omitted).  When exercised concurrently with administration of the trust, "the rehabilitation process served by the channeling injunction supports the equitable resolution of asbestos-related claims" and "makes it possible for future asbestos

claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process." Combustion Eng'g, 391 F.3d at 234.

In the instant case, several Appellants raise objections to the channeling injunction within the Joint Plan, including: (1) the scope of the channeling injunction; (2) the fairness and equality of the channeling injunction; and (3) the effect of the channeling injunction on releases from liability under the Plan. The Court considers each objection in turn.

### 1. The Scope of the Channeling Injunction

#### a. Extension of the Channeling Injunction to Independent Insurer Wrongdoing Claims

The Libby Claimants allege that the scope of § 524(g) channeling injunction is improper because it is too ambiguous to be enforced. While they acknowledge that the injunction clearly enjoins them from pursuing Grace's insurers on claims related to insurer derivative liability, they contend that the injunction is vague as to whether they may assert claims against insurers for their alleged independent tortious "insurer wrongdoing."[51] (Libby Br. 38.) Thus, they argue that because the Bankruptcy Court did not expressly rule on whether individual insurer wrongdoing claims are permissible, the injunction as a whole is improper. Grace and its insurers[52] disagree, claiming that the injunction is explicitly clear that it only bars claims that are found to be derivative of Grace's liability. For the reasons that follow, the Court finds that the injunction in its present form is unambiguous in that it only enjoins the Libby Claimants from bringing claims against Grace's insurers for their derivative liability.

---

[51] These independent claims of insurer wrongdoing are based on the notion that as Grace's insurers, these insurance companies owed the Libby Claimants a duty of care to warn them of the dangers associated with asbestos and the nearby mine.

[52] Insurance agencies CNA Companies, MCC, Arrowood, and Travelers all filed responsive appellate briefs.

The Court first considers the alleged ambiguity of the injunction.  According to the Libby

Claimants, the channeling injunction runs afoul of Federal Rule of Civil Procedure 65(d).  Rule 65(d)

provides that "[e]very order granting an injunction . . . must state the reasons why it is issued; state

its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other

document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  The basic purpose of

Rule 65(d) is to ensure that enjoined individuals are on notice of what conduct is precisely outlawed

or permitted by the injunction.  Schmidt v. Lessard, 414 U.S. 473, 476 (1974); see also Granny Goose

Foods, Inc. v. Bhd. of Teamsters, Local No. 70, 415 U.S. 423, 444 (1974) (stating that enjoined

individuals are entitled to "fair and precisely-drawn notice" of what injunctions prohibit).  The Third

Circuit has recognized that injunctions designed to bar future violations may receive a  somewhat

relaxed interpretation, Louis W. Epstein Family P'Ship v. Kmart Corp., 13 F. 3d 762, 771 (3d Cir.

1994) (quoting Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1022 (9th Cir. 1985)),

because "[a]ll that is required under Rule 65(d) is for the language of the injunction to be as specific

as possible under the totality of the circumstances, such that a reasonable person could understand

what conduct is proscribed." Prosser v. Springel, Nos. Civ. A. 2008-16, 2008-18, 2008 WL 2368898,

at *7 (D.V.I. June 6, 2008) (quoting Medtronic, Inc. v. Benda, 689 F.2d 645, 649 (7th Cir. 1982)).

However, "[b]road, non-specific language that merely enjoins a party to obey the law or comply with

an agreement" will not satisfy the requirements of Rule 65(d).  Epstein, 13 F.3d at 771 (internal

citation omitted); Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n, 389 U.S. 64, 76 (1967).

The channeling injunction in the instant case meets the specification requirements of Rule

65(d).  The terms of the Joint Plan specify that the injunction and its corresponding trust are issued

pursuant to § 524(g) of the Bankruptcy Code.  Section 524(g), in turn, provides that channeling

injunctions can extend to "identifiable" third parties who are "directly or indirectly liable" for the

debtor's conduct, including alleged liability "aris[ing] by reason of . . . the third party's provision of insurance to the debtor[.]" 11 U.S.C. § 524(g)(4)(A)(ii)(III). As the record makes abundantly clear, Grace's channeling injunction incorporates the statutory requirements of § 524(g). The injunction precludes the assertion of "Asbestos PI Claims" against Grace and any "Asbestos Protected Party." Asbestos PI Claims are defined in Section 1.1(34) of the Joint Plan as any:

> Claim . . . or Demand against, or any present or future, debt, liability, or obligation of, any of the Debtors or the Asbestos Protected Parties . . . arising out of . . . (a) death, wrongful death, personal or bodily injury . . . sickness, disease, loss of consortium, survivorship, medical monitoring, or other [damages] . . . caused, or allegedly caused [by] . . . directly or indirectly, in whole or in part, acts or omissions of . . . the Debtor; and (b) the presence of or exposure at any time to asbestos or any products or materials containing asbestos that were mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, supplied, produced, specified, selected, distributed, disposed of, installed by, or in any way marketed by . . . the Debtor[.]

(Joint Plan § 1.1(34).) Those parties covered by the injunction—"Asbestos Protected Parties"—are likewise clearly listed in Section 1.1(51) of the Joint Plan. (Id. at § 1.1(51).) Subsection (d) of this Section directly states that insurers with whom Grace has reached settlements and who have agreed to contribute funds to the asbestos trust—referred to as "Settled Asbestos Insurance Companies"— are encompassed within the Asbestos Protected Party definition. (Id. § 1.1(51)(d).) Thus, Grace's channeling injunction is not ambiguous.

Quite to the contrary and consistent with Rule 65(d), the channeling injunction provides enough specificity and reasonable detail, without any reference to a complaint or other documents, that is sufficient to put all involved parties on notice of what is prohibited—the pursuit of an Asbestos PI Claim against Grace or any Asbestos Protected Party *for its derivative liability*, including those insurers with whom Grace previously settled. By necessity, the injunction uses sufficiently broad language because it was crafted to encompass the hundreds of potential asbestos claims that may be filed in the future. Such a "sweeping injunction" is permissible if it is "clearly necessary to protect

the assets of the bankrupt's estate." <u>Kremen v. Blank</u>, 55 B.R. 1018, 1022–23 (D. Md. 1985); <u>see also</u> <u>United States v. An Article of Drug</u>, 661 F.2d 742, 747 (9th Cir. 1981) ("[A]n injunction may be framed to bar future violations that are likely to occur.") (internal citation omitted). Given the complexity of the Joint Plan, the various provisions of the several settlements at play, the massive number of parties involved, and the still unknown number of potential future claimants, the Bankruptcy Court could not have realistically framed a more specific order. <u>Prosser</u>, 2008 WL 2368898, at *8. Therefore, in accordance with the circumstances at hand, the channeling injunction is sufficiently specific.[53]

Having decided that the injunction is not vague, the Court next addresses the Libby Claimants' assertion that the Bankruptcy Court should have expressly ruled on the permissibility of independently pursuing claims against insurers for their own alleged tortious conduct. Merely because the Bankruptcy Court did not specifically state whether or not independent insurer

---

[53] The Libby Claimants rely on the recent Supreme Court decision of <u>Travelers Indem. Co.v. Bailey</u>, 129 S. Ct. 2195 (2009) to show the peril to which they are subjected as a result of the ambiguity of the injunction. The Libby Claimants correctly state that in <u>Travelers</u>, the Supreme Court held that an injunction issued pursuant to the 1986 John Manville bankruptcy reorganization barred actions against Manville's insurers for their own alleged tortious conduct. <u>Id.</u> at 2203. However, <u>Travelers</u> is distinguishable from the instant case because the Manville injunction was not entered pursuant to § 524(g). Unlike the injunction in Grace's Joint Plan, the Manville injunction was therefore not limited in scope or tied to any statutory authority. The Supreme Court noted this distinction in its Opinion, expressly stating that:

> Our holding is narrow. We do not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing . . . [I]n 1994 Congress explicitly authorized bankruptcy courts . . . to enjoin actions against a nondebtor [under § 524(g)]. On direct review today, a channeling injunction of the sort issued by the Bankruptcy Court in 1986 would have to be measured against the requirements of § 524 . . . we do not address the scope of an injunction authorized by that section.

<u>Id.</u> at 2207. Thus, the holding of <u>Travelers</u> is inapplicable to the instant litigation on this point.

wrongdoing claims are permissible does not make the Joint Plan ambiguous and inoperable.[54]  The

Libby Claimants have not provided, nor has the Court independently found, any provision of the

Bankruptcy Code or federal caselaw indicating that a bankruptcy court judge must explicitly address

all possible future legal issues and rule on whether or not they would be covered by the channeling

injunction.  Such a requirement would be unreasonable, impractical, and, for all intents and purposes,

impossible given the massive scale of this case and the still unknown number of future claims.

Finally, if the Bankruptcy Court had addressed these claims, it may have unintentionally

crossed into the unconstitutional territory of advisory opinions.  It is firmly established in our judicial

system that federal courts cannot issue advisory opinions.  See Hayburn's Case, 2 U.S. (2 Dall.) 409

(1792) (finding that the issuance of nonbinding opinions on the amount of benefits available to

Revolutionary War veterans was "not of a judicial nature"); Muskrat v. United States, 219 U.S. 346,

363 (1911) (holding that a lawsuit between the government and Native Americans over an allotment

of land was not justiciable); Flast v. Cohen, 392 U.S. 83, 96–97 (1968) ("[T]he implicit policies

embodied in Article III, and not history alone, impose the rule against advisory opinions[.]") (internal

citations omitted).  In order for a case to be justiciable and not an advisory opinion, there must be an

actual dispute between adverse litigants.  See Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (stating

that a justiciable dispute involves "real and substantial controversy admitting of specific relief through

a decree of a conclusive character, as distinguished from an opinion advising what the law would be

upon a hypothetical state of facts") (internal quotations and citations omitted); Porta v. Klagholz, 19

F. Supp. 2d 290, 294 (D.N.J. 1998) ("[F]or a case to be justiciable . . . there must be an actual dispute

---

[54] In fact, the Court notes that at the Confirmation Hearing, the Bankruptcy Court clearly told the parties that: "[t]here is no way that I'm going to be granting any injunction that covers independent liability not derivative of the debtor . . . to the extent the liability is determined not to be derivative it won't be channeled." (Hearing Trans., 01/10/11, at 51, JA 055017.)

between adverse litigants[.]") (internal quotations and citations omitted).

Herein lies the flaw in the Libby Claimants' argument—there is no actual dispute, nor are the claims presented with "clear concreteness . . . precisely framed and necessary for decision[.]" Flast, 392 U.S. at 96–97 (internal citations omitted). There is no dispute between the parties that Grace's injunction bars claims against insurers for their derivative liability. Having established above that the channeling injunction is not ambiguous, there also is no dispute that the Libby Claimants can independently pursue claims against Grace's insurers for their own alleged wrongdoing. The Libby Claimants have not, however, articulated to the Court what specific conduct or actions these alleged insurer tort claims are based upon or when they have or will occur, but instead merely allude to hypothetical future claims that are too conjectural at this point in time. As such, there is no real and substantial controversy for the Court to decide. If and when the Appellants bring such a suit for independent insurer liability, then a court will consider the merits of these claims and decide whether or not they are derivative of Grace's liability, and therefore entitled to injunctive protection. This inquiry is simply too premature at this point in time. The Bankruptcy Court properly declined to rule on these purely hypothetical claims. This Court likewise declines the invitation to do so.[55]

---

[55] In a separate but related argument, Grace's insurer MCC asserts that the Bankruptcy Court erred in stating that Grace and MCC agreed that the indemnity provisions of their settlement agreement would not cover MCC's alleged independent tortious conduct. MCC claims that if it is sued for its own independent wrongdoing, then its settlement agreement with Grace should indemnify it against such claims. However, given that such independent wrongdoing claims are completely hypothetical at this point, the Court need not rule on this issue.

## b.    Extension of the Channeling Injunction to BNSF

As set forth above, § 524(g) authorizes extension of the channeling injunction to certain third parties in limited situations.  See 11 U.S.C. § 524(g)(4)(A)(ii)(I–IV).  BNSF now asks this Court to extend to it the protections afforded by the § 524(g) injunction.  In its briefing presented to the Court, however, its rationale for making this request is unclear.[56]  The Court is therefore placed in the difficult position of assessing the scope of BNSF's request.

In its brief, BNSF asserts that "[c]laims by personal injury plaintiffs against non-debtors such as BNSF asserting derivative liability are 'indirect' claims against the Debtors that seek to recover damages caused by the presence of asbestos, and fall within the claims authorized to be channeled … In essence, claims asserted against BNSF constitute indirect claims against the Debtor's Estate[.]" (BNSF Br. 32.)  This statement mischaracterizes the definition of an "indirect claim" under Grace's Joint Plan.  Under the Plan, an "Indirect PI Trust Claim" is a claim made against Grace by an indirect claimant for indemnification, contribution, or subrogation for damages it paid to a personal injury plaintiff exposed to asbestos for which Grace is liable.  (Joint Plan § 1.1(144).)  In another Section, the Joint Plan provides that such claims shall be enjoined pursuant to the § 524(g) injunction.  (Id. at § 8.2.1.)  In this scenario, the indirect claim under the Plan that could be enjoined would be any claim for indemnity and/or contribution that BNSF could seek from Grace. It would not be, as BNSF categorizes it, a claim by a personal injury claimant asserted directly against BNSF.  Only the indirect claim brought *by BNSF* against Grace could be enjoined and channeled to the trust under the Plan; not the direct claim by the personal injury plaintiff *against BNSF*.  To allow the injunction to issue

---

[56] The Court notes that BNSF did not attempt to clarify its request at Oral Argument before this Court on June 28, 2011, when it merely stated that: "The third issue on appeal is that BNSF should be entitled to the 524(g) injunction . . . We'll rest on our briefs on that point." (No. Civ. A. 11-199, Doc. No. 160, Tr. 6/28/11 at 53.)

in the latter situation would have the effect of not only precluding actions against BNSF for its liability derivative of Grace's conduct, but also its own independent liability. This result is expressly prohibited by Third Circuit precedent. See Combustion Eng'g, 391 F.3d 190, 233 (3d Cir. 2004) ("[Section] 524(g) d[oes] not authorize a channeling injunction over [ ] independent, non-derivative third-party actions against non-debtors[.]"). Therefore, to the extent that BNSF requests that the § 524(g) injunction be extended to enjoin claims against it for its own independent liability owed to personal injury claimants, this request will not be granted.

The Court now considers extension of the channeling injunction to enjoin claims against BNSF for actions brought against it that are allegedly derivative of Grace's conduct. On this point, the Court must consider the holding of Combustion Engineering, as it is directly relevant here. In that case, the Third Circuit clarified the scope of a § 524(g) channeling injunction, holding that:

> [Section] 524(g) limits the situations where a channeling injunction may enjoin actions against third parties to those where a third party has derivative liability for the claims against the debtor . . . [B]oth the plain language of the statute and its legislative history make clear [that] § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor.

Id. at 234, 236. In so holding, the Third Circuit recognized the four instances under which third-party liability could arise under the Code in a Chapter 11 reorganization case: (1) a third party's ownership of a financial interest in the debtor; (2) a third party's involvement in management of the debtor; (3) a third party's provision of insurance to the debtor or a related party; or (4) a third party's involvement in a transaction changing the debtor's corporate structure, or in a loan or other financial transaction affecting the financial condition of the debtor. Id. at 235; see also 11 U.S.C. 524(g)(4)(A)(ii)(I–IV). If the third party does not fall into one of these four categories, then its claims will not be considered derivative of the debtor's liability, and thus are not eligible to be enjoined. Combustion Eng'g, 190 F.3d at 236–37 ("[Section] 524(g) expressly contemplates the inclusion of third parties' liability

within the scope of the channeling injunction  [ ] and sets out the specific requirements that must be met in order to permit inclusion[.]"); In re Federal-Mogul Global, Inc., 411 B.R. 148, 165–66 (Bankr. D. Del. 2008) (finding that a third party whose alleged liability arose from its contractual agreements with the debtor, but not as a result of any of the four conditions listed in § 524(g), could not have its claims enjoined); In re Pittsburgh Corning, Corp., 453 B.R. 570, 590 n.25 (Bankr. W.D. Pa. 2011) (noting that it is "clear that the asbestos channeling injunction protection is available only to nondebtor affiliates that meet the § 524(g) requirements").

In the instant case, BNSF's alleged liability did not arise by any of the four circumstances provided by § 524(g): BNSF never owned a financial interest in Grace, provided insurance to it, engaged in its management, or entered into a transaction with it that altered Grace's corporate structure.  Rather, BNSF's contractual indemnity agreements serve as the crux of its relationship with Grace.  It has been explicitly recognized, however, that contractual indemnity agreements that do not otherwise meet the definitional requirements of § 524(g) cannot serve as the link in the chain connecting a third party's liability to the debtor for purposes of extending the channeling injunction to non-debtors.  See Federal-Mogul, 411 B.R. at 166.  Thus, because BNSF's claims against Grace do not meet the Code's definitional requirements of derivative liability, § 524(g) explicitly precludes the Court from extending injunctive relief to BNSF under these circumstances.

Moreover, § 524(g) injunctive relief is "closely tied to the value being contributed to the plan." In re Congoleum Corp., 362 B.R. 167, 180 (Bankr. D.N.J. 2007).  Although BNSF asserts in a footnote that it "was always ready and willing" to make a contribution to the trust (BNSF Br. 33 n.4), this does not change the fact that BNSF never in fact made such a contribution.  Common sense and fairness dictate that BNSF should not be freely shielded from liability, while other parties are required to make substantial payments and sacrifices in order to receive injunctive protection.   The Court therefore declines to extend injunctive relief to BNSF.

### c.    AMH's Objections to the Scope of the Channeling Injunction

AMH alleges that the scope of the channeling injunction sweeps too broadly in violation of § 524(g) in regards to property damage claims.  AMH claims that there is no need to channel property damage claims at all because such claims are unimpaired and fully paid under the TDP.  (AMH Br. 50.)  In making its argument, AMH asks this Court: "If P[roperty] D[amage] Claims are unimpaired and are to be paid 100% . . . what is the purpose of channeling such claims to a trust?" (Id.)

The answer, of course, is that the purpose of channeling these claims is ensure the payment of both current and future property damage claims. Section 524(g) requires debtors seeking its protection to show that there is a substantial likelihood that they will be subject to future property damage or personal injury claims related to asbestos exposure before they can take advantage of the benefits provided by the statute's trust and channeling injunction. See 11 U.S.C. § 524(g)(2)(B)(ii)(I). Despite the fact that many property damage claims have been resolved in the instant case, a cloud of uncertainty still hangs over the Debtor.  Grace began shipping insulation products containing traces of asbestos across the country and internationally as early as the 1920s.  It still remains unknown (and may never be ascertained) how many entities and individuals were affected by these products, the precise quantity of asbestos-laden products that were sold, which buildings the products were used in and how much was used per building, or the percentage of these entities that have successfully removed the asbestos products from their buildings.  Thus, there remains a significant chance that future property damage claims will be asserted against Grace by property damage claimants. Numerous expert witnesses testified to this fact before the Bankruptcy Court.[57]  Therefore, in order

---

[57] The Court credits the testimony of former Judge Alexander Sanders, the legal representative for future asbestos-related property damage claimants ("PD FCR") in this case, and expert witness Dr. Denise Martin. Judge Sanders testified to the unquestionable benefits afforded to future property damage claimants under Grace's Joint Plan in comparison to pursuing their claims outside the context of the trust. (See Trans. of Plan Confirmation Hearing, ("Sanders Testimony"),  09/17/09 at 97–100, JA 004262.)  Dr. Martin testified as to the substantial

to meet the requirements of § 524(g), the Joint Plan must have established mechanisms that will handle payment of these future claims. Grace's Plan does so through the procedures associated with its PD Trust. As such, the extension of the channeling injunction to these property damage claims is proper.

### 2. The Fairness and Equality of the Channeling Injunction

#### a. Application of the Channeling Injunction to MCC

Prior to filing for bankruptcy, Grace had reached a settlement agreement with one of its insurers, MCC. Pursuant to that agreement, MCC made substantial monetary contributions to Grace to assist in the coverage of its asbestos-related liability. In exchange, Grace terminated MCC's previous obligations and agreed to indemnify MCC against all future asbestos-related claims. After filing for bankruptcy, Grace entered into settlements with several other insurers. These settlements, as well as Grace's own contributions, will be used to fund the PI Trust. As a result, these other insurers and MCC were all designated as Settled Asbestos Insurance Companies under the terms of the Joint Plan, meaning that they were entitled to injunctive relief under § 524(g). The Libby Claimants now allege that extending this injunctive relief to MCC violates the "fair and equitable" requirement of § 524(g) because MCC did not make a direct financial contribution to the trust, but is nonetheless still protected from asbestos-related litigation. Grace and MCC claim that the statute has not been violated because MCC's financial contribution is indirectly included in the overall trust amount since Grace's own contributions to the trust are, in part, due to MCC's previous contribution.

Section 524(g) provides, in relevant part, that a channeling injunction protecting debtors and identifiable third parties must be "fair and equitable" to those "persons that might subsequently assert

---

likelihood that future property damage claims will be made against the trust. See In re W.R. Grace & Co., 446 B.R. 96, 144 (Bankr. D. Del. 2011).

[asbestos-related claims against the debtor], in light of the benefits provided . . . to [the] trust on behalf of such . . . debtors or such third part[ies]." 11 U.S.C. § 524(g)(4)(B)(ii). "A review of the case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan." In re Congoleum Corp., 362 B.R. 167, 180 (Bankr. D.N.J. 2007). Federal courts within the Third Circuit have repeatedly recognized that such contributions to the trust can be made by the debtor or third parties themselves, or, alternatively, *on behalf of* the parties protected by the injunction. See In re Kaiser Aluminum Corp., Bankr. No. 02-10429, 2006 WL 616243, at *17 (Bankr. D. Del. Feb. 6, 2006) (finding that settlements reached between Kaiser and its insurers at various points in time were fair and equitable because they constituted "substantial contributions" to the asbestos trust "on behalf of the Protected Parties"); In re Burns & Roe Enter.'s, Inc., No. Civ. A. 08-4191, 2009 WL 438694, at *9, *35 (D.N.J. Feb. 23, 2009) (finding that the § 524(g) injunction at issue was fair and equitable to future claimants based on the benefits provided to the trust by or on behalf of the protected parties and settling insurers); In re Armstrong World Indus., Inc., 348 B.R. 136, 156 (D. Del. 2006) (same); In re Federal-MogulGlobal, Inc., Bankr. No. 01-10578, 2007 WL 4180545, at *33 (Bankr. D. Del. Nov. 16, 2007) (holding that substantial contributions made to the trust, either directly or by "the consensual resolution of claims against the Debtors," were fair and equitable). As such, as long as a party has contributed reasonable value to the reorganization plan, whether through its own direct contribution or by those made indirectly on its behalf by another party, then it is fair and equitable to future claimants for that party to receive the injunctive protection afforded by § 524(g).

As previously mentioned, the trust in this case is funded by both Grace's own contributions and the contributions of several third parties. MCC and Grace entered into their settlement agreement at a time when Grace was already experiencing financial difficulty as a result of the increased number of asbestos claims filed against it. The settlement payments made by MCC substantially increased

Grace's available funds. After the bankruptcy filing, the remainder of these funds became part of Grace's bankruptcy estate. Subsequently, during its period of corporate restructuring, Grace formulated the Joint Plan under which it agreed to directly pay substantial value to the trust largely from the remainder of the assets and funds available in its bankruptcy estate. Thus, the contributions to the asbestos trust directly made by Grace include, to some degree, an amount originally contributed by MCC. Without MCC's previous payments, Grace would not be able to donate as much as it presently can to the trust. As such, Grace's direct contributions to the trust reflect, as provided for in § 524(g), an amount made "on behalf of" MCC. Therefore, extending injunctive protection to MCC is fair and equitable under these circumstances. In fact, not enjoining future claims against MCC could render a potentially unfair result since MCC could actually be responsible for double the amount of any other party given its previous significant monetary contribution to Grace.

For these reasons, the requirements of § 524(g) are satisfied, and the findings of the Bankruptcy Court on this matter are therefore affirmed.

### b. Application of the Channeling Injunction to CNA

In separate but related arguments, both BNSF and the Libby Claimants object to Grace's aforementioned Settlement Agreement with CNA, which categorizes CNA as a Settled Asbestos Insurance Company entitled to § 524(g) injunctive relief, because it allegedly violates the "fair and equitable" requirement of the statute.

### i. BNSF's Objections

According to BNSF, the Bankruptcy Court erred because it did not make a specific finding as to whether the Libby Claimants' aforementioned post-bankruptcy, independent insurer wrongdoing tort claims against CNA would be covered by the channeling injunction, and that therefore entry of the injunction was not "fair and equitable" to those parties, *i.e.*, the Libby Claimants, whose future claims might be enjoined. BNSF further asserts that the Grace–CNA Settlement Agreement is unfair

because the entire value of CNA's contribution under the Agreement would be included in the trust's overall pool—an amount set to be distributed among all asbestos personal injury claimants—without regard as to whether or not the claimant has a direct claim against CNA. Thus, BNSF claims that the current structure of the Joint Plan cannot be affirmed because it fails to account for the fact that the Libby Claimants are the only Class 6 claimants that could arguably bring direct claims against CNA for the insurer's alleged independent tort liability (assuming they could do so under applicable state law), and that allowing other Class 6 claimants who cannot assert such independent claims against CNA to recover the same amount is unfair and inequitable.

At the outset, BNSF lacks the standing to raise these claims.[58] The rule of the Third Circuit is clear that "[a]ppellate standing in the bankruptcy context is more restrictive than Article III standing," and is limited to "persons aggrieved by an order of the bankruptcy court." In re Combustion Eng'g, 391 F.3d 190, 214 (3d Cir. 2005) (quoting In re Dykes, 10 F.3d 184, 187 (3d Cir. 1993)). Aggrieved persons are those whose rights or interests are *directly* affected by an order of the bankruptcy court that "diminish their property, increase their burdens, or impair their rights." Id. (internal citations and quotations omitted) (emphasis added.). Appellate standing is not available to those parties that are only indirectly affected by the bankruptcy court's order by some indirect exposure to a potential harm. Id. at 215 (citing Travelers Ins. Co. v. H.K. Porter Co., 45 F.3d 737, 741 (3d Cir. 1995)).[59]

---

[58] To the extent that the Libby Claimants, rather than BNSF, object to confirmation of the Plan, their claims are considered and discussed more fully, *infra*.

[59] BNSF relies on the recent Third Circuit case of In re Global Ind. Technologies, Inc., 645 F.3d 201 (3d Cir. 2011) ("GIT") to establish that it has standing. In GIT, the Third Circuit identified two types of standing in the context of bankruptcy litigation: (1) "bankruptcy standing," which addresses what is required of the parties to bring a claim before the bankruptcy court; and (2) "appellate standing," which addresses what is needed to bring a claim on appeal. Id. at 209. The Third Circuit only found that the objecting parties in that case had bankruptcy standing to object to confirmation of the reorganization plan when it was before the bankruptcy

BNSF does not meet the requirements of appellate standing here because it has failed to show

the Court how it would be directly adversely affected by the extension of the channeling injunction to

CNA.  Rather, BNSF appears to be raising concerns that properly belong to the Libby Claimants.[60]

---

court, and did not address the objecting parties' appellate standing.  Id. at 209–10.  In the instant
case, BNSF objects to substantive findings made by the Bankruptcy Court, and therefore BNSF
must establish that it meets the requirements of appellate—not bankruptcy—standing to bring
these claims.  Therefore, BNSF's reliance on the holding of GIT to establish its standing on this
issue is misplaced.

   [60] BNSF claims that it has standing because the channeling injunction enjoins BNSF from
impleading and/or pursuing contribution claims against CNA, and will therefore inevitably
increase the number of claims asserted against BNSF.  BNSF cites PWS Holding Corp., 228 F.3d
224 (3d Cir. 2000), which it claims precisely supports its argument that "[d]irectly enjoining
BNSF from pursuing such claims against the CNA Companies establishes standing." (BNSF Br.
Objecting to Settlement Agreement, at 10 n.3.)  This misrepresents the holding of PWS Holding.
In that case, a creditor argued that the plan proponents failed to comply with disclosure
requirements by not providing certain information to creditors.  PWS Holding, 228 F.3d at 248.
The Third Circuit found that the creditor lacked appellate standing to raise this claim because it
could not show that it was "personally aggrieved" by the bankruptcy court's order, and that the
possibility that other creditors would have acted differently was simply not enough to serve as the
basis for third-party standing.  Id. at 249.  In so holding, the Third Circuit noted that third-party
standing is of particular concern in bankruptcy proceedings that involve numerous parties, and
that, while the Bankruptcy Code confers broad standing to parties at the trial level in this context,
the same is not true on appeal.  Id. at 248.  The court stated that appellate standing is more
restricted, and noted that "courts have been understandably skeptical of the litigant's motives and
have often denied standing" in situations where a creditor seeks to assert the rights of another
party on appeal in bankruptcy proceedings.  Id. (quoting Kane v. Johns-Manville Corp., 843 F.2d
636, 643 (2d Cir. 1988) (internal citation omitted)).
       The Court finds this language particularly instructive here.  In its briefing, BNSF does not
specifically identify any claims for which it presently seeks contribution or any impleader actions
against CNA, let alone show the Court how the Joint Plan would inevitably increase the number
of claims filed against BNSF should CNA receive injunctive protection.  The Plan Proponents
respond that BNSF has no such claims against CNA.  (See Plan Proponents Br. Regarding
Objection to Settlement Agreement, at 38 n.92, "BNSF has no claims against CNA . . . ").)
Therefore, as noted by the Third Circuit in PWS Holding, these amorphous claims are "simply
too speculative to be a basis for . . . standing here."  Id. at 249.
       Moreover, BNSF has not explained to the Court how it would even have a contribution
claim against CNA.  CNA and the Plan Proponents allege that BNSF would never be able to
assert such claims based on how liability is apportioned according to Montana's multiple
defendant liability statute.  See MONT. CODE. ANN. § 27-1-703.  Rather than engaging in a
lengthy choice-of-law analysis and interpretation of state law, the Court notes that a "terse
reference in a complex . . . case is insufficient" to establish BNSF's standing here.  See Time
Warner Entm't Co., L.P. v. F.C.C., 56 F.3d 151, 202 (D.C. Cir. 1995) (finding that a party's
reference to an argument in a footnote in its brief that was neither explained nor properly
developed was insufficient grounds for standing); see also S.W. Pa. Growth Alliance v. Browner,

Such third-party standing, rooted in the uncertain possibility that the Libby Claimants may eventually bring independent tort claims at some point in the future, is impermissible. Therefore, due to the fact that BNSF was not personally aggrieved by the Bankruptcy Court's order extending injunctive protection to CNA,[61] the Court need not even address the merits of its claims.[62]

## ii. The Libby Claimants' Objections

The Libby Claimants also object to the channeling injunction on the grounds that it does not satisfy the fair and equitable requirement of § 524(g)(4)(B)(ii).[63] As a result of the Settlement

---

121 F.3d 106, 122 (3d Cir. 1997) ("[A]ppellate courts should generally not address legal issues that the parties have not developed through proper briefing."). Finally, to the extent that BNSF asserts claims against CNA for the proceeds of its *own* insurance agreements with CNA, Section 8.2.2 of the Joint Plan makes explicitly clear that BNSF will not be hindered from asserting such claims and should have no difficulty in recovering these proceeds to which it is properly entitled.

[61] Additionally, BNSF's argument would also fail on mootness grounds. BNSF argues that because it is a co-defendant with CNA, if the channeling injunction enjoined the Libby Claimants' future independent tort claims against CNA, then BNSF could potentially be exposed to greater liability since it is likely that more claims would be filed against it. Having already decided above, however, that that the Libby Claimants are not enjoined from bringing separate claims against insurers for their independent tort liability in this case, this argument is now moot.

[62] Having found that BNSF lacks standing to raise these claims, the Court declines to discuss the merits of these claims in depth. Any objections related to approval of the Settlement Agreement have been addressed at length, *supra*. As to any remaining objections related to issuance of the injunction in the context of confirmation of the Joint Plan, the Court notes that the Bankruptcy Court fully addressed and considered the merits of these claims in its oversight of this case. (See Bankr. No. 01-1139, Doc. No. 26106, 01/22/11, Order Pursuant to Sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Companies ("Approval Order").) Bankruptcy courts are entitled, in their discretion, to issue injunctions to the fullest extent permitted by § 524(g). See 11 U.S.C. § 524(g)(1)(A–B); see also Travelers Indem. Co. v. Bailey, 129 S. Ct. 2195, 2202 (2009). Therefore, the Court presently finds—for the sake of clarity and finality—that the Bankruptcy Court properly exercised its discretion without any clear error, and therefore all its findings related to BNSF's objections on these grounds are affirmed.

[63] This section states, in relevant part, that:

(4)(B) . . . [S]uch injunction shall be valid and enforceable . . . if–
    (ii) the court determines, before entering the order confirming such plan, that
    . . . such injunction . . . is fair and equitable with respect to the persons that
    might subsequently assert such demands, in light of the benefits provided, or

Agreement reached between Grace and CNA, CNA agreed to contribute the proceeds of its insurance policies to Grace's bankruptcy estate for the benefit of asbestos personal injury claimants. In return, CNA was designated as a Settled Asbestos Insurance Company entitled to § 524(g) injunctive relief.

As previously mentioned, CNA's insurance policies with Grace consist of coverage for both "products" and "non-products" claims. The Libby Claimants hold non-products claims because their injuries are primarily due to exposure as a result of airborne asbestos. According to the Libby Claimants, they hold "stronger insurance rights" because Grace's insurance covers 100% of the non-products claims asserted against it. (Libby Br. 27.) They claim that CNA's contribution that covers both products and non-products claims, without independently assigning a set value for each, violates the fair and equitable requirement because it will be distributed pro rata to all personal injury claimants without differentiating between product and non-product claimants.[64]

---

to be provided, to such trust on behalf of such debtor or debtors or such third party.

11 U.S.C. § 524(g)(4)(B)(ii).

[64] The Libby Claimants also assert that the fair and equitable requirement has been violated here because extending the channeling injunction to protect CNA could enjoin their potential independent insurer wrongdoing tort claims against CNA, and that the Bankruptcy Court's failure to value these independent tort claims was error. First, the channeling injunction is clear that it only enjoins third party claims that are derivative of Grace's liability, and the Libby Claimants are free to pursue their independent tort claims against CNA. This issue was discussed at length, *supra*, when the Court addressed the extension of the injunction to independent wrongdoing claims.

As to the Libby Claimants' other contention, the Court finds that there is nothing unfair or inequitable about the Bankruptcy Court's non-valuation of these claims that would run afoul of § 524(g)'s requirements. Section 524(g) provides that a channeling injunction must be fair and equitable to persons that might *subsequently assert* demands against the debtor or derivatively-liable third party in the future. See 11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added). The statute goes on to define "demands" in this context as requests "for payment, present or future . . . [that] pursuant to the plan [are] to be paid by the trust." 11 U.S.C. § 524(g)(5)(C). Thus, in accordance with the express language of the statute, the consideration being paid by CNA must be fair and equitable to claimants asserting claims against the PI Trust in the future in light of the benefits CNA has provided to such trust. The Libby Claimants have shown no reason and cited no evidence indicating that they would be unable to do so in the future. Nothing in the statutory language requires the Bankruptcy Court to independently value these alleged independent tort claims that may at some point be asserted against CNA. As such, the Libby

Section 524(g) requires a court, prior to issuing injunctive relief, to first find that the reorganization plan is fair and equitable to persons who might later assert asbestos-related claims in light of the benefits the debtor or third parties provide to the trust. See 11 U.S.C. 524(g)(4)(B)(ii). In crafting this statutory provision, Congress did not explicitly define the meaning of "fair and equitable." As a result, most courts interpreting the section have "looked at all the elements of a plan and then made a generalized determination of what is fair and equitable." In re Congoleum Corp., 362 B.R. 167, 179–180 (Bankr. D.N.J. 2007); see also In re Kaiser Aluminum Corp., Bankr. No. 02-10429, 2006 WL 616243, at *17, 22 (Bankr. D. Del. Feb. 6, 2006); In re J.T. Thorpe Co., 308 B.R. 782, 791 (Bankr. S.D. Tex. 2003). This determination does not require mathematical certainty nor precision, but should identify a clear relationship between the benefits received and the contributions made by a third party that receives injunctive protection. In re Quigley Co., Inc., 437 B.R. 102, 133, 134 n.42 (Bankr. S.D.N.Y. 2010).

An analysis of the record indicates that the fair and equitable requirement is clearly satisfied here. At trial, an expert witness estimated that claims against the PI Trust will have a total value ranging between $6.3 and $7.4 billion. As discussed at length above, Grace's Settlement Agreement with CNA injects significant monetary and non-monetary value into Grace's bankruptcy estate. Under that Agreement, CNA will contribute up to $84 million to the PI Trust for the sole benefit of personal injury claimants, a significant percentage of which are Libby Claimants. Additionally, the Settlement requires that both CNA and Grace give up prior obligations owed to and claims asserted against each other, and resolves all issues related to coverage, retrospective premiums, and indemnity rights. Given that Grace and CNA have been intensely litigating these various issues for over three decades, the value of putting an end to this litigation can hardly be overstated. Thus, in "examin[ing] the contributions

Claimants' assertions on these grounds are based upon a flawed interpretation of the statute, and are therefore meritless.

. . . in the context of the overall bankruptcy scheme," it is evident to the Court that the benefits provided

to the trust by CNA and Grace are fair and equitable to any persons that might subsequently bring any

asbestos-related claims.  There is a clear relationship between the value provided by CNA's significant

contributions and the benefit of injunctive relief it retains under the Settlement and Joint Plan.  Section

524(g) does not require mathematical precision, and the case law does not indicate that an

individualized valuation to differentiate between products and non-products claimants is necessary

under these circumstances.[65]  Therefore, the Court finds that the fair and equitable requirement of §

524(g) is satisfied here, and the Libby Claimants objections are overruled.

### 3. The Effect of the Channeling Injunction on Releases from Liability Under the Joint Plan

The Libby Claimants argue against confirmation of the Joint Plan on the grounds that it

impermissibly releases Grace's subsidiaries, Sealed Air and Fresenius, from future claims related to

Grace's asbestos liabilities by extending injunctive protection to them.  They claim that third parties

cannot be released from liability without the affirmative agreement of all creditors involved in the

debtor's reorganization, and that because the Libby Claimants did not vote in favor of the Joint Plan,

it was erroneous for the Bankruptcy Court to allow the release of Sealed Air and Fresenius from

---

[65] The Libby Claimants rely on Quigley, 437 B.R. 102, 140 (Bankr. S.D.N.Y. 2010) to support their argument that the Bankruptcy Court was required to assign a precise value to non-products claims.  It is true that the Quigley Court held that a third party's contribution to the reorganization plan was substantially less than the benefit it would realize from the channeling injunction.  Id.  Quigley, however, is distinguishable from the instant case.  The third party in Quigley was the debtor's parent corporation and sole shareholder.  Id. at 111.  Moreover, the parent itself had previously manufactured asbestos-containing products.  Id.  Upon acquiring the subsidiary, the parent took out many insurance liability policies that provided joint coverage to both corporations for their asbestos liability.  Id.  In light of this intertwined relationship, the Quigley Court engaged in a complicated and lengthy analysis of what the parent's estimated asbestos liability would be outside of its subsidiary's bankruptcy.  Id.  at 134–140.  The instant scenario does not involve a parent and subsidiary with joint insurance policies.  Rather, this dispute solely involves the debtor and one of its many insurers.  Therefore, such a complex and lengthy analysis of the debtor's relationship with the third party is not warranted in this case, and the Court need only analyze the overall impact of CNA's contribution in the context of Grace's entire bankruptcy scheme.  See Congoleum, 362 B.R. at 179–180.

liability.

In order for a reorganization plan that includes an injunction barring third-party claims against non-debtors to be approved, the injunction must be "both necessary to the reorganization and fair" under 11 U.S.C. § 105(a).[66] In re Global Indus. Techs., Inc., 645 F.3d 201, 206 (3d Cir. 2011) (internal citations omitted) ("GIT"); see also In re Cont'l Airlines, Inc., 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings[.]"); In re Prussia Assoc., 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005) (citing Cont'l Airlines); In re Exide Tech., 303 B.R. 48, 72 (Bankr. D. Del. 2003) (same).[67] Grace's channeling injunction satisfies both of these requirements. First, extending the effects of the injunction to release the subsidiaries from future liability was necessary to both settlement agreements. The litigation regarding Sealed Air and Fresenius' liability to and indemnification from Grace demanded a significant amount of time and resources that was driving Grace further into debt. In order to effectively reorganize itself and emerge from bankruptcy as a going concern, it was evident early on in the reorganization period that Grace and its subsidiaries needed to settle their litigation disputes. A key part of both settlements was the release of both subsidiaries from future liability. Without these releases, it is unlikely that either Sealed Air or Fresenius would have agreed to settle. Moreover, Sealed Air and Fresenius' $1.1 billion contribution was also very necessary to effectuate Grace's reorganization and

---

[66] Section 105(a) of the Bankruptcy Code states that: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

[67] In making their argument, the Libby Claimants rely on In re Zenith Elecs Corp., 241 B.R. 92 (Bankr. D. Del. 1999), which held that release of third party creditor claims could not be accomplished without the affirmative agreement of affected creditors. Id. at 111. However, Zenith was a lower court decision. As such, it is not binding on this Court. Zenith also predates the Third Circuit's findings in GIT and Continental Airlines, two decisions which *are* binding on this Court. Moreover, since Zenith was decided, other courts have noted its weaknesses. See In re Exide Techs., 303 B.R. at 72 (stating that the holding of Zenith is "neither conclusive nor . . . [is it] a list of conjunctive requirements," but rather is merely "helpful in weighing the equities of the particular case after a fact-specific review") (internal citations omitted).

make the Joint Plan work. This amount constitutes a significant portion of Grace's assets that will be used to pay both present and future personal injury and property damage claims, without which Grace would likely be unable to meet its outstanding liabilities and obligations under the Joint Plan. As such, the Court finds that both settlement agreements were necessary to effectuate Grace's successful reorganization.

Second, the injunction in this case is also fair to Grace's creditors. As detailed above in regards to the injunction's necessity, as well as continuously throughout this Opinion, there are only a narrow range of claims barred by the injunction for the distinct purpose of effectuating settlements to fund the Joint Plan and Grace's reorganization. All other creditor claims will be assumed and paid by Grace after it has completed reorganization. Moreover, both this Court and the Bankruptcy Court have previously considered the fairness of the Fresenius and Sealed Air Settlement Agreements. The District Court previously approved the settlements, finding that the releases were fair to Grace's bankruptcy estate and its creditors. The Bankruptcy Court expressly adopted these findings in its 2011 Confirmation Order. See In re W.R. Grace & Co., 446 B.R. 96, 138–40 (Bankr. D. Del. 2011) (summarizing District Court and Bankruptcy Court proceedings). Therefore, if the Libby Claimants were concerned with the fairness of the injunction, they could have raised this issue at a point in time prior to entry of the injunction in 2011. As such, the Court finds that the channeling injunction in Grace's Joint Plan is both necessary to Grace's reorganization and fair to its creditors, and the Libby Claimants' claims are therefore denied.

### D.    Classification of Creditor Claims

Section 1129(a)(1) of the Code provides that a Chapter 11 reorganization plan may only be confirmed if "[t]he plan complies with the applicable provisions of [Title 11]." 11 U.S.C. § 1129(a)(1). Montana and the Crown[68] now allege that the Joint Plan cannot be confirmed because it does not comply with §§ 1122(a) and 524(g) of the Bankruptcy Code.   Specifically, they believe that their contribution and indemnification claims are not "substantially similar" to other claims within Class 6 because they are of a different nature and are based on different acts, and that therefore the Joint Plan's classification scheme violates § 1122(a).   Montana and the Crown further assert that their claims should not be subject to the § 524(g) injunction because they are different than the remainder of claims within Class 6.   Finally, both Appellants claim that even if their claims were the kind to which a § 524(g) injunction could apply, their claims do not meet the definitional requirements of "claims" and "demands" under the Bankruptcy Code, and thus cannot be enjoined by the channeling injunction.   The Court considers each argument separately below.

### 1.    The Section 1122(a) Classification Requirement

Section 3.1.6(a) of the Joint Plan classifies all personal injury claims resulting from exposure to Grace Asbestos in Class 6, Asbestos PI Claims.[69]   The personal injury claims in Class 6 are

---

[68] The Crown relied on Montana's brief in making this argument.  (See Crown Br. 20 ("The Crown incorporates by reference as if fully set forth herein those arguments set forth in Part I of the State of Montana's Opening Brief on Appeal[.]").)  Therefore, the Court jointly considers the claims of Montana and the Crown.

[69] Section 1.1(34) of the Joint Plan broadly defines an "Asbestos PI Claim" as:

a Claim . . . or Demand against . . . any of the Debtors or Asbestos Protected Parties . . . whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty . . . based on, arising out of, resulting from, or attributable to, directly or indirectly:

> (a) death, wrongful death, personal or bodily injury . . . caused, or allegedly caused, based on, arising or allegedly arising from or attributable to, directly or indirectly, in whole or in part, acts or omissions of one or more of the Debtors; [and]

comprised of both (1) direct claims for personal injuries brought against Grace; and (2) indirect claims, entitled "Indirect PI Trust Claims," brought against Grace by third parties seeking contribution and indemnity as a result of being sued for asbestos liability related to Grace operations. Section 1.1(144) of the Plan defines Indirect PI Trust Claims as:

> any Claim . . . or Demand against the Debtors . . . held by any Entity . . . who has been, is, or may be a defendant in an action seeking damages for . . . personal injuries . . . to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability . . . [and] on account of alleged liability of the Debtors for payment, repayment, reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action[.]

(Joint Plan § 1.1(144).) Both the claims of Montana and the Crown fall within the definition of Indirect PI Trust Claims under the Plan because they seek indemnity and/or contribution from Grace.

Montana and the Crown, however, object to the classification of their claims in Class 6 on the basis that their claims are of a different nature. Specifically, they argue that claims for indemnity and contribution do not belong in Class 6 because they are not personal injury claims. Furthermore, they allege that their claims are rooted in a failure to warn theory, rather than liability based on asbestos production, and therefore are different than the remainder of the claims in Class 6. Thus, they believe that § 1122(a) is violated on these grounds.

Section 1122(a) of the Code governs the classification of claims, providing that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). In analyzing whether claims within a given class are substantially similar, "the focus of the classification [should be on] the legal character of the claim as it relates to the *assets of the debtor*." In re AOV Indus., Inc., 792 F.2d 1140, 1150 (D.C. Cir. 1986) (quoting J.P. Morgan & Co. v. Mo. Pac. R.R., 85 F.2d 351, 352 (8th Cir. 1936)) (emphasis

---

(b) the presence of or exposure at any time to [Grace] asbestos.

(Joint Plan § 1.1(34)(i)(a–b).)

in original).  Therefore, in determining claim placement, plan proponents should attempt to group together those claims that exhibit a similar effect on the debtor's bankruptcy estate, rather than merely grouping together claims that are otherwise similar in character.  See id. at 1150–51 (citing In re Martin's Point Ltd. P'ship, 12 B.R. 721, 727 (Bankr. N.D. Ga. 1981)).  Plan proponents and bankruptcy courts have considerably broad discretion in deciding how to classify claims.  See In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) ("[I]t remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case."); see also In re U.S. Truck Co., Inc., 800 F.2d 581, 586 (6th Cir. 1986) (same).  However, plan proponents' classification schemes are not without limits.  See In re Dow Corning, 244 B.R. 634, 644 (Bankr. E.D. Mich. 1999) ("[T]here are limits on a plan proponent's classification freedom.") (internal citations omitted).  It is a well-recognized principle that the classification of claims or interests must be "reasonable," and cannot be grouped together for arbitrary or fraudulent purposes.  See Jersey City Med. Ctr., 817 F.2d at 1061; John Hancock Mut. Life. Ins. Co. v. Route 37 Bus. Park Assoc., 987 F.2d 154, 159 (3d Cir. 1993); In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 639 (Bankr. E.D.Pa. 1996); In re Fairfield Exec. Assoc., 161 B.R. 595, 600 (D.N.J. 1993).  "In short, . . . substantially similar claims may not be classified separately when it is done for an illegitimate reason."  Dow Corning, 244 B.R. at 644 (internal citations omitted).

It is clear to the Court that, in exercising their broad discretion under the Bankruptcy Code, the Bankruptcy Court and the Plan Proponents properly classified Montana and the Crown's indirect claims in Class 6.  Both direct and indirect claims under the Plan exhibit a similar effect on Grace's bankruptcy estate—they seek recovery from the trust for actions related to Grace's asbestos liability.  It makes no difference whether this recovery is sought directly by an individual plaintiff or indirectly through indemnity and/or contribution, or what the applicable legal theory is that underlies the claim, because, after all is said and done, all these claims "relate to the assets of the debtor" in substantially the same

way. <u>AOV Indus.</u>, 792 F.2d at 1150. Furthermore, the Court notes that similar classification schemes involving direct and indirect claims related to a debtor's asbestos liability have been upheld on a regular basis by the federal courts. <u>See, e.g.</u>, <u>In re Combustion Eng'g, Inc.</u>, 295 B.R. 459, 495–96 (Bankr. D. Del. 2003), <u>rev'd on other grounds</u>; 391 F. 190 (3d Cir. 2004); <u>In re Pittsburgh Corning Corp.</u>, 453 B.R. 570, 581 n.15 (Bankr. W.D. Pa. 2011); <u>In re Burns and Roe Enters., Inc.</u>, No. Civ. A. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009); <u>In re Dow Corning, Corp.</u>, 244 B.R. 634, 664–65 (Bankr. E.D. Mich. 1999); <u>In re Asbestos Claims Mgmt. Corp.</u>, 294 B.R. 663, 673 (N.D. Tex. 2003); <u>In re Porter Hayden Co.</u>, Bankr. No. 02-54152, 2006 WL 4667137, at *6 (Bankr. D. Md. June 30, 2006).

It is also evident that the classification of Montana and the Crown's claims in Class 6 is reasonable. Both direct claims brought by injured plaintiffs and indirect claims brought by Montana arise out of exposure to Grace Asbestos in Libby, Montana. Similarly, both the direct claims of injured plaintiffs and indirect claims brought by the Crown arise out of exposure to Grace Asbestos from ZAI products sold in Canada. Nothing in the record indicates that Montana or the Crown's claims were placed in Class 6 for arbitrary or fraudulent purposes. As such, the Code—and common sense—indicate that the indirect claims of Montana and the Crown are "substantially similar to the other claims or interests" in Class 6, and that therefore § 1122(a) has not been violated.

### 2.      Circumvention of the Section 524(g) Injunction

The § 524(g) channeling injunction in the instant litigation enjoins both the direct and indirect claims brought against Grace, and channels all such claims within Class 6 to the Grace trust. Montana and the Crown contend that their claims against Grace should not enjoined because their indemnity and contribution claims are based on a failure to warn theory that is different than all other claims in Class 6. Having already decided that Montana and the Crown's claims are not substantially different from other indirect claims within Class 6, the Court likewise declines to pull back the curtain of injunctive protection and expose Grace to liability for these claims.

Section 524(g) provides that an injunction may "enjoin entities from taking legal action for the purpose of directly or *indirectly* collecting . . . [on] any claim or demand that . . . is to be paid in whole or in part by [the] trust[.]" 11 U.S.C. § 524(g)(1)(B) (emphasis added). The primary purpose of § 524(g) is to "facilitat[e] the reorganization and rehabilitation of the debtor" while simultaneously promoting "the equitable resolution of asbestos-related claims." In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2005). In order to achieve this purpose, reorganization plans under Chapter 11 must resolve both direct and indirect claims brought against a debtor. If both types of claims arise out of the same nucleus of conduct, this purpose can only be achieved if both are enjoined.

Grace's Joint Plan, established pursuant to the requirements of § 524(g), properly categorizes the claims of Montana and the Crown as Indirect PI Trust Claims. As such, they are properly enjoined and channeled to the trust. To hold otherwise would be a fallacy. If the channeling injunction only plugged the hole in Grace's bankruptcy estate left open as a result of direct personal injury claims, then Grace would still sink from the flood of indirect claims that could permissibly be brought against it. This is not the result that was contemplated by Congress in its creation of this statutory section. See 140 Cong. Rec. 6, 8,021 (1994) (statements of Senator Brown); 140 Cong. Rec. S. 4523 (Apr. 20, 1994) (statements of Senator Heflin and Senator Graham); *Collier on Bankruptcy* § 111 (2011) (discussing statements of Senator Heflin). Rather, "[b]ecause Indirect PI Trust Claims . . . relate to direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases." In re Armstrong World Indus., Inc., 348 B.R. 136, 168–69 (D. Del. 2006) (internal citations omitted). Thus, the Court finds that Montana and the Crown's claims are properly enjoined pursuant to the requirements of § 524(g).

### 3. Definitional Requirements of "Claims" and "Demands" Under the Bankruptcy Code

Montana and the Crown further allege that their claims do not fall within the definitions of "claims" and "demands" under the Code, and that therefore they should not be subject to the § 524(g) channeling injunction.

#### a. Claims Under the Bankruptcy Code

Montana and the Crown allege that their requests for contribution and indemnity against Grace are not "claims" because they arose after Grace's 2001 bankruptcy petition, and that therefore they should not be channeled to the trust. In response, Grace contends that Montana and the Crown's claims fall precisely within the definition of a "claim" as recently interpreted by the Third Circuit, and that, as a result, Appellants' contribution and indemnity claims are properly channeled to Grace's trust to await payment.

The Court begins its analysis with the Bankruptcy Code's definition of a "claim":

[a] right to payment, whether or not such right is reduced to judgment, liquidated, *unliquidated*, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured, or *unsecured*[.]

11 U.S.C. § 105(5)(A) (emphasis added). In adopting this definition, Congress intended the term to have an expansive and all-encompassing definition so as to "permit[] the broadest possible relief in the bankruptcy court." H.R. REP. NO. 95–595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266, at 21; see also In re Jadczak, Bankr. No. 10-11804, 2011 WL 13612, at *5 (Bankr. E.D. Pa. Jan. 4, 2011) (acknowledging the statute's broad scope). Partially due to the expansive scope of the statutory section, federal courts over the years have differed as to when exactly a claim arises under § 105(5)(A).

The Third Circuit put an end to this debate in its recent precedential opinion of Jeld-Wen, Inc. v. Van Brunt (In re Grossman's, Inc.), 607 F.3d 114 (3d Cir. 2010) ("Grossman's"). In that case, a plaintiff purchased asbestos-containing products for her home from Grossman's, a home improvement and lumber retailer, in 1977. Id. at 117. More than twenty years later, Grossman's filed for Chapter

11 bankruptcy, at which time it had actual knowledge that it had engaged in the sale of asbestos-laden products. Id. Grossman's Chapter 11 reorganization plan was confirmed in December of 1997. Id. Subsequently, in 2006, the plaintiff developed mesothelioma as a result of exposure to asbestos, and filed suit against Grossman's. Id. Applying prior caselaw, the bankruptcy court found, and the district court affirmed, that the plaintiff did not have a claim against Grossman's bankruptcy estate because her symptoms did not manifest until nearly ten years after Grossman's had filed its petition for bankruptcy. Id. at 118.

On appeal, the Third Circuit, sitting *en banc*,[70] overruled the lower courts (as well as prior contradictory caselaw), and clearly held that: "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." Id. at 125. In regard to the plaintiff, this meant that her claims against Grossman's arose in 1977 when she was first exposed to the asbestos-laden product. Id.

The Court finds that, despite Appellants' statements to the contrary, Grossman's is directly applicable to this case and that Montana and the Crown's indirect claims for contribution and indemnity

---

[70] In its review of this case, the Third Circuit noted the importance of its precedential holding, stating that: "It is only on a rare occasion that we overrule a prior precedential opinion. We assemble en banc to consider whether this is such an occasion." In re Grossman's, 607 F.3d 114, 117 (3d Cir. 2010) (Sloviter, J.).

Prior to its holding in this case, Avellino & Bienes v. M. Frenville Co., (Matter of M. Frenville Co.), 744 F.2d 332 (3d Cir. 1984) ("Frenville") provided the governing test in the Third Circuit for when a claim arose under the Bankruptcy Code. The Frenville test dictated that a claim arose when a right to payment accrued under state law. Id. at 337.

At the time that the Joint Plan was pending before the Bankruptcy Court, Frenville was still governing law. Therefore, Montana argued both before the Bankruptcy Court and now before this Court that Montana state law should apply to its claims. (See Montana Br. 21.) On July 2, 2010, the Third Circuit issued its opinion in Grossman's, whereby it expressly overruled the Frenville Test. Grossman's, 607 F.3d at 121 ("We are persuaded that the widespread criticism of Frenville's accrual test is justified, as it imposes too narrow an interpretation of a 'claim' under the Bankruptcy Code. Accordingly, the Frenville accrual test should be and now is overruled."). Thus, the holding of Grossman's remains the only applicable governing law for this Court to consider, and it therefore need not engage in an analysis of Montana state law on this point.

constitute "claims" under its holding. It is undisputed that the Libby Claimants and the Canadian

plaintiffs in the ZAI class action suits were exposed to Grace Asbestos long before Grace's filing of its

bankruptcy petition in 2001. Grace owned and operated the mine in Libby, Montana between 1963 and

1990.[71] Grace's predecessor shipped Zonolite materials used in ZAI products as early as the 1920's.

Moreover, the conduct giving rise to injury here—Grace's mining of asbestos, shipment of ZAI

products to Canada, and Montana and the Crown's alleged failure to warn—all occurred prior to the

2001 bankruptcy petition. Montana would have this Court find that the holding of Grossman's only

applies to direct tort claims under Grace's Joint Plan. However, at no point in its Opinion did the Third

Circuit exempt indemnity and contribution claims in Chapter 11 reorganization plans from the holding

of Grossman's. To do so, in fact, would have been contra to the broad definition that Congress intended

for § 101(5)(A) to have under the Code. See Grossman's, 607 F.3d at 121 (recognizing that Congress

intended the "broadest possible definition" of the term "claim" in its statutory creation). Moreover,

subsequent cases applying Grossman's have held that its holding is not limited to direct tort claims.

See In re Rodriguez, 629 F.3d 136, 142 (3d Cir. 2010) (holding that a mortgagee's right to collect

unpaid escrow amounts from mortgagors constituted a "claim" because it was rooted in the language

of the loan documentation and mortgage itself that were available to both parties prior to bankruptcy

filing); In re Gainey Corp., 447 B.R. 807, 818 (W.D. Mich. May 6, 2011) (finding that a sales order that

relieved a purchaser from the obligation to pay insurance deductibles for tort claims asserted against

the company constituted "claims" because they were based on torts that predated the asset sale); In re

266 Wash. Assoc., 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) ("Generally, unsecured creditors hold

substantially similar claims; they are claimants of equal legal rank entitled to share pro rata in values

---

[71] Prior to 1963, Grace's predecessors, the Zonolite Company and Universal Zonolite Insulation Company ("Zonolite"), owned and operated the Libby mine. Zonolite assigned all of its rights, title, interest, and equity to Grace upon its purchase of the mine. In re W.R. Grace & Co., 386 B.R. 17, 23–24 (Bankr. D. Del. 2008).

remaining after payment of secured and priority claims. It has accordingly been observed that unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor.") (internal quotations and citations omitted).

Finally, the Court is unconvinced by Montana and the Crown's arguments that their requests for indemnity and contribution are still too contingent to be deemed "claims" because their rights to assert those claims have not yet accrued. This makes no difference under the Bankruptcy Code because § 101(5)(A) expressly encompasses requests that may still be "contingent," "unmatured," and "unliquidated." See 11 U.S.C. § 101(5)(A). In fact, the Third Circuit has previously found that "the contingent nature of the right to payment does not change the fact that the right to payment exists, even if it is remote, and thereby constitutes a 'claim' for purposes of § 101(5)." Rodriguez, 629 F.3d at 142. Thus, Appellants' argument is without merit.

### b. Demands under the Bankruptcy Code

In the alternative, Montana and the Crown also allege that their requests for indemnity and/or contribution do not constitute "demands" under the Bankruptcy Code because their requests for payment have not yet become due, and that therefore their claims should be exempt from the § 524(g) channeling injunction.

Section 524(g) defines the term "demand" in the context of Chapter 11 reorganization plans related to asbestos liability as a "demand for payment" that is either "present or future" and that "arises out of the same or similar conduct or events that give rise to the claims addressed by the injunction." 11 U.S.C. § 524(g)(5)(B). Thus, the straightforward reading of the statute would appear to be that a demand is a claim that is either already present or may arise at some point in the future. Montana and the Crown's requests for indemnity and/or contribution fit neatly within the parameters of this definition—they are claims against Grace seeking reimbursement for personal injury lawsuits related to Grace Asbestos that Appellants defended or will defend in the future. Thus, the Court finds that

Appellants' indemnity and/or contribution requests also satisfy the definitional requirements of "demands" under the Bankruptcy Code.

For all the aforementioned reasons, the claims made by Montana and the Crown fall within the definitions of "claims" and "demands" under the Code. Therefore, these claims and demands are properly subjected to the § 524(g) injunction and are properly channeled to the trust to await payment.

### E. Feasibility of the Joint Plan

Section 1129(a)(11) of the Bankruptcy Code provides that:

(a) The Court shall confirm a plan only if all of the following requirements are met:

* * *

> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. 1129(a)(11). The debtor bears the burden of proof on this inquiry, and must show by a preponderance of the evidence that a reorganization plan is feasible. Corestates Bank, N.A. v. United Chem. Techs. Inc., 202 B.R. 33, 45 (E.D. Pa. 1996 (Padova, J.) (internal citations omitted); In re S. Canaan Cellular Invs., Inc., 427 B.R. 44, 61 (Bankr. E.D. Pa. 2010).

The purpose of the feasibility requirement is to prevent court confirmation of "visionary schemes." In re Solange D. Chadda, Bankr. No. 07-12665, 2007 WL 3407375, at * 4 (Bankr. E.D. Pa. Nov. 9, 2007) (internal citations omitted). In order to find a reorganization plan worthy of confirmation, the bankruptcy court must make a specific finding as to the plan's feasibility. S. Canaan Cellular, 427 B.R. at 61; see also Chadda, at *4. In making this finding, the bankruptcy court need not require a guarantee of success, but rather only must find that "the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success." Corestates Bank, 202 B.R. at 45 (citing 5 *Collier on Bankruptcy* ¶ 1129.02[11] (15th ed. 1991)). However, the debtor's own unsupported sincerity and belief that its plan is feasible is insufficient to satisfy the

inquiry.  S. Canaan Cellular, 427 B.R. at 61.  Rather, "[t]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  Id. (internal citations and quotations omitted).

The bankruptcy court can consider a wide array of factors in determining a plan's feasibility, including assessment of the debtor's capital structure, the earning power of the business, economic conditions, and the ability of the corporation's management.  See In re Landmark at Plaza Park, Ltd., 7 B.R. 653, 659 (Bankr. D.N.J. 1980).  Most importantly, the debtor must provide the bankruptcy court with an estimate of its future earning capacity.  See In re Phila. & W. Ry. Co., 51 F. Supp. 129, 131 (E.D. Pa. 1943).

In the instant case, the record clearly reflects that the Bankruptcy Court considered evidence concerning estimates of Grace's future earning capacity, capital structure, earning power, and current economic conditions.  The Bankruptcy Court particularly credited the two-day expert testimony of Ms. Pamela Zilly, a vastly experienced investment banker and financial adviser that has previously been retained to work on other mass tort bankruptcy cases.  The record also indicates that the Bankruptcy Court considered several financial reports and exhibits that were entered into evidence, as well as additional witness testimony.  After careful consideration of all the evidence before it, the Bankruptcy Court found that "[i]n light of Grace's past performance, its ability to obtain exit financing, and its reasonable and conservative projections, we find that Reorganized Grace will be able to pay its debts as they come due."  In re W.R. Grace & Co., 446 B.R. 96, 142 (Bankr. D. Del. 2011).

This Court finds ample evidence in the voluminous record before it to support the Bankruptcy Court's finding.  Given her extensive prior experience and expertise in mass tort bankruptcies, Ms. Zilly was more than qualified to testify as to Grace's future earning capacity, capital structure, and earning power.  Ms. Zilly testified that, in her expert opinion, Grace could emerge from bankruptcy as a financially strong corporation that would continue to steadily grow and garner significant profits that

would enable it to satisfy its outstanding liabilities. Ms. Zilly's expert opinion was well supported and properly based on her analysis of Grace's corporate structure, internal records and historical precedent, financial reports of Grace's current business performance, financial projections of its future earning capacity, review of cost-cutting measures and productivity programs implemented since Grace entered bankruptcy, and analysis of a $37.3 million reserve established by Grace to cover its unsettled property damage claims and allocate payment for future claims. This evidence indicated that Grace's sales had doubled between 2000 and 2008, a time period that spanned several cycles of the chemical industry and troubling economic times. Ms. Zilly also analyzed and testified that Grace's Core EBITDA[72] showed a 64% increase between 2003 and 2008, and was therefore indicative of Grace's current profitability and future earning capacity as a corporation. Moreover, Grace also offered into evidence the written testimony of its General Counsel, Mr. Shelnitz, to explain how it arrived at the estimated value of future asbestos claims. The Bankruptcy Court properly credited this witness testimony, and this Court must "extend[ ] great deference to the Bankruptcy Court's assessment of the witnesses' testimony." Corestates Bank, 202 B.R. at 46 (citing Fellheimer, Eichen, & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1223 (3d Cir. 1995)).

Therefore, based on the extensive evidence before it, the Court believes that there is more than a "reasonable probability" that the Joint Plan would be successful. The evidence is credible, well supported, reasonable, and appropriately provides the Court with an accurate depiction of Grace's current and future financial status. Following confirmation, it is likely that "the things which are to be done . . . can be done as a practical matter under the facts." South Canaan Cellular, 427 B.R. at 61

---

[72] EBITDA is a commonly-used financial acronym that stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization." The EBITDA attempts to provide an accurate measure of a corporation's earnings that closely resembles its cash flow by removing large non-cash expenditures from the company's Statement of Operations. See Joseph J. Sciametta & Jack Kloster, EBITDA vs. Free Cash Flow—A Study in Viability and Value Indicators, 22 AM. BANKR. INST. J. 16 (Mar. 2003).

(internal citations and quotations omitted). Thus, the Court finds that Grace satisfied its burden of proving that the Joint Plan is feasible and that liquidation or further financial reorganization will not be likely.

Nevertheless, two Appellants, AMH and Montana, object on the grounds that the feasibility requirement is not satisfied under the present structure of the Plan. For the sake of clarity and finality, the Court considers each Appellant's arguments in turn.

### 1. AMH's Feasibility Claims

AMH contends that Grace failed to meet its burden of proving the Joint Plan's feasibility because it did not present sufficient evidence to establish how its anticipated liabilities would be dealt with under the Plan's provisions. To support its argument, AMH points to a number of alleged deficiencies on Grace's part, including the fact that a formal loan commitment document was not introduced as evidence of Grace's ability to obtain exit financing, Grace's alleged failure to introduce sufficient evidence that the trust could pay its outstanding property damage liabilities in the future, and the Plan's alleged failure to account for AMH's class claim.

The Court first considers AMH's allegation that Grace's introduction of evidence indicating that it could receive exit financing was deficient because it was based on "the confidence of its own investment advisor" and was not supported by any "concrete evidence" such as a formal loan commitment document. (AMH Br. 62.) Both parts of this argument lack merit. Ms. Zilly's testimony regarding Grace's ability to obtain exit financing is not unreliable merely because she was Grace's own financial advisor. In fact, her familiarity with Grace makes her even *more* qualified to accurately inform the Court about Grace's financial stability. Absent a lack of foundation to testify about the matter in question or a ground for impeachment, the Federal Rules of Evidence make clear that Ms.

Zilly's testimony was proper.[73]  Moreover, given that Grace bears the burden of proof here to show that its reorganization plan is feasible, it is only logical to expect that it would present its own financial advisor to attest to this fact.  Numerous other courts have allowed such witness testimony, and the Court sees no reason to dispute this practice.  See, e.g., Corestates Bank, 202 B.R. at 46 (crediting the testimony of a financial analyst specifically hired by the debtor to assist in the preparation of financial statements for reorganization, as well as the testimony of the debtor's own Chief Financial Officer regarding the corporation's financial projections).

Additionally, AMH's argument also fails because neither the Code nor federal caselaw require Grace to submit any specific documents proving the Plan's feasibility.  All that is required is that the debtor satisfy its burden of proof by showing that "a reasonable assurance of commercial viability" is possible.  Chaddha, 2007 WL 3407375, at *4 (internal citation omitted).  Grace more than satisfied this requirement through the presentation of its expert witnesses and demonstrative exhibits.  Ms. Zilly specifically testified that Grace could have obtained formal commitment letters from lenders, but chose not to in order to maintain flexibility in its capital structure.  Similar approaches have been taken by

---

[73]   Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In conjunction with Rule 702, Rule 703 states, in relevant part:

An expert may base an opinion on facts or data in the case that the expert *has been made aware of or personally observed*. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703 (emphasis added).

other courts that have confirmed reorganization plans based upon a reasonable probability that a debtor would be able to obtain financing. See In re Global Ocean Carriers, Ltd., 251 B.R. 31, 46 (Bankr. D. Del. 2000); In re 222 Liberty Assoc., 108 B.R. 971, 986 (Bankr. E.D. Pa. 1990); In re Reading Broad. Inc., 386 B.R. 562, 574 (Bankr. E.D. Pa. 2008). As such, the Court finds that AMH's first argument is without merit.

The Court next considers AMH's allegation that Grace allegedly failed to substantiate its belief that it could satisfy its outstanding property damage liabilities. AMH claims that the only evidence offered on this point was Ms. Zilly's testimony that Reorganized Grace would be able to provide the PD Trust with approximately $1.6 billion over the course of twenty-five years. AMH asserts that the $1.6 billion figure has not been substantiated in any way, and that the Plan does not provide the means for Grace to stretch out its liabilities over a twenty-five year period.

The Court, however, finds ample evidence in the record before it to find that Grace would be able to satisfy its outstanding property damage liabilities over this twenty-five year period. In reaching her conclusion on this point, Ms. Zilly testified that, after an extensive analysis of Grace's financial records and corporate structure, she estimated Grace's unresolved and future property damage claims to be approximately $37 million. In account of this estimate, Grace established a $37.3 million reserve for the purpose of satisfying both its current unresolved and future property damage claims. Moreover, Ms. Zilly approximated that Grace would be able to obtain up to $1.6 billion over the next twenty-five years to pay these outstanding claims. She arrived at this conclusion after extensive review of Grace's financial history, current profitability, and estimated future earning capacity. Her reliance on this information properly supported her expert opinion and was entirely appropriate because experts in this field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Most importantly, her testimony indicates a reasonable probability that Grace would be able to meet its debt obligations. Section 1129(a)(11) of the Code requires nothing more.

Finally, AMH also argues that the Plan is not feasible, and thus cannot be confirmed, because it fails to take into account the possibility that AMH's putative class action claims may be allowed at some point in the future. This argument fails for several reasons. First, both this Court and the Bankruptcy Court have previously ruled that AMH's class action claim has little or no value. See In re W.R. Grace & Co., No. Civ. A. 08-118, 2008 WL 4234339, at *2 (D. Del. Sept. 4, 2008); In re W.R. Grace & Co., 389 B.R. 373, 380 (Bankr. D. Del. 2008). These decisions suggest that it is unlikely that AMH's class claims will ever be allowed, and the foundational structure of AMH's argument is therefore significantly weakened.

Moreover, AMH premises its argument on In re Harbin, 486 F.3d 510 (9th Cir. 2007), which held that "a bankruptcy court cannot adequately determine a plan's feasibility for purposes of section 1129(a)(11) without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan." Id. at 518 (internal citations omitted). However, Harbin is distinguishable from the instant litigation. In that case, a creditor sued a debtor on a breach of contract claim. Id. at 514. The jury returned a verdict in the creditor's favor, but the court set aside the jury verdict and ruled in the debtor's favor. Id. The creditor appealed. Id. While the appeal was pending, the debtor sought to confirm its Chapter 11 plan. Id. The Ninth Circuit held that the plan could not be confirmed because the pending appeal "could significantly affect the plan's feasibility in the future." Id. at 518. Specifically, the potential claim at issue—reinstatement of a jury verdict—was certainly possible. This is not the case here. Given that both this Court and the Bankruptcy Court have previously found that AMH's class action claims lack value, there is no reasonably certain possibility that this claim "could significantly affect the plan's feasibility in the future." Id. As such, AMH's objection on this point is accordingly overruled.[74]

---

[74] AMH also claims that the Plan is not feasible because the procedures associated with the 2003 Bar Date Notice Order for PD Claims are flawed.

In 2002, Grace attempted to organize all the property damage claims brought against it,

In conclusion, the Court also notes that while AMH challenges the feasibility of the Joint Plan on numerous grounds before this Court, it failed to present any concrete evidence of its own on this point before the Bankruptcy Court. While Grace bears the burden of proving that its plan is feasible under § 1129(a)(11), an objecting party "bear[s] the burden of producing evidence to support their objection." In re Armstrong World Indus., Inc., 348 B.R. 111, 122 (Bankr. D. Del. 2006) (citing In re Lernout & Hauspie Speech Prods., N.V., 301 B.R. 651, 656 (Bankr. D. Del. 2003)); see also In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689, 696 (Bankr. D. Kan. 1992) (internal citations omitted). The record indicates that during the Confirmation Hearing proceedings, AMH offered no expert witness of its own to contradict the evidence entered by Grace regarding the Plan's feasibility, despite having ample opportunity to do so. AMH participated in all of the depositions of Grace witnesses, and therefore was provided with sufficient notice and information to form its own credible objection at the Hearing. The only testimony put forth by AMH related to this point was a report prepared by a former Grace analyst in 1995. However, the report was not formally admitted into evidence. Moreover, it was

and sought a centralized way to provide notice to all potential claimants. The result was the Summary Bar Date Notice Program ("Bar Notice"), which was published in thousands of newspapers and periodicals, and was estimated to reach 83% of adults nationwide. Over the years, AMH has repeatedly challenged the sufficiency of the Bar Notice, alleging that the notice procedures used did not reach a sufficient number of potential claimants and thereby violated due process. AMH repeats that argument here. The adequacy of the Bar Notice, however, has long been settled. In 2007, the Bankruptcy Court found that it comports with due process. See In re W.R. Grace & Co., 366 B.R. 302, 304 (Bankr. D. Del. 2007). This finding was affirmed by both this Court and the Third Circuit. See Mission Towers v. W.R. Grace & Co., No. Civ. A. 07-287, 2007 WL 4333817, at *1 (D. Del. Dec. 6, 2007); aff'd 316 Fed. App'x. 134, 136 (3d Cir. 2009).

AMH claims that the Third Circuit's recent decision in In re Grossman's, Inc., 607 F.3d 114 (3d Cir. 2010), discussed more extensively, *supra*, has now re-opened the issue of the adequacy of the Bar Notice. Contrary to AMH's assertion, however, the holding of this case did not significantly alter the sufficiency of the Bar Notice. Rather, the Third Circuit in Grossman's merely clarified the scope of when a "claim" arises in the context of a Chapter 11 bankruptcy plan. Id. at 215. The Bar Notice does not address when a claim arises in this litigation, but is limited to the issue of providing adequate notice to potential claimants. Whether or not any given property damage claimant is now deemed to be a pre-petition or post-petition claimant under the new Grossman's test has no effect on if the claimant was given adequate notice. As such, AMH's objection on these grounds likewise fails.

significantly outdated, and the Bankruptcy Court properly found that it did not therefore accurately depict the amount of Grace's current property damage claims, especially "when actual figures are available and when Grace has settled nearly all of its known PD Claims during the course of its bankruptcy." In re W.R. Grace & Co., 446 B.R. 96, 144 n.82 (Bankr. D. Del. 2011); see also Corestates Bank, 202 B.R. at 46 (overruling an objection to the feasibility of a reorganization plan, even when objecting party put forth its own contrary witnesses testimony). As such, if AMH took issue with the feasibility of the Joint Plan, it should have presented credible contradictory evidence and witnesses of its own on this point before the Bankruptcy Court prior to confirmation of the Plan. Nothing in the record indicates that it was prevented from doing so. Thus, its objection to the Joint Plan's feasibility is overruled.

### 2. Montana's Feasibility Claims

Montana[75] avers that the Joint Plan is not feasible because its alleged indemnity and/or contribution claims purportedly cannot be discharged under the current terms of the Plan. Specifically, Montana asserts that it could potentially hold a claim against Grace valued up to $850 million, which it claims would require the need for further liquidation or reorganization of Grace. Thus, Montana argues that § 1129(a)(11) would be violated by these circumstances.

The Court first considers Montana's hypothetical $850 million[76] future claim against Grace. This monetary figure appears to be derived from a line of questioning of Ms. Zilly by Montana's

---

[75] The Crown does not join Montana in this claim.

[76] Montana contends that it arrived at its current hypothetical $850 million claim amount by estimating that approximately 1,150 claimants could potentially bring suit against it, and that each claim is subject to a statutory maximum of $750,000 under Montana state law. Montana's appellate brief and the record are devoid of any explanation for its previous $750 million claim amount.

counsel at the Confirmation Hearing.[77]   It is a well established maxim, however,  that mere "remarks by counsel are not evidence." Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 n.11 (3d Cir. 2003); see also Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 210 (3d Cir. 1992); Edwards v. City of Phila., 860 F.2d 568, 575 (3d Cir. 1988). Counsel never explained or provided a basis upon which the amount of its hypothetical claim was based. The relevance and reliability of this hypothetical assertion was never ascertained, and therefore this evidence was never formally introduced into the record.  Absent the introduction of otherwise proper evidence or objective data to support its argument, Montana's reliance on this line of questioning is misplaced. See In re B. Cohen & Sons Caterers, Inc., 124 B.R. 642, 647 n.8 (E.D. Pa. 1991).

Additionally, this hypothetical claim remains mere conjecture at this point.  Montana has provided no evidence indicating a "reasonable likelihood" that such a claim could actually be asserted against Grace's bankruptcy estate or when this would occur. South Canaan Cellular, 427

---

[77] Specifically, Montana's counsel questioned Ms. Zilly about Grace's potential ability to pay a hypothetical $750 million non-dischargeable post-confirmation judgment upon the Effective Date of the Plan.  The relevant line of questioning was as follows:

| Montana: | Again, assuming a 750 million dollar non-dischargeable post-confirmation judgment, would Grace have the ability to pay that one year after the effective date? |
| Ms. Zilly: | Well, needless to say, I have not done the analysis, but you know, it's possible they might be able to pay it based on an accrual of cash as well as additional borrowings.  But, you know, again, it's totally based on two assumptions which I have not put down on a piece of paper or figured out what the ramifications of those would be. |
| Montana: | So as you sit here today you're unable to determine that? |
| Ms. Zilly: | I think that's a fair statement. |

(See Conf. Hearing Trans.("Zilly testimony"), 10/13/09, at 157–58, JA 004476) .

B.R. at 61. The mere "'possibility of failure is not fatal' to confirmation." Id. at 62 (quoting 7 *Collier on Bankruptcy* ¶ 1129.02[11] (16th ed. 2009)). The Court refuses to grant such a speculative and unsupported request.

Finally, even if Montana's reliance on this testimony was proper, its argument would still fail because it does not account for how its indemnity and contribution claims would be handled by the TDP. Under the terms of the Joint Plan, Montana's indirect claims for contribution and indemnity will be channeled to the PI Trust to await distribution. No payments will be made until Grace has successfully reorganized. Therefore, any claims asserted against Grace's bankruptcy estate at this time would not affect the viability of Reorganized Grace, or inevitably lead to liquidation or a second reorganization. Accordingly, Montana's objections to the Plan's feasibility are likewise overruled.

## F.      Equality of Treatment Among Creditors

"'Equality of distribution among creditors is a central policy of the Bankruptcy Code.'" In re Combustion Eng'g., Inc., 391 F.3d 190, 239 (3d Cir. 2005) (quoting Begier v. IRS, 496 U.S. 53, 58 (1990)). This emphasis on the equality of distribution among creditors is highlighted within the requirements of 11 U.S.C. §§ 524(g) and 1123(a)(4) of the Code.

Section 524(g) explicitly requires that an asbestos trust value and pay all "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(B)(2)(ii)(V). The Third Circuit has expressly recognized the importance of equality of treatment among creditors under Chapter 11, stating that "a plan of reorganization [must] provide similar treatment to similarly situated claims." Combustion Eng'g, 391 F.3d at 239; see also Grossman's, 607 F.3d at 126 n.12 (citing relevant provisions of Section 524(g)).

Similarly, a Chapter 11 reorganization plan must also meet the requirements of § 1123(a)(4)

of the Code.  Section 1123(a)(4) requires a plan to "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4).  Federal caselaw construing this provision of the Code has interpreted equal treatment to mean that: (1) all class members must be subject to the same process for claim satisfaction, In re Cent. Med. Ctr., 122 B.R. 568, 575 (E.D. Mo. 1990); (2) all class members' claims must be of "equal value" through the application of the same pro rata distribution or payment percentage procedures to all claims,  In re Quigley Co., Inc., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[A]ll members of the class must receive equal value.   In addition, each member of the class must pay the same consideration for its distribution."); In re Adelphia Commc'ns, Corp., 361 B.R. 337, 362, 363 (Bankr. S.D.N.Y. 2007); and (3) all class members must give up the same degree of consideration for their distribution under the plan. Quigley, 377 B.R. at 116–17.  However, perfect or precise equality is not required—only approximate equality. Id. at 116; In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990) ("This is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure since there is no statutory obligation . . . to quantify exactly what each class member is relinquishing[.]") (internal citation omitted).

The Third Circuit has instructed courts analyzing a reorganization plan's equality of distribution to "consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted." Combustion Eng'g, 391 F.3d at 241.  In doing so, the structure of the reorganization plan must comply with the literal terms of the Code and should not "impermissibly discriminate" against certain claimants.   Id. at 239.  The Bankruptcy Court in the instant case found that Grace satisfied all these requirements in its proposed Joint Plan.  However, several appellants, namely the Libby Claimants, BNSF, Montana, the Crown, and AMH, retain

objections to the Plan on the grounds that it impermissibly discriminates against them. The Court considers each objection in turn below.

### 1.     The Libby Claimants' Discrimination Claims

The Libby Claimants allege that the Joint Plan impermissibly discriminates against them in violation of §§ 524(g) and 1123(a)(4) in three ways: (1) the proposed trust distribution procedures ("TDP") set the bar too high for many Libby Claimants to qualify for more severe Disease Levels, and therefore obtain greater recovery; (2) the Joint Plan pays the Libby Claimants less than their pre-bankruptcy settlements; and (3) the structure of the Joint Plan discriminates against those claims covered by Grace's non-products insurance.

### a.     The TDP Criteria for Category IV-B

Personal injury claims under the Joint Plan are categorized according to their nature (*i.e.*, the specific type of pleural disease suffered) and level of severity. These categorizations establish the amount of payment a claimant may obtain under Expedited Review—an accelerated form of claims-processing designed to encourage settlement and conserve resources through the establishment of different levels of pleural disease. The Joint Plan currently has eight asbestos-related "Disease Levels." Each Disease Level is defined by specific medical and compensation criteria derived from medical research and applicable tort system considerations. If a claimant meets the criteria for a specific Disease Level, he can obtain an automatic settlement offer—referred to in the Plan as a "Scheduled Value"—representing a set value associated with that particular level, multiplied by a payment percentage. Those suffering from "severe disabling pleural disease" are assigned Category IV-B under the Plan. The Libby Claimants assert that Category IV-B's criteria is discriminatory because it includes "add-ons" (*i.e.,* additional criteria to the standard diagnostic criteria) that make it very difficult for otherwise-eligible Libby residents to qualify for Category IV-B severe disabling pleural disease (and consequently greater compensation payments under the TDP).

Thus, they allege that this disparate treatment violates §§ 524(g) and 1123(a)(4) because it does not provide the same treatment for each claim or interest among the asbestos personal injury claimants within Class 6.

In support of their argument, the Libby Claimants provide the Court with a myriad of statistics from a mortality study conducted by the Center for Asbestos-Related Disease ("CARD") in Libby, Montana. The CARD study attempts to show that the current categorizations under the Joint Plan would exclude significant percentages of Libby residents because they would not meet the heightened criteria of the add-ons. However, the Bankruptcy Court already addressed this evidence at the Confirmation Hearing, and found that the study was not reliable and did not follow accepted methodology.[78] The Bankruptcy Court was in the best position to consider this evidence because it had the opportunity to hear the parties' testimony and review their extensive briefing over the course of the sixteen-day Confirmation Hearing. This Court agrees with the Bankruptcy Court's assessment that the study is unreliable, and sees no reason to re-open assessment of this already-disqualified evidence.

Additionally, the Court is not convinced that the Category IV-B criteria discriminates against the Libby Claimants because they have failed to establish that similar asbestos claims in Class 6 are not treated "in substantially the same manner" as required by § 524(g), or that the Joint Plan does not "provide the same treatment for each claim" as required by §1123(a)(4). The different Disease

---

[78] Specifically, it was brought to light that Appellants' expert witness that conducted the CARD study did not randomly select his sample, but rather drew his conclusions based on a select group of asbestos patients that he himself treated in Libby. The importance of random sampling in legal research and evidence is a topic that has been widely discussed in various law review and journal articles, and the Court need not opine on this point here. See generally Richard A. Berk, *An Introduction to Sample Selection Bias in Sociological Data*, 48 AM. SOC. REV. 386 (1983); Bert Black, James A. Jacobson, Edward W. Madeira, Jr., & Andrew See, *New Directions in Expert Testimony: Scientific, Technical, and Other Specialized Knowledge Evidence in Federal and State Courts*, SH007 A.L.I.–A.B.A. 115 (2002).

Levels of the Joint Plan are designed to group similar claims together to ensure that claimants with similar profiles are treated uniformly. Here, individuals within Category IV-B are grouped together on the premise that they all suffer from "severe disabling pleural disease." This category is not exclusive to any geographic location, but rather includes all claims that qualify as severe disabling pleural disease. Appellants have not established that they will be treated differently under the plan (*i.e.*, discriminated against) from claimants in other geographic areas. Instead, their argument is that the specific criteria defining Category IV-B is discriminatory because fewer Libby residents are able to meet these standards. This argument fails, however, because it does not show how the criteria would be applied in a discriminatory manner under the Plan. Merely because fewer Libby Claimants qualify for inclusion within this heightened Disease Level does not mean that the Libby Claimants themselves will be treated differently from other claimants within Class 6. The Libby Claimants will have the same opportunity as all other asbestos claimants to establish the nature and severity of their diseases, and the TDP affords all claimants the equal opportunity to increase their amount of recovery if they can prove that they were exposed to Grace Asbestos more than any other asbestos type.[79] Thus, the Court is satisfied that the distribution procedures of Category IV-B are not

---

[79] The Joint Plan takes into account the unique situation of the Libby Claimants in this litigation due to the fact that they were exposed to asbestos through multiple avenues. The Plan accounts for this by lessening the burden of production that the Libby Claimants must establish regarding their specific pleural diseases. Specifically, the TDP permits claimants at lower Disease Levels to bring subsequent claims if their diseases should progress to a more severe diagnosis (including the possibility of qualifying for Category IV-B several disabling pleural disease). Additionally, the Libby Claimants are not required to prove "significant occupational exposure" in order to qualify for additional recovery.

The Joint Plan also accounts for the Libby Claimants' situation through the application of an "Extraordinary Claim Value" multiplier under the TDP, discussed more fully, *infra*. If a personal injury claimant can establish that 75% or more of his asbestos exposure was traceable to Grace Asbestos, then he is entitled to an award of up to five times the set Scheduled Value. If a claimant can establish that 95% or more of his asbestos exposure can be traced to Grace Asbestos, then he is entitled to an award of up to eight times more than the Scheduled Value. These Plan provisions were designed specifically with the Libby Claimants' personal injury claims in mind.

discriminatory and do not violate § 524(g) or § 1123(a)(4).

Finally, the Libby Claimants' discrimination argument also fails because of the Individual Review safeguard put in place by the Joint Plan. Under the Individual Review process, a personal injury claimant may still be able to recover up to the Maximum Value of his claim, even if he otherwise failed to meet the criteria to qualify for a specific Disease Level under Expedited Review. Individual Review was established to safeguard claims that are viable, but that may have otherwise slipped between the cracks of the eight Expedited Review categories. The Individual Review process allows claimants that are displeased with their recovery or categorization under Expedited Review to present their claims and any supporting evidence to a panel of trustees representing the asbestos trust. The panel may award such claimants liquidated settlements if it finds they are entitled to greater recovery or a higher categorization than they were given in Expedited Review.

The Libby Claimants allege that the Individual Review process itself is discriminatory because a significant percentage of Libby residents would not qualify for Category IV-B under Expedited Review, and would therefore be "shunted" to the as-of-yet undeveloped process of Individual Review "by reason of discriminatory medical criteria." (Libby Br. 20.) Again, this argument fails on the same grounds—Appellants have failed to show how exactly they would be treated differently than other similarly situated claimants. There is no evidence in the record indicating that the Libby Claimants in particular would be afforded different treatment during the Individual Review process. In fact, Individual Review would actually allow the displeased Libby Claimants the possibility to recover even *more* than they otherwise could under the structure of the Joint Plan. Merely because the process of Individual Review has not yet been fully developed does not mean that the trustees will make their review decisions in a discriminatory fashion. Therefore, the Court finds that Individual Review would cure any discrepancies that could possibly occur under Expedited Review, and that all similarly-situated claimants would be treated in substantially the

same manner under the Joint Plan.[80]

In viewing the Joint Plan as an "integrated whole," the record shows that equality of distribution among creditors is satisfied here. The Court therefore affirms the Bankruptcy Court's finding that the claim processing mechanisms of the TDP comply with §§ 524(g) and 1123(a)(4) of the Bankruptcy Code, and that the Libby Claimants have not proven any unfair discrimination.

### b. Pre-Bankruptcy Settlements

The Libby Claimants also allege that the Joint Plan discriminates against them by paying them at a rate less than what Libby residents received in pre-bankruptcy settlements with Grace. Prior to filing for bankruptcy, the average asbestos-related lawsuit against Grace in Libby settled for approximately $268,000. The Libby Claimants allege that under the current structure of the Joint Plan, they stand to receive substantially less compensation. Grace counters that the personal injury claim values utilized by the Joint Plan reflect Grace's pre-bankruptcy settlement history, adjusted to bring them current. Under the Plan's structure, each of the eight designated Disease Levels has a Scheduled Value assigned to it that reflects nationwide settlement values obtained in the tort system. Appellants argue, however, that in order for the TDP to actually yield a Scheduled Value

---

[80] The Libby Claimants also argue that the Individual Review process is discriminatory because it impermissibly delegates the Court's authority to a non-judicial entity—the panel of trustees representing the trust. In making their argument, the Libby Claimants rely heavily on the language of In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005). That case involved the confirmation of a debtor's proposed claims liquidations procedures under § 502(c) of the Bankruptcy Code, which would have allowed a non-judicial committee to determine actual distributions to individual claimants. The Libby Claimants' reliance on this case is incorrect because its holding is rooted in § 502 of the Code, which mandates that a court determine the validity and amount of claims. See 11 U.S.C. § 502(b) ("the *court* shall determine the amount of such claim . . . .") (emphasis added). In contrast, the case at hand deals with an asbestos trust under § 524(g) of the Code. Section 524(g) does not require that a court determine the amount and validity of claims, but rather authorizes the utilization of various "mechanisms" to do so. See 11 U.S.C. § 524(g)(2)(B)(ii)(V) (providing that "pursuant to court orders *or otherwise*, the trust will operate through mechanisms . . . that provide reasonable assurance that the *trust* will value, and be in a financial position to pay, present claims and future demands") (emphasis added). Thus, G-I Holdings is factually distinct, and the Joint Plan's Individual Review process does not impermissibly delegate authority to a non-judicial entity.

equivalent to the pre-bankruptcy settlement amounts in Libby, they would need to qualify for inclusion within Disease Level Category IV-B. As mentioned above, many Libby Claimants do not qualify for Category IV-B based upon the nature and severity of their pleural diseases. Thus, the Libby Claimants allege that Grace's valuations under the Joint Plan were "designed" to discriminate against them by having assigned Scheduled Values "far less than the [actual] tort system value of their claims." (Libby Br. 22.)

Sections 524(g) and 1123(a)(4) only require that an asbestos trust value and pay "present claims and future demands that involve similar claims in substantially the same manner," 11 U.S.C. § 524(g)(B)(2)(ii)(V), and that a reorganization plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4). Although "procedures may vary somewhat between classes," all that is required by these provisions of the Code is that "the primary treatment is unquestionably the same for each claimant" within each class. In re Dow Corning Corp., 244 B.R. 634, 669 (Bank. E.D. Mich. 1999). Thus, in order to constitute discrimination, a reorganization plan would have to single out specific claimants within a class for disparate treatment.

The TDP values for asbestos personal injury claims under Grace's Joint Plan were set using national averages that reflected claimants' exposure to Grace Asbestos in all states, not just Montana. This was done to ensure uniform treatment among claimants nationwide and to conserve trust resources. Thus, the Joint Plan purports to lump together claimants that share similar diagnoses and levels of pleural disease severity so that similarly situated individuals receive the same treatment. Nothing in the record indicates that the Libby Claimants would be singled out for disparate treatment from others within Class 6. In fact, all the claimants within Class 6—including those from Libby and elsewhere—will have an equal opportunity to present their claims for categorization purposes under the Joint Plan. Each of these claimants will be analyzed under the same categorization criteria. Dependent upon the nature and severity of their disease, each will be assigned to a specific Disease

Level associated with a specific dollar amount. Once liquidated, every payment within Class 6 will then be multiplied by the same payment percentage. Nothing in this process indicates that the Libby Claimants are earmarked for disparate treatment within Class 6. To the contrary, this procedure clearly indicates that the Libby Claimants will receive the same treatment as all other claimants within Class 6. This equality of treatment is all that is required by §§ 524(g) and 1123(a)(4).[81] [82]

---

[81] The Libby Claimants' discrimination argument also ignores the second clause of § 1123(a)(4), which states that disparate treatment of a claim is permissible if the holder of that claim "agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). The initial compensation option available to the Libby Claimants under the Joint Plan is to seek an automatic settlement payment under Expedited Review—an entirely voluntary decision. If a claimant is unhappy with his categorization or amount of compensation received under Expedited Review, he can elect to pursue Individual Review. Therefore, even if the Expedited Review process did by some chance treat the Libby Claimants less favorably (and the Court finds that it does not), it is completely within a claimant's discretion whether or not to accept the settlement offer presented to him. Should a Libby Claimant accept such an offer rather than seeking Individual Review of his claim, he is thereby agreeing to the "less favorable treatment." See In re Dow Corning Corp., 244 B.R. 634, 669 (Bank. E.D. Mich. 1999) ("[A]ny claimant who selects settlement will have done so in a manner that complies with the second clause of § 1123(a)(4).") (internal citation omitted). Thus, the Libby Claimants' discrimination claim doubly fails on these grounds.

[82] The Scheduled Values assigned to each Disease Level under the Joint Plan are based on the premise that most asbestos claimants will be unable to exactly pinpoint the type of asbestos to which they were exposed. The structure of the Joint Plan therefore takes into account that these claimants can bring claims against several defendants in the tort system for their personal injuries related to asbestos, and can thereby obtain compensation from other defendants besides Grace. The Joint Plan also accounts for, however, the rare situation in which a claimant can pinpoint that he was predominantly exposed to Grace Asbestos and would be unlikely to recover damages from other defendants. In such a situation, an "Extraordinary Claims Value" multiplier is applied to the claimant's regular Scheduled Value under the TDP, entitling the claimant to obtain a claim up to eight times its Scheduled Value.

The Libby Claimants assert that the Extraordinary Claims Value multiplier discriminates against them because a claimant would need to show that he has "little likelihood of substantial recovery elsewhere" in order to obtain its benefit, and that the "Plan Proponents have long been aware that Libby Claimants assert claims against wrong-doers in addition to Grace." (Libby Br. 25.) Once again, the Libby Claimants have put forth a straw man argument—the requirement of proving a small likelihood of recovery from other tortfeasors applies equally to *all* claimants within Class 6 that wish to take advantage of the Extraordinary Claims Value multiplier. Nothing in the record indicates that the Libby Claimants would be the only members of Class 6 "disadvantaged" by this mechanism. Thus, their argument cannot stand.

### c.       Grace's Non-Products Insurance Coverage

As previously discussed, Grace's insurance provides it with both "products" and "non-products" coverage.  Products coverage covers Grace's liability for injuries from manufactured asbestos-containing products, while non-products coverage applies to liabilities resulting from exposure to Grace Asbestos in particle form.  The Libby Claimants hold non-product claims because their exposure to Grace Asbestos was primarily due to inhaling vermiculite from the Libby mine.  Grace's products insurance includes aggregate limits on the total amount insurance companies are required to pay per claim.  On the other hand, Grace's non-products coverage has no limit, but rather permits payment of an unlimited amounts of claims, provided that such claims do not exceed the per occurrence limit on the policy.  According to Appellants, Grace's insurance covers 100% of its non-products claims, while only covering approximately 7% of its products claims as a result of the aggregate limitations.   Appellants argue that, as non-products claimants, they hold "stronger insurance rights" than their product claimant counterparts because Grace's insurance permits greater coverage for its non-products claims.  Essentially, Appellants' argument is that because Grace's insurance covers a greater percentage of its non-products than products claims, the non-product claimants are more important and are entitled to greater compensation.  They argue that the two groups should not be held to the same standards, and that doing so results in discriminatory treatment.

In order for the Libby Claimants to receive any additional compensation under Grace's insurance policy, they would first need to prove that they possess a right to the non-products insurance proceeds.  As explained in detail above, the general rule of the Third Circuit is that insurance policies which provide liability coverage become part of the debtor's estate upon filing for bankruptcy.  See ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F. 3d 252, 260 (3d Cir. 2006); First Fid. Bank v. McAteer, 985 F.2d 114, 116 (3d Cir. 1993).  Thus, rights to Grace's insurance policies

became property of Grace's bankruptcy estate when it filed for bankruptcy in April of 2001. Since the Libby Claimants were not named insureds under the policies, the Third Circuit rule makes clear that they did not hold rights to the non-products insurance.

Due to the fact that the Libby Claimants hold no direct rights to the insurance proceeds, the only other way that they could receive any additional insurance proceeds would be to show that they hold a particular interest in the policy. "While federal law defines the limits of what is property of the estate, it is state law which determines a debtor's interest in particular property." In re Warrington, 424 B.R. 186, 189 (Bankr. E.D. Pa. 2010); accord, Butner v. United States, 440 U.S. 48, 54 (1979). Therefore, any insurance interests the Libby Claimants may hold must be analyzed under state law. Under Montana law, "the long-established rule" has been that "a direct action against an insurer does not lie until the liability of the insured has been established[.]" Ulrigg v. Jones, 274 Mont. 215, 224 ,907 P.2d 937, 943 (Mont. 1995) (internal citations omitted).[83] Thus, the Libby Claimants must establish Grace's liability to them in order to attain any additional

---

[83] According to the Libby Claimants, under Montana state law, their rights to the insurance proceeds vested at the time of their injuries. In making their argument, the Libby Claimants rely on the holding of McLane v. Farmers Ins. Exch., 150 Mont. 116, 120, 432 P.2d 98, 100 (Mont. 1967) (providing that an automobile accident victim's rights in his insurance policy vested either at the time of the accident or, alternatively, at the time of the implied waiver of the right to rescind). However, although the Libby Claimants' reading of McLane is correct, their reliance on it is misplaced.

As discussed in detail above, McLane dealt with an insurance policy regarding an automobile accident. The issue in that case was whether an insurance company's actions constituted an implied waiver of its right to rescind its coverage. Id. at 99. The plaintiff's liability was not at issue. Since McLane became law in 1967, no other case in Montana has cited it as legal authority for the position that a victim's rights to insurance proceeds vest at the time of the accident. In fact, subsequent Montana caselaw has established that automobile accident insurance holds a unique place in the state's legal landscape. Specifically, Montana has a "public policy" of protecting injured victims of automobile accidents by granting them payment of damages which are not in dispute without first executing a settlement agreement and final release. See Ridley v. Guar. Nat. Ins. Co., 286 Mont. 325, 336, 951 P.2d 987, 993 (Mont. 1997); see also Dubray v. Farmers Ins. Exch., 307 Mont. 134, 137, 36 P.3d 897, 900 (Mont. 2001). Given the unique position of automobile insurance proceeds under Montana state law, the Court declines to apply the holding of McLane to the non-automobile accident insurance case at hand.

compensation.

The Libby Claimants, however, have failed to show this Court how Grace is liable to them. Instead, they merely repeat their blanket statement that "[u]nder state law the Libby Claimants have the right to collect from Grace's insurers," (Libby Br.28), without providing any direct evidence or legal citation as to why such liability is warranted. There has been no underlying judgment or settlement with Grace post-bankruptcy upon which liability may be premised. See Lough v. Ins. Co. of N. Am., 242 Mont. 171, 173, 789 P.2d 576, 577 (Mont. 1990) (indicating that liability may be established by an underlying settlement or judgment). Nor have the Libby Claimants asserted that Grace is liable to them based on a cause of action rooted in a Montana statute. See Ulrigg, 907 P.2d at 944 (providing that liability may be established if the Montana state legislature expressly creates a cause of action by statute). As a result, Appellants have not established Grace's liability under Montana state law, and thus do not have a right to any additional insurance proceeds.

In sum, the Libby Claimants have not established that the Joint Plan impermissibly discriminates against them. Rather, the Court is satisfied that the Joint Plan "provide[s] reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). Therefore, the Bankruptcy Court's determination that the Joint Plan is not discriminatory toward the Libby Claimants is affirmed.

### 2. BNSF's Discrimination Claims

BNSF also argues that some of its claims are treated substantially differently than other claims within the same class. Thus, BNSF asserts that the Joint Plan cannot be confirmed because it contravenes § 1123(a)(4) of the Bankruptcy Code, and its established procedure unfairly increases BNSF's administrative costs. Each argument is considered separately below.[84]

---

[84] BNSF also alleges that the Joint Plan improperly classifies its claims within Class 6, claiming that "[t]he common-law claims of BNSF should have been separately classified based on disparate treatment[.]" (BNSF Br. 26 (internal capitalization omitted).) In making this

### a.    Equal Treatment Under Section 1123(a)(4)

The current structure of the Joint Plan accounts for both direct and indirect claims against Grace.  For all intents and purposes, direct claimants under the TDP are those individuals that directly suffered injuries from exposure to Grace Asbestos.  Indirect claims against Grace are those claims that are derivative of Grace's liability, such as common-law indemnity and contribution claims, brought by co-defendants of Grace in the tort system. BNSF is an indirect claimant of Grace because it seeks indemnification and contribution from Grace for personal injury lawsuits it previously defended or will defend related to the Grace Asbestos that it transported by railroad from the Libby mine site.

Grace's PI Trust has established procedures to handle the payment of both direct and indirect claims.  The matrix put forth by the TDP authorizes all direct claimants within Class 6 to receive Scheduled Values (or, if they meet the necessary prerequisites, Maximum Values) that purport to reflect the estimated value of their claims outside of bankruptcy.  An indirect claimant's payment under the TDP depends on the claimant's relationship with a direct claimant.  An indirect claimant must first prove that it paid all, or a significant portion, of a liability that Grace owed to a direct claimant.  The indirect claimant can then pursue an indemnity and/or contribution claim against the trust.  At this point, the indirect claimant assumes the same position as a direct claimant and is entitled to recover from the trust the same amount that a direct claimant could have recovered had it brought a direct claim against the trust itself.

As previously mentioned, the Joint Plan takes into account that several direct claimants may have been exposed to more than just one type of asbestos or may be unable to adequately trace their exposure to one specific type.  In such instances, the Joint Plan reduces the amount of recovery such

---

argument, however, BNSF makes no mention of the relevant provision of the Bankruptcy Code, 11 U.S.C. § 1122(a), or any supporting caselaw.  The Court refuses to make BNSF's argument for it.  Therefore, based on a lack of evidence to the contrary, the Court affirms the Bankruptcy Court's finding that BNSF's claims are properly classified in Class 6.

claimants can obtain from Grace because they can potentially recover from multiple asbestos manufacturers. Similarly, the Joint Plan also accounts for claimants that may be able to prove that they were predominantly exposed to Grace Asbestos. In this scenario, the individual would be entitled to receive "Extraordinary Claims Value" treatment, meaning that his actual award could be up to eight times its Scheduled Value. However, if an Extraordinary Claims Value claimant can additionally obtain recovery from a non-debtor, then the overall award is reduced to the Scheduled Value amount (or, in qualifying circumstances, the Maximum Value) on the premise that claimants should not be able to recover "more than once" for their injuries. The amount of indemnification and contribution that the non-debtor could receive from Debtor Grace in such instances, however, would be limited to the amount the direct claimant could have received directly from Grace.[85]

---

[85] A step-by-step example is particularly helpful to understand this process. Suppose a hypothetical Libby Claimant brings a claim against BNSF for personal injuries related to its derivative liability for operation of the railroad in Libby, Montana. Debtor Grace would likely be a co-defendant in the litigation because the injuries would be connected to Grace Asbestos.

- Assume that the Libby Claimant prevails in the litigation and obtains an award in the amount of $400,000 (the same amount that has been established as the approximate base line for Libby Claimants suffering from severe pleural disease that can prove that they were exposed 95% or more to Grace Asbestos).
- Assume that BNSF initially pays the Libby Claimant this amount. Due to the fact that BNSF and Grace were co-defendants in the litigation, payment of this award would extinguish any subsequent claims that the Libby Claimant could have against Grace.
- BNSF would then seek indemnity and contribution from Grace in an amount representing Grace's share of the liability.
- Under the Plan, indirect claimants seeking indemnity and contribution step into the shoes of the former direct claimant to pursue their claims, and can recover the same amount the direct claimant could have recovered from the trust. In continuing with the aforementioned example, this means that BNSF would receive the same amount for its indirect claim as that which the Libby Claimant would have recovered directly from Grace's trust.
- Assume that the Libby Claimant can prove that he suffers from severe pleural disease and that the Scheduled Value of his claim would be $50,000 under the TDP. Further assume that the claimant, being from Libby, could prove that he was predominantly exposed to Grace Asbestos by more than 95%. In such a situation, the Extraordinary Claim Value would have entitled this hypothetical Libby Claimant to eight times the Scheduled Value of his claim ($400,000) had he directly pursued his claim against Grace.
- However, because the claimant could obtain additional recovery from another party (BNSF), his recovery would be limited to the Scheduled Value of the claim ($50,000) to avoid allowing double recovery.
- Thus, Grace would only indemnify BNSF for $50,000 because this is the amount that the Libby Claimant could have recovered directly from the trust.

BNSF alleges that essentially all claims brought against it could be valued at the Extraordinary Claims Value level because its allegedly tortious actions primarily occurred in Libby, Montana. Thus, it claims that most creditors in Class 6 will receive awards roughly equal to their estimated value outside of bankruptcy, but "indirect claimants such as BNSF who make payment to Grace Exposure Claimants in the first instance and then assert common-law indemnity or contribution against the Debtor . . . receive significantly reduced awards," thereby singling them out for disparate treatment under the Plan. (BNSF Br. 16.) In response, Grace claims that the Joint Plan as applied to BNSF does not discriminate against BNSF because the same process is used to handle all indirect claims made against the Grace trust.

At the outset, the Court notes BNSF appears to be solely challenging the Joint Plan on the grounds of disparate treatment based on its alleged common law indemnity and contribution rights.[86] Grace suggests that this Court need not even consider BNSF's alleged common law indemnity and contribution claims because this issue was not raised below before the Bankruptcy Court. In a

---

[86] BNSF also holds contractual indemnity rights in regards to any asbestos-related liability with Grace in Libby, Montana. Between 1938 and 1995, Grace and BNSF entered into several agreements, including various property leases, quit-claim deeds, right-of-way agreements, assignment contracts, and asset transfer agreements. Under the terms of these various agreements, Grace and BNSF agreed that Grace would fully indemnify BNSF for any and all asbestos-related claims asserted against BNSF, including defense costs. See In re W.R. Grace & Co., 386 B.R. 17, 23–24 (Bankr. D. Del. 2008); In re W.R. Grace & Co., 446 B.R. 96, 125 n.47 (Bankr. D. Del. 2011). BNSF previously objected to treatment of its contractual indemnity rights under the Joint Plan. The Bankruptcy Court therefore amended the Joint Plan in December of 2010 by adding Section 5.14 to the TDP, entitled "BNSF TDP Claims," which covers "claims of BNSF seeking indemnification from Grace based upon an alleged contractual indemnity obligation." Under Section 5.14 of the TDP, BNSF's contractual indemnity claims will be channeled to the trust, where they will be reviewed, processed, and payment will be determined.

In its briefing submitted to this Court, BNSF recognizes that its objections based on contractual indemnity were resolved by the addition of Section 5.14. (See BNSF Br. 18 n.3 ("To the extent BNSF's indirect claims falls within its contractual indemnity, it will be entitled to an award equal to its actual non-bankruptcy value. BNSF asserts that most of its indirect claims constitute contractual indemnity claims.").) In that very same footnote, BNSF also asserts that "[n]either the Debtors nor the other Plan Proponents, however, have admitted that the [contractual] indemnity agreements exist . . . or are binding[.]" (Id.) Therefore, to the extent that any part of BNSF's present argument attempts to extend to its contractual indemnity rights, the Court finds that this issue was already addressed by the Bankruptcy Court's December 2010 Plan modification.

footnote, BNSF asserts that "while not expressly using the word 'indemnity,' BNSF specifically argued [to the Bankruptcy Court] that its indirect claims, where derivative liability was imposed on BNSF, were being accorded disparate treatment."  (BNSF Reply Br. 4 n.1.)  In a March 4, 2011 Memorandum Opinion and Order,[87] the Bankruptcy Court explicitly stated that:

> BNSF cited no law in support of [a common law right to contribution], and did not mention it in its post-trial brief, or its pretrial statement. Furthermore, BNSF did not argue or address the issue of a common law right to contribution at the confirmation hearing . . . At [a] hearing on March 2, 2011, BNSF referred to a "common law indemnity claim."  This was the first mention by BNSF of a common law indemnity claim and to the extent BNSF meant "indemnity" in this statement as opposed to "contribution," its motion for reconsideration is denied as it never raised the issue before.  To the extent BNSF meant to refer to a common law contribution claim, it has not pursued this.

In re W.R. Grace & Co., Bankr. No. 01-1139, 2011 WL 832940, at *1–2, n.5 (Bankr. D. Del. Mar. 4, 2011).   The Bankruptcy Court was in the best position to analyze the evidence before it, and appears to have resolved this issue with its aforementioned Memorandum Opinion and Order. Nevertheless, for the sake of clarity and to ensure comprehensive resolution of this issue, the Court will proceed to consider the merits of BNSF's disparate treatment claim.

As set forth above, in bankruptcy, equality of treatment among creditors in a Chapter 11 reorganization plan  has two aspects: (1) all members of the class must receive equal value for their claims; and (2) each member of the class must pay the same consideration for distributions under the plan.  Quigley, 377 B.R. 110, 116 (S.D.N.Y. 2007).  Equal value has been interpreted by the federal courts to mean that all class members' claims must be subject to the same process for claim satisfaction through the application of the same pro rata distribution and payment percentage procedures.  See In re Cent. Med. Ctr., 122 B.R. 568, 575 (E.D. Mo. 1990); In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990).  The Court finds that this requirement has been satisfied

---

[87] The final version of the Joint Plan was amended and confirmed on January 31, 2011. Therefore, any subsequent opinions and orders of the Bankruptcy Court only addressed any residual issues, but did not significantly alter the structure of the Joint Plan that is presently on appeal before this Court.

in the instant case. Pursuant to the TDP, all indirect claimants must first successfully establish that they have "paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation," and that this payment would "forever and fully release[ ] the PI trust from all liability to the Direct Claimant." (Plan Ex. 4, § 5.6, JA 000305–307.) Under the Plan's outlined procedure, all indirect claimants will then step into the shoes of the direct claimant when bringing their indemnity and/or contribution claims against the trust. All indirect claimants' indemnity and/or contribution claims will be distributed in the amount that the direct claimant would have received had it made the demand against the trust itself. No indirect claimant under Grace's Joint Plan will take a different route—all claimants will follow the same track to recovery.

Nevertheless, BNSF contends that equal value is not being accorded to its claims because most Class 6 claimants will receive the full non-bankruptcy value of their claims under the TDP, while BNSF is precluded from receiving the full value of its claims because the Joint Plan does not include the Extraordinary Claims Value when assigning a value to BNSF's claims.[88] BNSF's argument, however, suffers from a fundamental flaw: only direct claimants under the TDP can qualify for Extraordinary Claims Value treatment, and BNSF, as an indirect claimant, would

---

[88] BNSF's argument fails to take into account that no creditors within Class 6 will likely be receiving 100% non-bankruptcy value for their claims under the TDP because the values assigned to claims under the trust only represent a rough average of the claim value outside of bankruptcy. In fact, BNSF expressly acknowledges this point in its briefing submitted to the Court:

> The intent in setting the Scheduled and Maximum Values for each category was to provide claim values "roughly equivalent" to what the asbestos-related claimant would have received in the tort system . . . Although some asbestos PI claimants may have received higher awards in the tort system (perhaps due to favorable juries, access to more experienced and qualified lawyers, etc.), while others may have received lower awards in the tort system (perhaps for obverse reasons), the values scheduled in the TDP represent the "rough justice" value of the claims.

(BNSF Br. 14.) Thus, the full non-bankruptcy amount of a direct claimant's claim is not actually being paid by the TDP, but rather only a rough estimate of this amount. This point therefore further undercuts BNSF's argument.

therefore never be entitled to this valuation. In order to be eligible for the Extraordinary Claims Value multiplier, a claimant must show that his asbestos exposure "occurred predominantly as a result of working in a manufacturing facility of Grace during a period in which Grace was manufacturing asbestos-containing products at that facility, or . . . was at least 75% the result of exposure to asbestos or an asbestos-containing product or to conduct for which Grace has legal responsibility." (TDP § 5.4(a), Ex 4, JA 000303.) Realistically, only a Libby resident or mine worker could qualify under this provision of the Joint Plan. BNSF and other indirect claimants would never be able to meet the definitional requirements to fall into this category. Accordingly, BNSF's contention is without merit.[89]

Finally, BNSF also claims that it is not receiving equal value for its claims under the Joint Plan because it might, at some uncertain point in the future, suffer a judgment or enter into a settlement with a direct claimant by which it would be required to pay a direct claimant more than the amount it could recover from the trust. This argument, however, fails to take into account that all indirect claimants in Class 6 run this risk, and that therefore they are all being treated the same. For example, suppose a Libby plaintiff suffering from severe disabling pleural disease brings a claim against the State of Montana on a failure to warn theory, and receives a $100,000 jury verdict in his favor. When seeking indemnity and/or contribution from Grace, Montana would recover from Grace's trust the exact amount the Libby resident could have recovered himself directly from the trust. Since the plaintiff suffered from severe disabling pleural disease, his claim under Category IV-B would be valued at $50,000. Moreover, being from Libby, the plaintiff could likely qualify for the Extraordinary Claims Value, thereby multiplying his Scheduled Value eight times its set amount—netting a $400,000 award. Given that the plaintiff could recover from both Grace and Montana, however, the Plan would limit his recovery to $50,000. Thus, Montana would only be

---

[89] The Crown made the same argument regarding access to the Extraordinary Claims Value multiplier. (See Crown Br. 26–27.) The Court overrules this objection to the Joint Plan for the same reasons that it rejects BNSF's claims above.

indemnified by Grace for $50,000, and would remain responsible for the remainder of the plaintiff's jury verdict amount entered against it.[90]  A lawsuit brought against BNSF would operate no differently—BNSF too would remain liable for the outstanding $50,000 in this hypothetical scenario. Thus, all indirect claimants are being treated equally under the Joint Plan, and are receiving equal value for their claims.

In addition to ensuring that all class members receive equal value for their claims, "each member of the class must pay the same consideration for its distribution [under the plan]."  Id.; see also In re AOV Indus. Inc., 792 F.2d 1140, 1151–52 (D.C. Cir. 1986) ("It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.");  In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990) (citing AOV Indus.).  In extremely limited circumstances, federal courts have found that when a creditor has given up some unique claim in order to participate in a Chapter 11 plan, it has paid more consideration for its distribution and therefore suffered disparate treatment.  See AOV Indus., 792 F. 2d 1140, 1151 (D.C. Cir. 1986) (finding that a creditor received unequal treatment under a plan because it held  "a unique, guaranteed claim," while all other creditors within the class merely held derivative, non-guaranteed claims).  BNSF attempts to portray itself as having such a unique claim based on the premise that it is the only creditor in Class 6 that would not be independently liable to the direct claimant, but would still be held derivatively liable for Grace's sole tortious conduct in which it played no part.

---

[90] In fact, both Montana and the Crown raised this same argument, alleging that the TDP "results in disparate treatment particularly to a holder of an Indirect PI Trust Claim in the event that a judgment is entered against it in an amount in excess of the maximum value."  (MN Br. 42–42.) (Crown Br. 28.)  Nothing in the record indicates that Montana or the Crown are being treated differently than any other indirect claimant under the Joint Plan.  For the same reasons set forth above regarding BNSF, the Court finds that the TDP applies the same process to all claims in Class 6, and that therefore all indirect claimants, including Montana and the Crown, are being treated equally under the Plan.

This argument does not make legal sense, however, because for an action to proceed against BNSF, BNSF would have to bear at least some independent liability. If liability were solely based on Grace's actions alone and BNSF was not at least minimally independently liable to the plaintiff, then BNSF would be dismissed from the lawsuit altogether, and would never need to seek indemnity and/or contribution from Grace in the first place.[91] In light of this consideration, BNSF's assertion of a unique claim derails and can proceed no further. Rather, all similarly situated indirect claimants here are giving up the same degree of consideration—the possibility that they could receive a higher award in the tort system, or inversely, a lower award—in order to participate in the Joint Plan and receive a definitively set amount of distribution from the trust.[92]

Finally, the Court points out that if it were to award BNSF the Extraordinary Claims Value treatment for its common law indemnity and contribution claims, then it would actually be awarding BNSF *preferential* treatment to all other creditors within Class 6. As the Plan stands, all claimants are subject to the same process for distribution determination purposes. If BNSF were allowed to

---

[91] It appears that BNSF has confused the concepts of "liability" and "indemnity." As explained above, BNSF would need to have at least a minimum percentage of fault in order for the lawsuit to proceed forward. It is possible, however, that BNSF could subsequently be awarded full indemnity for its indirect claim (in fact, this is what its contractual indemnity agreements with Grace were designed to do). Regardless of the phrasing of BNSF's argument, its claim is not uniquely situated from all others in Class 6, and BNSF therefore is not a victim of disparate treatment.

[92] In fact, federal courts have afforded the equal consideration prong a more relaxed inquiry because determining each party's amount of consideration is an extremely amorphous process, particularly in Chapter 11 bankruptcy cases. See Quigley, 377 B.R. at 118–19 (recognizing that the parties' degrees of consideration were too indefinite to determine precisely); AOV Indus.,792 F.2d at 1156 (Starr, J., dissenting) (describing problematic aspects of requiring equal consideration in bankruptcy cases); Dow Corning, 255 B.R. at 497–98 (same). The court in Dow Corning particularly highlighted this point in the context of a mass tort bankruptcy involving hundreds of unliquidated claims, stating that:

> Requiring a bankruptcy court to inquire as to the amount of consideration involved in each claim . . . especially in a mass tort situation, would be unrealistic, unworkable, and an unduly burdensome position for the bankruptcy court to be in.

Id. at 497.

obtain Extraordinary Claims Value treatment, however, this would actually allow it to recover more from the trust than a direct claimant could since the direct claimant would remain subject to the Scheduled Value safety valve against double recovery. Section 5.6 of the TDP specifically seeks to avoid such unfairness, providing that: "In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant . . . [including] timing, amount or manner of payment. In addition, no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid to the related Direct Claimant." (Asbestos PI Trust Distribution Procedures ("TDP") § 5.6, Ex. 4, JA 000306.) Permitting BNSF to obtain the Extraordinary Claims Value would therefore not only directly contravene the Plan's requirements, but would also award favorable treatment to BNSF, which is expressly forbidden by the Code.[93]

Based on the above reasons, the Court affirms the Bankruptcy Court's finding that the Joint Plan treats BNSF equally in comparison to other creditors within Class 6, and does not unfairly discriminate against it.[94]

---

[93] Indeed, allowing BNSF to obtain this extra level of recovery would not only violate the equal treatment requirement of § 1123(a)(4), but would also run afoul of § 524(g)'s requirement to pay present and future claims the same amount in substantially the same manner under the same criteria. See 11 U.S.C. 524(g)(2)(B)(ii)V).

[94] In its brief submitted to the Court, BNSF sporadically mentions that it is entitled to defense costs and attorney's fees from Grace. On this point, the Court affirms the Bankruptcy Court's holding that "[t]here is nothing in the Bankruptcy Code, and BNSF has pointed to no case law, that indicates that a plan must pay attorneys' fees incurred in connection with the underlying tort claims or indemnity or contribution claims arising from those torts." In re W.R. Grace & Co., Bankr. No. 01-1139, 2011 WL 832940, at *1 (Bankr. D. Del. Mar. 4, 2011).
The Court notes, however, that BNSF's contractual indemnity agreements with Grace over the years allegedly called for Grace to fully indemnify BNSF for any asbestos-related liability, including the cost of defense and attorneys' fees. To the extent that BNSF's present argument is based on these contractual indemnity agreements, this would constitute a contract interpretation dispute that is beyond the confines of the present suit, and the Court need not opine on it any further here.
Moreover, BNSF also argues to this Court that BNSF's classification under the Joint Plan violates the Absolute Priority Rule, which provides that dissenting creditors will be paid in full, and that no creditor with a claim or interest that is junior to the claims of the dissenting creditor will get or retain anything under the plan. See 11 U.S.C. § 1129(b)(2)(B)(i)–(ii). BNSF's

### b. Administrative Costs

Under the current structure of the Joint Plan, an indirect claimant asserting a claim against the trust must prove that it has paid in full Grace's liability and obligation to a direct claimant for which the trust would otherwise have had to provide payment. Additionally, the indirect claimant must obtain the direct claimant's agreement to forever and fully release Grace from related liability. If an indirect claimant cannot meet these requirements, Section 5.6 of the TDP provides that the indirect claimant may:

> request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant . . . If the Indirect Claimant can show that it has paid . . . . [the] liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid.

(TDP § 5.6, Ex. 4, JA 000306. ) BNSF asserts that in the event that it may not be able to satisfy these requirements and must instead pursue Individualized Review, it will unfairly face increased administrative costs that would not be imposed on other indirect claimants, thereby violating § 1123(a)(4).

BNSF has not, however, demonstrated how it would be burdened by more administrative costs than any other indirect claimant within Class 6. Rather, it is apparent that all indirect claimants within Class 6 would be required to prove the validity of their claim subject to the requirements of Section 5.6, and, if unable to meet these requirements, would be able to pursue their claim under Individualized Review.

Moreover, the Court notes that there is nothing discriminatory or unfair about requiring a

---

specific objection under the absolute priority rule is that its common law indemnity and contribution claims should have been separately classified because the Joint Plan treats them differently than the other creditors in Class 6, and that therefore, as a dissenting creditor, no creditor with a claim junior to its own should have retained anything under the Plan. However, given the Court's finding that BNSF's claims are no different than any others in Class 6, BNSF's absolute priority rule argument unravels and lacks merit.

claimant against the trust to prove the validity of its claim, or to seek release of the debtor—the one paying the indirect claimant—from future liability. Given Grace's financially precarious situation as a bankrupt debtor with limited funds, it must seek to protect itself from future liability and to conserve as many resources as it possibly can in order to meet its current and future obligations. The Court gently reminds BNSF not to bite the hand that feeds it, particularly in light of the fact that BNSF has not made a contribution to the trust like other indirect claimants, and will still be entitled to full indemnity per its contractual agreements with Grace.

The Court declines to deem the Joint Plan unfairly discriminatory based on the mere possibility of increased administrative costs. Administrative costs are a hurdle faced by corporations, law firms, and courts across the nation on a daily basis, and the Court has not been provided with any information that BNSF would be unable to handle this administrative inconvenience. As such, BNSF's challenge to the Joint Plan on these grounds is denied.[95]

### 3. Montana and the Crown's Discrimination Claims [96]

Montana and the Crown allege, *inter alia*, that the Joint Plan discriminates against them on account of: (1) the legal theory upon which their liability in this lawsuit is based; (2) the timing associated with the receipt of their payments from the trust; and (3) an apparent lack of equality of payment among creditors. Each argument is considered separately below.

---

[95] Montana and the Crown also put forth similar arguments alleging that the TDP's restrictions on holders of indirect claims result in "increased costs that would be incurred by such tortured and bureaucratic processes" and that requiring indirect claimants to obtain a release from underlying direct claimants before recovering from the trust is discriminatory. (MN Br. 42) (Crown Br. 26.) Montana and the Crown's arguments fail for the same reason that BNSF's arguments failed. The Court reiterates its finding that there is nothing discriminatory or unfair about requiring a claimant against the trust to prove the validity of its claim, or to seek release of the debtor—the one paying the indirect claimant—from future liability. The Court extends the same reminder to Montana and the Crown that it did to BNSF, and also finds that Montana and the Crown are properly equipped to handle these administrative costs.

[96] For the most part, the Crown adopts the arguments of Montana (Crown Br. at 28 ("The Crown incorporates by reference as if fully set forth herein those arguments set forth in Part V of the Montana Opening Brief.").) The Crown does, however, put forth one additional argument that Montana does not make, and is considered separately in Part (c), *infra*.

### a.      Failure to Warn Liability

In order to have an indirect claim paid by the trust, the indirect claimant must first prove that it paid in full a liability or obligation to an individual or entity to whom Grace otherwise would have been liable.[97]   Montana and the Crown aver that this requirement discriminates against them. Specifically, they assert that their alleged liability to direct claimants arises from a purported failure to warn about the dangers associated with Grace Asbestos—a claim for which they are independently liable and for which Grace would have no underlying liability.   Thus, Grace would not have to reimburse Montana or the Crown for any amount that they paid to a claimant for such a claim under the Plan because Grace would not have otherwise been liable to the claimant.   Montana and the Crown therefore ask this Court to amend the TDP "to make clear that indirect contribution and indemnity claims . . . will receive payment, even if they do not result from an indirect claimholder[']s payment of a claim for which the Asbestos PI Trust would have been liable." (MN Br. 38–39.) For the following reasons, the Court declines to do so.

As noted by the Third Circuit, Appellants' potential liability here is based on a legal duty independent from Grace's liability.   See W.R. Grace & Co., 591 F.3d 164, 173 (3d Cir. 2009) ("Montana's potential liability is based on an independent legal duty that Montana's Supreme Court has decided that the State, as sovereign, owes to its people, namely, a governmental duty to warn about hazards at Grace's site.").   Thus, if the Court were to grant Montana and the Crown's request

---

[97] Section 5.6 of the TDP provides, in relevant part:

Indirect PI Trust Claims . . . shall be . . . paid by the PI Trust . . . if the holder of such claim [ ] establishes to the satisfaction of the Trustees that the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation to. . . . To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant[.]

(TDP § 5.6, Ex. 4, JA 000305–306.) See also In re W.R. Grace & Co., 446 B.R. 96, 117 n.30 (Bankr. D. Del. 2011).

to amend the Plan, then Grace could be liable for the independent wrongdoing of third parties. Neither Montana nor the Crown point the Court to any legal authority that requires a debtor to reimburse third parties for wrongs for which the debtor is not responsible. This is because no such requirement exists. Montana and the Crown's argument, therefore, is legally incorrect.

Moreover, the record is devoid of any evidence indicating disparate treatment. Neither Appellant has convincingly shown how it would be disparately impacted by the Joint Plan's requirements for indirect claimants. Rather, it is evident that the same procedures are applied to and the same things are required of all indirect claimants within Class 6. The Court finds that both Montana and the Crown are required to give up equal degrees of consideration in order to benefit from the TDP and will be receiving equal value for their claims under the Plan. The TDP, therefore, does not impermissibly discriminate against either Montana or the Crown in violation of § 1123(a)(4).

Finally, if Appellants were to prevail on this request, the entire central purpose of § 524(g) would be destroyed. As detailed at length above, § 524(g) "helps achieve the purpose of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity." In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2004). If the Court were to grant Montana and the Crown's request for an amendment, then Grace would never be able to successfully reorganize and resolve its asbestos liabilities. Moreover, due to the fact that Grace would have to make additional payments for these indirect claims, there would be less money available in the trust for future claimants. The Court will not grant an unfounded request that would have such a disadvantageous effect on the trust as a whole.

### b.    The Effect of Timing on Treatment of Creditor Claims

Montana and the Crown further allege that the Joint Plan discriminates against them on the basis of the timing of the payment of claims under the TDP.  Under the terms of the Joint Plan, all finalized claims[98] are placed in a payment queue to await payment based upon the date the claim was finalized.  Montana and the Crown contend that this "first-in, first-out" mechanism results in disparate treatment of their claims because, as indirect claimants, their claims take longer to process since they must first settle the underlying direct claims before they can assert their indirect claims against the trust.[99]  (MN Br. 41.)  Thus, they believe that they only way to afford all creditors equal treatment is to wait until all underlying direct claims have been settled against indirect claimants prior to making any distributions from the trust.  (Id.)

Once again, however, Appellants fail to show how this process would treat them differently than the other creditors within Class 6.  Instead, it is evident that all claimants in Class 6—both direct and indirect—will be subjected to this same "first-in, first-out" process.  The TDP also provides various protective mechanisms, such as the Payment Percentage requirement, that ensure

---

[98] Claims are considered finalized if they have been paid in accordance with the terms of a settlement agreement or final court order.

[99] In making their argument, Appellants blend their improper classification and discriminatory treatment allegations.  Essentially, Montana and the Crown assert that their claims are different from others in Class 6 because they are indemnity and/or contribution claims based on a failure to warn theory, and that, as holders of such claims, they are not treated equally with other claimants based on the timing associated with payment of indirect claims under the Plan.
In In re Congoleum Corp., 362 B.R. 167, 183–84 (Bankr. D.N.J. 2007), the court stated that "the timing of a filing of a claim can bear on whether claims are similarly situated.  At the same time, it [is] also emphasized that timing may not be the sole consideration and that the legal character of the claim remains the foremost consideration."  Id. (discussing language in Combustion Engineering).  The Court finds this passage particularly instructive in the present litigation.  Even if the timing of indirect claims here was somehow discriminatory (and the Court finds that it is not), the legal character of Montana and the Crown's claims as indirect claims and their corresponding effect on Grace's bankruptcy estate should still remain the "foremost consideration" in the Court's analysis.  It has already been decided that Montana and the Crown's claims are similarly situated to other claims in Class 6 on account of their effect on Grace's bankruptcy estate, and are therefore not unfairly discriminated against in any way.  Having already decided this "foremost consideration," the Court likewise finds that the Plan does not unfairly discriminate against Appellants in relation to the timing of payment of their claims.

that all Class 6 claims receive similar treatment, regardless of where they fall in the payment queue.[100]   Merely because indirect claimants must first settle their underlying direct claims before they can assert their own claims against the trust does not indicate disparate treatment.  It is worth repeating that the Court does not find that there is anything discriminatory about requiring claimants against the trust to prove the validity of their claims.  To extinguish this requirement could, in fact, have the effect of producing *disparate* treatment among creditors in the same class.

Having found that treatment of Montana and the Crown under the Joint Plan does not run afoul of § 1123(a)(4), the Court likewise declines to adopt Appellants' suggestion that the TDP should wait until all underlying direct claims have been asserted and settled against indirect claimants before making payments from the trust.  It would be entirely unreasonable, unfair, and unprecedented to require all claimants to await payment from the trust until all claims have been filed.  Grace initially filed for bankruptcy in 2001.  Its various creditors have been awaiting payment for their claims since at least that time.  If the Plan was so amended, then litigation of this case could continue indefinitely.  This is especially true when considering that many future personal injury claimants have not yet developed symptoms and therefore have not even begun the process of filing a claim against the trust.  Moreover, litigation here may involve complex conflict of law issues related to interaction with Canada's international legal system that may take years to resolve.  As noted by Judge Posner, then Chief Judge of the United States Court of Appeals for the Seventh Circuit, "[t]hese bankruptcy appeals have a tangled history, an unbelievable present, and no future." Matter of New Era, 135 F.3d 1206, 1208 (7th Cir. 1998) (Posner, Chief J.).  There comes a time

---

[100] On this point, the Court credits the Confirmation Hearing testimony of the Asbestos PI FCR, Mr. David Austern.  Mr. Austern is the legal representative that was independently appointed by the Bankruptcy Court to protect the interests of future asbestos personal injury claimants in this litigation.  When questioned about the possibility of the PI Trust running out of funds before it could pay indirect claims for indemnity and contribution, Mr. Austern testified that he did not believe that such a scenario was likely under the current structure of the Plan. (See Bankr. No. 01-1139, Doc. No. 23532, Trans. 9/17/09, at 70–71 ("Austern Testimony").) Thus, Montana and the Crown's basis for its objection—that the PI Trust may run out of funds before it can satisfy its indirect claims—is without merit.

when finality of litigation is needed. Having already been pending for twelve years, the time for finality has arrived in this case. Allowing otherwise would have detrimental effects for both Grace and its creditors, most especially the significant number of claimants suffering from deadly pleural disease.

>    c.    **Equality of Payment and Treatment of Claims in Different Classes Under the Joint Plan**

Finally, the Crown alleges that it is a victim of disparate treatment because, under the Joint Plan, American and Canadian ZAI property damage claims will not be treated equally since American claimants allegedly will receive greater payment for their claims. For present purposes, it is important to remember that property damage claims are afforded a different classification under the Joint Plan than the personal injury claims related to exposure to Grace Asbestos in Class 6. American Property Damage ("PD") ZAI claims are categorized in Class 7B, and Canadian ZAI PD claims are classified in Class 8.

The bankruptcy court in In re Dow Corning, 244 B.R. 634, 666 (Bankr. E.D. Mich. 1999) faced a similar situation. In that case, several claimants affected or injured by purportedly defective breast implants sought recovery from a Chapter 11 debtor that was responsible for the manufacture and sale of the implants. Id. at 641–43. Under the debtor's reorganization plan, claimants were classified largely based on their country of citizenship. Id. at 641–42. Several foreign claimants asserted that they were unfairly discriminated against because the plan treated them differently from domestic claimants. Id. at 666. The court, however, declined to find disparate treatment on the premise that § 1123(a)(4) only pertains to the treatment of claims within the same class. Id. ("[T]hese objections misconstrue the import of § 1123(a)(4). . . . It does not require that claims legitimately classified in separate classes receive the same treatment.").

The holding of Dow Corning is directly applicable here. American ZAI PD claims are categorized in a completely different class than Canadian ZAI PD claims. As such, equal treatment

of these claims is not required.[101]  Moreover, the Court notes that both Class 7B and Class 8 are deemed impaired classes, and both classes are entitled to vote on the Plan.  The only major difference between both classes is the amount and method of payment their respective claimants will receive. American ZAI PD claims will be paid in accordance with the ZAI Trust Distribution Procedures established by the class settlement.  (See Joint Plan § 3.1.7(b)(ii).)  Canadian ZAI PD claims will be paid according to the terms of the Amended and Restated CDN ZAI Minutes of Settlement. (See id. § 3.1.8(b)(i).) Although Canadian claimants may receive a different amount of payment according to their Settlement than American claimants, it is important to remember that equal treatment is not synonymous with equal payment.  See Dow Corning, 244 B.R. at 670 ("[Section] 1123(a)(4) requires, not that class members receive equal payment, but equal treatment."); see also In re Finova Grp., Inc., 304 B.R. 630, 637 (D. Del. 2004) (stating that § 1123(a)(4) does not require parties to receive equal payment under a reorganization plan); In re Cent. Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (upholding a lottery system that resulted in awards of different recovery amounts to claimants because all claims were subjected to the same process).  As such, the Court finds that the Crown has not suffered disparate treatment on these grounds.

### 4.    AMH's Discrimination Claims

AMH claims that the Joint Plan does not treat it equally compared to other creditors in Class 7A.  Under the Plan's terms, all creditors must resolve their claims against the PD Trust in federal bankruptcy court.  By filing a proof of claim against the PD Trust, creditors agree to submit to the bankruptcy court's jurisdiction over their claims.  AMH claims it is treated inequitably under the Plan because it is the only claimant in Class 7A that has been denied the right to pursue its claims

---

[101] Montana makes a similar argument, alleging that it has been unfairly discriminated against because Class 6 is impaired under the Plan, while other unsecured claims in different classes (specifically Class 5, Class 7A, and Class 9) are unimpaired (MN Br. at 35.)  Given that § 1123(a)(4) only requires equality of treatment for creditors within the same class, Montana's argument is likewise without merit.

in the forum of its choice—South Carolina state court.[102]

As previously mentioned, in order to satisfy the equality of treatment requirements of §
1123(a)(4), all creditors in a given class must receive equal value for their claims and must pay the
same degree of consideration for their distribution under the trust. In re Quigley Co., Inc., 377 B.R.
110, 116 (Bankr. S.D.N.Y. 2007). The Court finds that both prongs of the equal treatment test are
satisfied here. All Class 7A claimants will receive equal value for their claims because they will all
be subject to the procedure outlined in the 2009 Case Management Order ("CMO") for Class 7A
Asbestos PD Claims. The CMO is a three-step process: (1) all creditors must first file a Proof of
Claim against the trust; (2) within forty-five days, the Claim will either be discharged by the
Bankruptcy Court or allowed to proceed forward in litigation; and (3) if allowed, the Claim will
proceed to litigation. (See CMO, Ex. 25, JA 000804.) Nowhere in the CMO is there any mention
that AMH would be the only claimant subject to this process. Rather, the opening line of the CMO

_____

[102] AMH also mentioned two other arguments in its appellate brief to this Court. It claims
that other creditors in Class 7A receive superior treatment because their claims are: (1)
already settled and awaiting payment, while AMH's claims remain in dispute; and (2) subject to
alternative dispute resolution (ADR) procedures with lowered proof thresholds. (AMH Br. 46.)
      As repeatedly stated throughout this Opinion, § 1123(a)(4) merely requires that all parties
receive equal value for their claims and relinquish equal consideration in order to participate in
the Plan, see Quigley, 377 B.R. at 116; and §524(g) only requires that the trust utilize
mechanisms that provide reasonable assurance that the trust will value and pay present and future
claims in substantially the same manner. 11 U.S.C. § 524(g)(2)(B)(ii)(V). Neither Code
provision makes any mention of disparity of treatment based on debtor-creditor settlements. In
fact, whether or not other claimants in a given class under a bankruptcy reorganization plan have
entered into settlements with the debtor or third parties is completely irrelevant to an inquiry into
equality of treatment among creditors in the class. Therefore, AMH's first argument is without
merit.
      AMH's second argument is also lacking. Although AMH mentions that creditors in Class
7A are subject to different ADR procedures, this is where its argument ends. AMH has failed to
present any evidence to the Court explaining these ADR methods or how they would result in
different treatment of AMH's claims. It is a well-established maxim that, on appeal, courts need
not address legal issues that have not been fully developed through proper briefing. See Sw. Pa.
Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997). Thus, given that AMH failed to
properly present this claim, the Court likewise declines to consider its merits.

is particularly telling here—it states that the purpose of the CMO is to "provide[ ] procedures for the resolution of *all* Class 7A Asbestos PD Claims[.]" (See id.) (emphasis added)  Thus, the process put forth by the CMO ensures that all Class 7A claimants will receive equal value for their claims.

The second prong of the equal treatment test requires equal consideration.  AMH essentially argues that the Joint Plan requires it to give up more than any other claimant in order to participate in the TDP because it is the only claimant that has been denied a choice of forum to litigate its claims. This assertion, however, is incorrect.  Rather, *all* Class 7A claimants that opt into the Plan and file Proofs of Claims against the trust are required to subject themselves to the Bankruptcy Court's jurisdiction.  No creditors' claims in this class will be handled in any other forum, and AMH has presented no evidence that treatment of its claims would be any different.  In fact, requiring all creditors to submit to federal bankruptcy jurisdiction is advantageous under these circumstances.  In a case of this scale and complexity, it is helpful to have the same rules, procedures, and binding caselaw applied to all claims.[103]  It is also helpful to solicit federal judges that specialize in bankruptcy to review such highly-technical claims and legal issues.  This encourages unified decision-making and uniform treatment of claims.  See generally, Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2050–51 (June 2000) (describing the benefits of having federal bankruptcy courts handle mass tort litigation related to asbestos liability).

Moreover, even if AMH were somehow disadvantaged by the bankruptcy court forum, its argument would still fail because it does not consider the second clause of § 1123(a)(4)—that disparate treatment cannot occur when a claimant *agrees* to the less favorable treatment.  See 11

---

[103] The CMO provides that all claims in Class 7A will be governed by the Federal Rules of Bankruptcy Procedure, Federal Rules of Civil Procedure, Federal Rules of Evidence, applicable federal statutes, and any applicable federal local court rules.

U.S.C. § 1123(a)(4) ("[A] plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest[.]").  Here, AMH agreed to the federal bankruptcy court forum when it initially filed three Proofs of Claims against the PD Trust and chose to extensively litigate its class action claims before the Bankruptcy Court.  This procedure in Chapter 11 bankruptcy cases is entirely legally permissible.  See Langenkamp v. Culp, 498 U.S. 42, 44 (1990) ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power.") (internal citations and quotations omitted); see also In re Winstar Commc'ns, Inc., 554 F.3d 382, 406 (3d Cir. 2009) (citing Langenkamp).  As such, AMH's claim doubly fails on these grounds.

Finally, the Court also finds that § 524(g) is satisfied under these circumstances because the trust utilizes mechanisms that will value and pay present and future claims in substantially the same manner.  11 U.S.C. § 524(g)(2)(B)(ii)(V).  As previously mentioned, all claims that have not already been settled will be subject to the requirements put forth in the 2009 CMO, which apply to both present and future property damage claims.  As such, all property damage claims in Class 7A will be treated in substantially the same manner.

Thus, for all the aforementioned reasons, and after careful consideration of the Plan as an integrated whole, the Court finds no disparate treatment in regards to the claims of the Libby Claimants, BNSF, Montana, the Crown, or AMH.

G.      **The Best Interest of the Creditors Test**

In an effort to protect creditor interests in bankruptcy proceedings, Congress created a provision in the Bankruptcy Code that is commonly referred to as the "best interest of the creditors test." 11 U.S.C. § 1129(a)(7)(A)(i–ii). Under the test, every creditor to a Chapter 11 reorganization plan must receive at least the liquidation value of its claim under the plan as it would in a Chapter 7 proceeding against the debtor in order for the court to find the plan is in the creditors' best interest.[104] In re Armstrong World Indus., Inc., 348 B.R. 136, 165–66 (Bankr. D. Del. 2006); In re Lisanti Foods, Inc., 329 B.R. 491, 500 (D.N.J. 2005). The bankruptcy courts determine this liquidation value by "conjur[ing] up a hypothetical [C]hapter 7 liquidation that would be conducted on the effective date of the plan." In re Affiliated Foods, Inc., 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000) (internal citations and quotations omitted). In the alternative, a creditor can individually waive the protection afforded by the best interests of the creditors test if it votes in favor of the plan's affirmation.[105] The purpose of the best interest of the creditors test is to ensure that creditors "are no worse off under a plan of reorganization than they would be with the Debtor in [C]hapter 7." In re Kellogg Square P'ship, 160 B.R. 343, 358 (Bankr. D. Minn. 1993).

The Libby Claimants allege that the Bankruptcy Court erred in finding that the Joint Plan

---

[104] Chapter 7 of the Code addresses the liquidation of a bankruptcy estate. Chapter 11 addresses reorganization plans in bankruptcy proceedings.

[105] A class vote, however, may not waive an individual creditor's right to this protection under the Code. See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 442 n.13 (1999); In re Am. Family Enters., 256 B.R. 377, 403 (D.N.J. 2000). Thus, an individual creditor is still guaranteed this protection even if its claim is included within a class under the plan that has voted as a whole in favor of the plan. See In re Adelphia Commc'ns Corp., 361 B.R. 337, 367 (S.D.N.Y. 2007). The Libby Claimants are members of Class 6, a majority of which voted in favor of the Joint Plan. In support of its argument, Grace cites the fact that the Libby Claimants were the only members of Class 6 that did not vote in favor of the Joint Plan. However, the best interest of the creditors test still requires the Court to pay due diligence to the Libby Claimants' individual claims, despite the fact that the rest of Class 6 voted in support of the Joint Plan.

satisfied the test by: (1) failing to make a specific finding regarding the recovery amount the Libby Claimants would receive in a hypothetical Chapter 7 proceeding; (2) disregarding the evidence of the Libby Claimants' expected settlements and jury verdicts; and (3) failing to consider the Libby Claimants' right to recover from Grace's insurance policies in a hypothetical Chapter 7 case. The Court considers each argument individually below.

### 1.	The Level of Specificity Required

The Libby Claimants allege that the Joint Plan fails to meet the best interests of the creditors test because the Bankruptcy Court did not identify the specific amount of their expected recovery under Chapter 7. Specifically, they claim that the Bankruptcy Court erred when it did not identify an exact percentage dividend that general unsecured creditors would receive in Chapter 7 liquidation.

Under the best interest of the creditors test, the plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan is within the creditors' best interests. In re Briscoe Enters., Ltd. II, 994 F.2d 1160, 1164 (5th Cir. 1993). As mentioned above, in analyzing whether a plan is within the creditors' best interest, the court ascertains the liquidation value of creditors' claims by creating a hypothetical Chapter 7 liquidation. Affiliated Foods, 249 B.R. at 787. After determining this liquidation value, the court should then make "an independent finding, based on the evidence and arguments presented, whether creditors will receive as much under the plan as they would in a hypothetical Chapter 7 liquidation." Id. Bankruptcy courts should issue their findings based on the record adduced at trial. See In re G-I Holdings, Inc., 420 B.R. 216, 265 (D.N.J. 2005) (affirming bankruptcy court's finding that the reorganization plan satisfied best interest of the creditors test based on a liquidation analysis and other evidence submitted at confirmation hearing); In re Armstrong World Indus., Inc., 348 B.R. 136, 165–66 (D. Del. 2006) (finding reorganization plan was in the creditors' best interests based on evidence presented at confirmation hearing). Such independent findings must be based on proper evidence rather than "mere assumptions or

assertions." Adelphia, 361 B.R. at 366. However, it is important to note that the valuation of claims in a hypothetical Chapter 7 liquidation is "not an exact science" because the process entails a considerable degree of speculation. Affiliated Foods, 249 B.R. 770 at 788 (citing In re Sierra-Cal, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997)); Adelphia, 361 B.R. at 367 (quoting In re Crowthers, 120 B.R. 279, 297–98 (Bankr. S.D.N.Y. 1900)); In re PC Liquidation Corp., 383 B.R. 856, 868 (E.D.N.Y. 2008) ("[T]he valuation of a hypothetical [C]hapter 7 liquidation is, by nature, inherently speculative[.]") (internal quotations and citations omitted). Thus, the court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record. It is not necessary to itemize or specifically determine precise values during this estimation procedure. Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation. Affiliated Foods, 249 B.R. at 788.[106]

At the Confirmation Hearing, Grace presented several witnesses that testified about the liquidation value of creditor claims under Chapter 7 in comparison to their recovery under the Chapter 11 Joint Plan. An expert witness in mass tort bankruptcy liquidation testified that Grace's creditors stand to recover substantially more under the Joint Plan than through liquidation.[107]

---

[106] A finding by the Bankruptcy Court that all creditors would receive no less under the Joint Plan than under Chapter 7 liquidation is a finding of fact. See PC Liquidation, 383 B.R. at 868 (internal citations omitted). Thus, as discussed above in "Section II: Standard of Review," *supra*, the Court will analyze such findings under a "clearly erroneous" standard.

[107] At the Confirmation Hearing, Ms. Zilly estimated the value of Grace's assets to be between $2.1 and $2.5 billion under the Joint Plan, and between $1.05 and $1.25 billion in a hypothetical Chapter 7 liquidation. She testified that she discounted the liquidation value to account for the time pressures faced in liquidation proceedings and the probability that buyers would pay less than fair market value for Grace's assets since successor liability protection would not be available under Chapter 7, and Grace's subsidiaries would therefore be unwilling to contribute funds to the trust. Ms. Zilly also testified that determining Grace's liability in liquidation would be extremely uncertain because there are no mechanisms under Chapter 7 that achieve an orderly settlement of claims and liabilities as there are in reorganization plans under Chapter 11. The Court notes that her testimony was based upon her extensive experience with mass tort bankruptcies, and was supported by the evidence found on the record.

Additionally, a claims estimation expert testified that the value of assets available for distribution to creditors was significantly higher under the Joint Plan than it would be under Chapter 7 liquidation.[108] The Bankruptcy Court properly credited this testimony. The Libby Claimants did not rebut this evidence with their own contrary expert testimony, despite having ample opportunity to do so. In the absence of no contrary evidence, and based upon the well-reasoned and well-founded estimates presented at the Confirmation Hearing, the Bankruptcy Court properly found that creditors would receive as much, if not more, under the Joint Plan as they would in a hypothetical Chapter 7 liquidation. In addition, the Bankruptcy Court properly considered evidence indicating that under Chapter 7 liquidation, the nature of the asbestos liabilities in this case would be very uncertain and complex. The Bankruptcy Code requires nothing more. The Bankruptcy Court was not obligated to determine precise liquidation values. Therefore, Grace has met its burden of showing that the Joint Plan complies with § 1129(a)(7) and the Libby Claimants have failed to establish that the Bankruptcy Court's finding on this point was clearly erroneous. Accordingly, this contention is without merit.

### 2. The Consideration of Evidence Concerning Tort System Values

The Libby Claimants allege that the Joint Plan also fails the best interest of the creditors test because they stand to recover more through jury trials and settlements in the tort system in a hypothetical Chapter 7 liquidation than under the Chapter 11 reorganization plan. They argue that the Bankruptcy Court should have considered the estimated amount that the Libby Claimants would

---

[108] Dr. Mark Peterson was the only expert witness who testified at the Confirmation Hearing as to the value of Grace's personal injury liability in a hypothetical Chapter 7 liquidation. He estimated Grace's liability under the Joint Plan to be between $9.2 and $10.7 billion. He testified that without the procedural safeguards available under Chapter 11, Grace's liabilities would quickly surpass this amount because there likely would be a substantial acceleration of claims filed in response to a Chapter 7 filing deadline. Dr. Peterson's testimony was based on his own extensive experience, as well as his analysis of comparable situations that occurred in similar bankruptcy proceedings.

be awarded through the tort system, as well as the estimated dividend percentage that would be paid to general unsecured creditors in Chapter 7. The Libby Claimants thus ask this Court to remand to the Bankruptcy Court to hold a hearing on this issue. For the reasons that follow, the Court declines to do so.

First, the Libby Claimants' claims are untimely. "Where a party had ample opportunity to produce evidence at trial, and failed to do so, a court should not permit that party to relitigate the case by presenting evidence previously ignored by the party." Matter of Nelson Co., 959 F.2d 1260, 1267 (3d Cir. 1992) (internal citations omitted); see also In re Ins. Brokerage Antitrust Litig, 579 F.3d 241, 261–62 (3d Cir. 2009) (stating that, absent exceptional circumstances, courts should not consider issues raised for the first time on appeal). The Libby Claimants had ample opportunity to produce evidence on this issue at the Confirmation Hearing, yet failed to do so. The only evidence presented at this time that addressed tort system values was the testimony of Grace's expert witness. Consideration of this issue is now untimely, and a remand to hold a hearing would be improper and a waste of judicial resources.

Moreover, even if this argument were timely, remand is still unwarranted because the Libby Claimants fail to take into account the practical implications of what Chapter 7 liquidation would entail in this case. As the Bankruptcy Court properly noted, valuation of Grace creditors' claims under Chapter 7 is highly speculative due to the uncertainty associated with future claims related to latent pleural disease. These future claims are not and cannot yet be known. The Joint Plan accounts for this uncertainty in its proposed structure, and guarantees all claimants—both current and future—some degree of recovery. In contrast, a liquidation under Chapter 7 has no such reassurance in place. Rather, creditors' claims in a Chapter 7 proceeding would be put into a pool that would not distribute payments until all claims in the class were liquidated and all the assets were reduced to cash value. See In re Kiwi Int'l. Air Lines, Inc., 344 F.3d 311, 318 n.6 (3d Cir. 2005); see also

<u>In re Baker & Getty Fin. Servs., Inc.,</u> 106 F.3d 1255, 1259 n.7 (6th Cir. 2000).  Given the latent nature of asbestos-related pleural disease, excessive time could pass until all future claims are ascertained.[109]  Thus, a Chapter 7 liquidation would need to be held open for a seemingly indefinite amount of time while all personal injury claimants pursued jury trials and settlements in the tort system.  Such a process would result in inevitable delay and disparate—or, even worse, unavailable—recovery amongst personal injury claimants.  Such uncertainty is certainly not within the creditors' best interests.  In comparison, the procedural safeguards and guaranteed recovery mechanisms that are in place under the Joint Plan will allow personal injury claimants to receive at least as much—if not more—than they would in liquidation.  Thus, it is evident to the Court that the guaranteed certainty of the Chapter 11 Joint Plan, as opposed to the high degree of uncertainty in a hypothetical Chapter 7 proceeding, is in the creditors' best interest.

Finally, the Libby Claimants contend that the best interest of the creditors test was violated because they stand to recover more through either settlements with a Chapter 7 trustee or jury verdicts against Grace outside the context of the asbestos trust.  In making this argument, the Libby Claimants relied on previous pre-bankruptcy settlement amounts between Grace and Libby residents as a benchmark for their present estimated recovery in a jury trial or settlement.  Their argument, however, suffers from a fundamental flaw—it compares settlement amounts obtained by *non-creditors* in the tort system years prior to Grace's bankruptcy petition to the claims of current

---

[109]  While the Libby Claimants assert that there would be no distribution to future claimants under Chapter 7, their assertion is summarily incorrect in light of the Third Circuit's recent decision in <u>Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)</u>, 607 F.3d 114 (3d Cir. 2010).  <u>Grossman's</u> held that "claims" under the Bankruptcy Code arise "when an individual is exposed pre-petition to a product or other conduct giving rise to injury," even if the injury manifested after the petition date.  <u>Id.</u> at 125; <u>see also</u> <u>Eagle-Picher Ind., Inc.</u>, 203 B.R. 256, 275 (S.D. Ohio 1996) ("[I]t is appropriate to take the value of future Asbestos Personal Injury Claims into account for determining the Claims that would be required to be in a liquidation under chapter 7[.]").  Thus, contrary to the Libby Claimants' position, future asbestos personal injury claims would need to be taken into account in the instant litigation for Chapter 7 liquidation purposes.

*creditors* after Grace filed for bankruptcy. As its name implies, the best interests of the creditors test only applies to creditors. Thus, the Libby Claimants' reliance on pre-bankruptcy settlements with non-creditors is inapposite. Additionally, the Libby Claimants cannot prove that they would even be able to obtain settlements or jury verdicts equal in amount to those made pre-bankruptcy. These prior settlements and verdicts were rendered at a time when Grace was still a highly solvent and profitable company. Grace's present circumstances are obviously quite different. There is currently only a finite pool of funds available to pay all claims, and this pool would rapidly deplete if individual claimants each obtained a verdict or settlement in differing amounts. Unless fortunate enough to be among those claimants able to obtain a settlement or verdict early in the process, certain Libby Claimants may not even recover at all. Thus, the Libby Claimants' argument is without merit.

For the above reasons, the Court declines to remand to the Bankruptcy Court for the purpose of obtaining a hearing on this issue.

### 3.     Recovery From Grace's Insurers in a Hypothetical Chapter 7 Case

The Libby Claimants next contend that the Bankruptcy Court erred in failing to consider their alleged rights to recover compensation under Grace's insurance policies in a hypothetical Chapter 7 case. They allege that while they would be enjoined from pursuing insurance proceeds under Chapter 11, they could proceed directly against Grace's insurers under Chapter 7. Thus, they claim they would receive more recovery through Chapter 7 liquidation proceedings than under the Joint Plan, and that therefore Grace's proposed reorganization plan is not within the creditors' best interest. For the following reasons, the Court respectfully disagrees with the Libby Claimants' position.[110]

---

[110] At the outset, the Libby Claimants' initial assertion that "the Bankruptcy Court erred in *refusing* to consider [their] insurance rights under Chapter 7" and that the bankruptcy judge "did not appear to take issue with the need to consider [their] insurance rights" is incorrect. (Libby

As already established above, the Libby Claimants have no direct right to Grace's insurance proceeds and thus can only prevail on their argument if Grace's liability to them is established. However, the Libby Claimants have failed to establish such liability in their briefing submitted to the Court, and "appellate courts should generally not address legal issues that the parties have not developed through proper briefing." Sw. Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997); see also Conchatta, Inc. v. Evanko, 83 Fed. App'x. 437, 441 (3d.Cir. 2003); Coastal Outdoor Adver. Grp., LLC v. Twp. of Union, N.J., 676 F. Supp. 2d 337, 350 n.16 (D.N.J. 2009) ("It is not this Court's job to make arguments on behalf of the Plaintiff[.]").   There has been no underlying judgment or settlement with the present Libby Claimants that occurred post-bankruptcy upon which liability may be premised.   Nor have they provided any legal authority to explain how liability is established under these circumstances.   Finally, there is no citation to or explanation provided of any provisions in Grace's insurance policies that indicate how and when insurance coverage would be applicable.   Instead, the Libby Claimants merely outline a process for pursuing Grace's insurance, without actually showing this Court why they have a claim to it in the first place.[111]   Accordingly, the Court refrains from filling in the gaps of their argument.

---

Br. 35) (emphasis added).  The record is clear that the Bankruptcy Court carefully considered the Libby Claimants' arguments.  Moreover, the Bankruptcy Court's Memorandum Opinion specifically discusses the Libby Claimants' alleged rights to Grace's insurance. See In re W.R. Grace & Co., 446 B.R. 96, 127–28 (Bankr. D. Del. 2011).  Merely because the Bankruptcy Court ultimately rejected these arguments does not mean that they were not seriously considered.  Such assertions misstate the Bankruptcy Court proceedings.  Thus, the Court notes that the Bankruptcy Court did not "refuse" to consider the Libby Claimants' insurance argument, and declines to find that the best interest of the creditors test was violated on these grounds.

[111] The Libby Claimants outline a process for pursuing Grace's insurance policies in lieu of actually establishing Grace's liability to them.  Under their proposed procedure, they assert that each Libby Claimant would first file a Proof of Claim in a Chapter 7 case, which would have the effect of establishing Grace's liability under 11 U.S.C. § 502(a). (Libby Br. 36.)  However, this assertion is incorrect.  Section 502(a) says nothing about liability, but rather merely states that "[a] claim or interest . . .  is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).

The next step in the Libby Claimants' proposed procedure is that, upon an objection by

The Libby Claimants spend the remainder of their argument attempting to show that they stand to recover more under Chapter 7 liquidation than under the Joint Plan. To properly address these assertions, a brief digression is needed to provide some background on the operation of Chapter 7 liquidation cases versus Chapter 11 reorganization plans in the context of the best interests of the creditors test. As already stated, the best interest of the creditors test requires a comparison of a creditor's Chapter 11 recovery amount to its hypothetical recovery under Chapter 7. Chapter 7 of the Code addresses the liquidation process of an insolvent debtor, in which the property of the bankruptcy estate is reduced to cash value in an attempt to satisfy the debtor's outstanding liabilities to its creditors. See Susan Power Johnston, Ivor Charles Wolk, & Anne-Louise Williams, *Basic Business Bankruptcy: Jurisdiction, Venue, Chapter 1 & Chapter 3 of the Bankruptcy Code*, 614 PLI/COMM. 43, 88 (1992). The purpose of Chapter 7 is to fairly distribute the debtor's assets among its creditors, and to give the debtor a fresh start through discharge in bankruptcy. Id. In comparison, Chapter 11 addresses debtor reorganization, a process that attempts to rehabilitate a business as a going concern rather than to liquidate it. Id. at 89. In Chapter 11 cases, the filing of a bankruptcy petition awards the debtor injunctive relief from current and future litigation so that the debtor has time to reorganize itself and emerge from bankruptcy as a going concern. Id.[112] Thus, in the present

---

the Chapter 7 trustee, the extent of their claims would need to be determined by jury trial under 28 U.S.C. § 1411(a). Once again, however, this statutory provision makes no mention of liability, but rather only provides that Chapter 11 may not affect the right to a jury trial in personal injury and wrongful death cases. See 28 U.S.C. § 1411(a).

The final step in the Libby Claimants' proposed procedure is the assertion that the Libby Claimants could bring an independent lawsuit against Grace in a hypothetical Chapter 7 case because they would not be enjoined from doing so under the § 362 injunction. However, whether or not the Libby Claimants could actually obtain relief from the automatic stay afforded by § 362 does not establish *how* Grace is liable to them, but would merely allow them to proceed forward with their claim. As such, the Court rejects the Libby Claimants' proposed liability procedure.

[112] Injunctive relief in Chapter 11 cases is initially available under 11 U.S.C. § 362. Section 362 applies to all cases filed under the Bankruptcy Code (except for the exceptions outlined in subsection (b) that are irrelevant here), regardless of the specific Chapter. In special

case, the Libby Claimants correctly assert that the automatic stay would prevent them from being able to directly pursue claims against Grace and its insurance under Chapter 11.

Injunctive relief under Chapter 7 would operate slightly differently in the instant case. After the filing of a Chapter 7 bankruptcy petition, an automatic stay against litigation would be put in place pursuant to 11 U.S.C. § 362(a).[113] The purpose of the automatic stay in this context is "to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor . . . with a reasonable respite from protracted litigation[.]" A.H.

---

circumstances under Chapter 11, supplemental injunctive relief may be available under other statutory provisions of the Code, such as the § 524(g) channeling injunction available in Chapter 11 asbestos bankruptcy cases.

[113] Section 362(a) states, in relevant part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of:
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; (4) any act to create, perfect, or enforce any lien against property of the estate; (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and (8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

11 U.S.C. § 362(a).

Robins Co., Inc.v. Piccinin, 788 F.2d 994, 998 (4th Cir. 1986) (internal citations omitted).  The scope of protection afforded by the automatic stay is broad, barring any action that "would inevitably have an adverse impact on the property of the bankruptcy estate."  In re Prudential Lines, Inc., 119 B.R. 430, 432 (S.D.N.Y. 1990) (internal citations and quotations omitted). Relief from the automatic stay is only available under certain limited circumstances specifically outlined in the Code.  See 11 U.S.C. § 362(d)(1–4).

The Libby Claimants allege that they would be able to circumvent the injunction in a hypothetical Chapter 7 liquidation because "[i]t is routine for claimants to obtain relief from the automatic stay to pursue the debtor's insurance coverage."  (Libby Br. 36.)[114]  However, none of the cases cited by the Libby Claimants stand for this proposition, nor do they lead to the conclusion that Chapter 7 liquidation would allow them to recover more under Chapter 7 than under the Joint Plan filed pursuant to Chapter 11.  See In re New Era, Inc., 135 F.3d 1206, 1210 (7th Cir. 1998); Admiral Ins. Co. v. Grace Indus., Inc., 409 B.R. 275, 278–79 (E.D.N.Y. 2009);  In re Walker, 151 B.R. 1006, 1008 (Bankr. E.D. Ark. 1993) (citing Green v. Welsh, 956 F.2d 30, 35 (2d Cir. 1992)).  While it is true that the creditors in these cases were allowed to lift the automatic stay and proceed against discharged debtors in order to recover from their insurance, these cases all dealt with the lifting of the

---

[114] The Court notes that the federal courts recognize four grounds upon which bankruptcy courts may enjoin suits against debtors and their assets and property.  See Piccinin, 788 F.2d at 1003–04.  In addition to two subsections of § 362, 11 U.S.C. § 105 and 28 U.S.C. § 1334 also permit federal courts to automatically stay litigation against insolvent debtors.  Section 105 allows bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]," which has been interpreted to include enjoinment of litigation against the debtor.  See 11 U.S.C. § 105; In re Davis, 730 F.2d 176, 184 (5th Cir. 1984); In re Otero Mills, Inc., 25 B.R. 1018, 1020 (D.N.M. 1982) (internal citations omitted).  Bankruptcy courts have also granted a stay against litigation pursuant to § 1334.  See 28 U.S.C. § 1334; Piccinin, 788 F.2d at 1003 (internal citations omitted).  Thus, the Court notes that in a hypothetical Chapter 7 liquidation of Grace, the bankruptcy court has wide discretion to grant an automatic stay under any of these statutory provisions.  However, given that the Libby Claimants solely premised their argument upon § 362, the Court discusses only this statutory provision in depth in its application to the present case.

137

automatic stay to pursue a claim against the debtor itself, rather than directly against its insurance agency. See Green, 956 F.2d at 35 ("[W]e believe that § 524 permits a plaintiff to proceed *against a discharged debtor* solely to recover from the debtor's insurer. Applied here, this principle permits [the creditor] to continue her suit *against [the debtors]* to establish liability as a precondition to recovery[.]") (emphasis added); Walker, 151 B.R. at 1008 ("[I]t is permissible to continue prosecution *against a debtor* if such action is necessary to prove liability as a prerequisite to recovery[.]") (emphasis added). In the instant litigation, the Libby Claimants seek to pursue claims against Grace's insurance directly. Thus, the legal authority they cite does not support their argument that they should be permitted to circumvent the § 362(a) automatic stay to pursue claims against Grace's insurers, nor does it show the Court that the best interests of the creditors test has been violated.

In fact, it appears to be settled law that, in appropriate circumstances, § 362(a) gives courts the power to enjoin parties from proceeding against non-debtors. See Piccinin, 788 F.2d at 1001–07. Subsection (a)(3) of the statute directs a stay of any action against an entity from obtaining possession of or exercising control over the property of the bankruptcy estate. 11 U.S.C. § 362(a)(3). Insurance contracts and products liability policies are recognized to be within the statutory definition of "property" under § 362. See id. at 1001 (citing In re Davis, 730 F.2d at 184); In re Johns Mansville Corp., 40 B.R. 219, 229 (S.D.N.Y. 1984). It has been held that insurance policies related to the bankruptcy estate constitute "valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be . . . the most important asset of the debtor's estate," and that therefore "[a]ny action in which the judgment may diminish this 'important asset' is unquestionably subject to [the § 362(a)] stay[.]" Piccinin, 788 F.2d at 1001 (internal citations and quotations omitted).[115] In the instant litigation,

---

[115] The Court recognizes that Piccinin dealt with a Chapter 11 proceeding. However, as explained above, *supra*, § 362 applies to cases filed under both Chapter 7 and Chapter 11 of the

Grace's insurance policies certainly constitute an "important asset" of its bankruptcy estate that are entitled to § 362(a) injunctive relief. Without the coverage provided by its insurance, Grace would almost certainly be unable to satisfy its outstanding liabilities and claims filed against it. Chapter 7 proceedings would undoubtedly adversely impact Grace's bankruptcy estate because of the "uncontrollable scramble for its assets" by thousands of personal injury claimants in various courts nationwide. See id. at 998; Prudential Lines, 119 B.R. at 432. The avalanche of claims would inevitably lead to a logistical nightmare and a rapid decrease in Grace's available assets, with no certain way of knowing that any amount of recovery would be greater than that afforded under the Joint Plan. In the alternative, the predetermined and guaranteed recovery available under the Joint Plan would certainly be within Grace's creditors' best interests. As such, the Court finds that the best interest of the creditors test has not been violated on these grounds.

Finally, even if the Libby Claimants could somehow circumvent the § 362 injunction under Chapter 7, their argument still fails because they have not successfully shown the Court that the amount they would recover under Chapter 7 would indeed be higher than that under Chapter 11. Under the best interests of the creditors test, courts should only consider "the dividend the creditor would receive from the [C]hapter 7 trustee—and only that amount—for comparison with the dividend available under the [Chapter 11] plan." In re Dow Corning, Corp., 237 B.R. 380, 411 (E.D. Mich. 1999) (citing 7 *Collier on Bankruptcy* ¶ 1129.03[7][b]). This means that in a liquidation proceeding, the Libby Claimants would be limited to the pro rata amount awarded to them by the Chapter 7

---

Bankruptcy Code. See 11 U.S.C. § 362(a) (stating that petitions filed under §§ 301, 302, and 303, provisions that address the commencement of bankruptcy petitions under the Code operate as an automatic stay); see also Johnston, *supra*, at 101–03 ("[T]he criteria for eligibility of an entity to be a [C]hapter 11 debtor are the same as those to be a [C]hapter 7 debtor[.]"). Thus, the findings of Piccinin would be applicable in a hypothetical liquidation of Grace under Chapter 7.

trustee.[116]  The Court, however, is unable to determine that this pro rata distribution of funds would

be in the creditors' best interest here because the Libby Claimants have not provided any information

showing that such a recovery amount would be higher than recovery available under Chapter 11.  No

information has been provided to explain what circumstances would require Grace's insurers to make

payments, the amount and extent of such coverage, or any limits on the policy coverage.  The only

mention of the application of Grace's insurance policies at all is in a footnote in the Libby Claimants'

appellate brief generally listing certain sections of Grace's insurance policies with one of its insurers.

No explanation accompanies the list that explains how or why the Libby Claimants would recover

more under Chapter 7.  Additionally, the Libby Claimants have failed to take into account the fact that

Grace remains involved in litigation with its insurers over the scope and coverage of its policies.

Therefore, they cannot definitively show that a Chapter 7 recovery amount would actually be greater

because the extent of the policy coverage still remains largely unknown.  Without such information

available to it, the Court is unable to find that Chapter 7 liquidation would indeed be within the

creditors' best interest.

     For all the above reasons, the Court declines to find that the best interest of the creditors has

been violated under the present circumstances.  The Chapter 11 Joint Plan would clearly provide the

Libby Claimants with the same, and likely even greater, amount of recovery than would be available

in a hypothetical Chapter 7 liquidation of Grace.  Moreover, the certainty and guaranty of at least

some amount of recovery under the Joint Plan is of tremendous value, both monetarily and

procedurally, to the Libby Claimants.  Therefore, the Libby Claimants' objections are overruled and

the findings of the Bankruptcy Court on this point are affirmed.

---

[116] 11 U.S.C. § 704(a)(1) provides that: "The trustee shall collect and reduce to money the
property of the estate . . . and close such estate as expeditiously as is compatible with the best
interests of parties in interest[.]"

## H.    Impairment of Claims in Chapter 11 Reorganization Plans

The Bankruptcy Code requires a reorganization plan to specify which classes of claims and interests are "impaired" and "unimpaired."  See 11 U.S.C. § 1123(a)(2–3); In re Aleris Int'l, Inc., Bankr. No. 09-10478, 2010 WL 3492664, at *13–14 (Bankr. D. Del. May 13, 2010).   Impairment of claims is governed by § 1124 of the Code, which provides that "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1); see also In re Combustion Eng'g, Inc., 391 F.3d 190, 216 n.24 (3d Cir. 2004);  In re Polytherm Indus., Inc., 33 B.R. 823, 828 (D.C.Wis. 1983) ("Whether a class is impaired is determined by applying the tests prescribed in § 1124, which are designed to identify the classes of claims that are impaired; that is, materially and adversely altered by the plan."). The Third Circuit addressed the issue of impairment in Chapter 11 reorganization plans in In re PPI Enters. (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003).  The creditor in PPI Enterprises argued that his unsecured claim was impaired by the debtor's reorganization plan because his potential recovery was limited by § 502(b)(6) of the Bankruptcy Code.  Id. at 202.  In its discussion, the court stated that:

> Each creditor has a set of legal, equitable, and contractual rights that may or may not be altered by bankruptcy.  If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely "unaltered," the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code.  If the creditor's claim is impaired, the Code provides the creditor with a vote that, depending on the value of the creditor's claim, may be sufficient to defeat confirmation of the bankruptcy plan.

Id.  The court recognized that the Bankruptcy Code creates a presumption of impairment in favor of creditors, which can only be overcome if the reorganization plan leaves the creditor's nonbankruptcy rights completely unaltered.  Id. at 203.  The Third Circuit nonetheless found that the creditor's rights in PPI Enterprises were not impaired because § 1124(1) is only violated if the impairment results from the terms of the reorganization plan, and not from the application of provisions in the Bankruptcy

Code.  Id. at 204.  Thus, courts should not use the Bankruptcy Code as "the relevant barometer for [determining] impairment," but rather should look to the terms of the reorganization plan itself as a potential source of limitation upon the legal, equitable, or contractual rights of a creditor.  Id.

In the instant case, both the Bank Lenders and AMH allege that their claims are impaired by the terms of the Joint Plan.  The Court considers each Appellant's claims separately below.

### 1.  The Bank Lenders' Claims[117]

The Bank Lenders hold unsecured claims against Grace.  As described in detail above, under the Joint Plan, the Bank Lenders will receive 100% payment of their $500 million principal, as well as payment of post-petition interest set at a 6.09% rate that converted into a floating Prime Rate in 2006.  The Bank Lenders' post-petition interest rate under the Joint Plan is greater than the federal judgment rate and the non-default rate set under their Credit Agreements with Grace, but less than the set default rate.[118]  Grace claims, and the Bankruptcy Court found, that no event of post-petition default occurred, and that therefore the Bank Lenders are not entitled to the post-petition default interest rate.  The Bank Lenders, however, maintain that Grace's bankruptcy filing *per se,* alleged failure to meet certain reporting requirements under the loan documents, and nonpayment of the principal and post-petition interest all constitute events of default under the Credit Agreements.  Thus, the Bank Lenders contend that, as a matter of state contract law, they are entitled to the default interest rate specified in their contractual agreements with Grace, and that the Plan's failure to award them this legal contractual right to which they are allegedly entitled constitutes impairment.

----

[117] The Bank Lenders and the Unsecured Creditors Committee filed joint objections and appellate briefs.  Thus, for ease of reference, the Court refers to these parties collectively hereinafter as the "Bank Lenders."  To the extent that either party asserts a separate and independent claim, the Court will clarify this in this Memorandum.

[118] The non-default rate under the Credit Agreements is 5.77% and the federal judgment rate at the time of the bankruptcy filing was 4.19%.  Under the Term Sheet, the interest rate that would apply to the Bank Lenders' claims is 6.09%.

### a.        Entitlement to the Post-Petition Default Interest Rate

Before the Court can properly determine whether or not the Bank Lenders are impaired by the

Joint Plan, it must initially determine whether they are entitled to the post-petition default interest rate

under the Credit Agreements in the first place.[119]  The logical first step here is that some event of

*default* must have occurred in order for the Court to find that the Bank Lenders are entitled to the

*default* post-petition interest rate.  This requires a determination as to whether or not Grace's actions

here constituted a "default" under the Credit Agreements entered into by the parties.  Due to the fact

that no specific Code provision explicitly defines what constitutes an "event of default," such an

inquiry is governed by provisions in the parties' contract or agreement.  See In re F.C.C., 217 F.3d

125, 136 n.6 (2d Cir. 2000) (citing In re NextWave Personal Commc'ns, Inc., 244 B.R. 253, 263

(Bankr. S.D.N.Y. 2000) ("The existence of a default here depends upon an interpretation of the FCC's

regulations[.]")).  In this case, the parties outlined what would constitute an event of default in Section

10 of both the 1998 and 1999 Credit Agreements.  The Bank Lenders claim that three events of

default listed in Section 10 of the Credit Agreements occurred here as a result of Grace's actions: (1)

the filing of Grace's own bankruptcy petition; (2) the alleged failure to adhere to certain reporting

requirements contained in the parties' loan documents; and (3) the failure to pay the remaining

---

[119] To be clear, this Section of the Court's Memorandum addresses the appeals related to the Bankruptcy Court's May 19, 2009 Memorandum Opinion finding that the Bank Lenders were not *entitled* to the post-petition default rate, In re W.R. Grace & Co., Bankr. No. 01-1139, 2009 WL 1469831, at *1 (Bankr. D. Del. May 19, 2009).  All other objections related to confirmation, such as whether the Bank Lenders' lack of entitlement to the default rate *constituted impairment*, were addressed in the Bankruptcy Court's January 31, 2011 Memorandum Opinion, In re W.R. Grace & Co., 446 B.R. 96 (Bankr. D. Del. 2011), and this Court's review of objections to this 2011 Opinion are addressed elsewhere in this Memorandum.  By order of this Court dated March 25, 2011, the Bank Lenders' appeals of both these Bankruptcy Court decisions were consolidated into one action.  (No. Civ. A. 11-199, Doc. No. 5, Stipulated and Agreed Order Consolidating Appeals and Granting Relief from the Standing Order On Mediation.)  In that Order, the Court ordered the parties to jointly file combined briefs in support of their consolidated appeals.  (Id. at 2.)

principal and interest after Grace filed for bankruptcy.

The first alleged event of default which the Court considers is the filing of Grace's own bankruptcy petition. Section 10 of the parties' Credit Agreements contains a provision providing that in the event that Grace should file for bankruptcy, this action would constitute an event of default under the contract. This provision constitutes what is known as an "*ipso facto*" clause. *Ipso facto* clauses are contractual provisions which expressly state that upon a borrower's filing of a bankruptcy petition, the creditor may accelerate the payment of the entire unpaid balance due under the terms of the contract. I.T.T. Small Bus. Fin. Corp. v. Frederique, 82 B.R. 4, 6 (E.D.N.Y. 1987). Prior to the adoption of the Bankruptcy Code in 1978, such *ipso facto* clauses were commonly enforced. See In re Chateaugay Corp., No. Civ. A. 92-7054, 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993). Now, however, it is well-established that *ipso facto* clauses are unenforceable as a matter of law under the Bankruptcy Code. See id. (recognizing that "contract provisions . . . alter[ing] the rights or obligations of a debtor as a result of the debtor's commencement of a case under the Bankruptcy Code" are unenforceable); In re EBC I, Inc., 356 B.R. 631, 640 (Bankr. D. Del. 2006) (internal citations omitted) (same); In re Lehman Bros. Holdings, Inc., 422 B.R. 407, 414–15 (Bankr. S.D.N.Y. 2010) ("It is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable.") (internal citations omitted); In re Hutchins, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."); In re Rose, 21 B.R. 272, 276–77 (Bankr. D.N.J. 1982). This is because the whole purpose of filing for bankruptcy is to provide the debtor with a "fresh start," and enforcement of *ipso facto* clauses would punish debtors by negating this central purpose. Rose, 21 B.R. at 277.

The general prohibition against *ipso facto* clauses has its roots in two specific sections of the Bankruptcy Code: §§ 541(c) and 365(e)(1). Section 541(c) provides that, despite a contractual

provision between the parties to the contrary, a debtor's interest becomes property of the bankruptcy estate upon the filing of a bankruptcy petition and the debtor does not lose the property due to its bankruptcy petition.[120] Section 365(e)(1) states that clauses in executory contracts[121] and unexpired leases that premise default upon a party's commencement of a bankruptcy action are unenforceable.[122] The Bank Lenders point out that the current dispute involves neither a forfeiture of the property of the estate nor an executory contract. As such, they allege that the general prohibition against *ipso*

---

[120] Section 541(c) provides that:

(c)(1) [A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

    (A) that restricts or conditions transfer of such interest by the debtor; or
    (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, . . .
(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

11 U.S.C. § 541(c)(1–2).

[121] An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that failure of either to complete performance would constitute a material breach excusing performance of the other. Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.), 50 F.3d 233, 239 (3d Cir. 1995).

[122] Section 365(e) provides, in relevant part, that:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

* * *
    (B) the commencement of a case under this title[.]

11 U.S.C. § 365(e)(1)(B).

*facto* clauses does not apply to their claims. This argument, however, overlooks the fact that the ban on *ipso facto* clauses has been interpreted to be much broader than the confines of §§ 541(c) and 365(e)(1). Numerous courts have prohibited enforcement of *ipso facto* clauses on more general grounds not based on either statutory provision.[123] See Riggs Nat'l Bank of Wash. v. Perry, 729 F.2d 982, 984–85 (4th Cir. 1984) ("This Court's enforcement of a default-upon-filing clause would clearly intrude upon th[e] policy" of giving debtors a fresh start in bankruptcy premised upon the automatic stay in § 362(d)(1)); Rose, 21 B.R. at 276–77 (finding that even though the contract in issue was non-executory, the bankruptcy default clause could still not be enforced because it was contrary to the central purpose of the Bankruptcy Code); In re Perry, 29 B.R. 787, 790–91 (D. Md. 1983) (finding that an *ipso facto* clause in an installment contract that was non-executory was nonetheless impermissible); In re Railway Reorganization Estate, Inc., 133 B.R. 578, 583 (Bankr. D. Del. 1991) ("Today courts continue to read the Code's *ipso facto* sections broadly to effectuate code policy and in recognition that bankruptcy matters are also inherently proceedings in equity.") (internal quotations and citations omitted). Moreover, the legislative history of § 365(e) itself appears to support this notion. The statements in the legislative history indicate that Congress recognized that *ipso facto* clauses generally have the effect of "hamper[ing] rehabilitation efforts" in bankruptcy. See, e.g., H.R. REP. No. 95-959. 95th Cong. 1st Sess. 348-9 (1977); SEN. REP. No. 95-989, 95th Cong., 2d Sess. 59

---

[123] In support of their argument, the Bank Lenders rely heavily on In re Anchor Resolution, Corp., 221 B.R. 330 (Bankr. D. Del. 1998). As a decision of a bankruptcy court, the Court notes that the findings in this case are not binding upon it, but rather merely serve as persuasive authority. Regardless, the facts of Anchor are very different from those in the case at hand. While the bankruptcy court in that case did recognize the debtor's voluntary petition for bankruptcy as an event of default under the parties' two contracts at issue, id. at 336, Anchor involved a complicated arrangement between the debtor and note purchasers regarding a third-party financial institution loan that was secured by several of the notes. Id. at 333–34. Moreover, the actions of the debtor constituted both pre-petition and post-petition defaults under the contracts. Id. This is not the situation here, and Anchor is therefore distinguishable.

(1978), U.S. CODE CONG. & ADMIN. NEWS 1978, p. 6304.  Courts have interpreted this legislative history as "indicat[ing] that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation. . . . The only congressional statement is clear that in most, if not all, instances, such clauses are not enforceable. . . . Thus, there is simply no reason to assume that Congress intended to make these clauses enforceable only in non-executory contracts." Rose, 21 B.R. at 276. As such, the Court agrees with the general trend of the federal courts that the prohibition against *ipso facto* clauses is not limited to actions based upon §§ 541(c) and 365(e).  The Court therefore finds that the Bank Lenders cannot premise Grace's alleged default on the *ipso facto* clause in their Credit Agreements.

The Court next considers the Bank Lenders' assertion that Grace's alleged failure to comply with certain reporting requirements under the Credit Agreements constituted an event of default. Specifically, the Bank Lenders allege that Grace failed to furnish each bank with certificates and other financial information as required by Section 8.2(a)–(c) of the Agreements, did not promptly give notice to appropriate parties as required by Section 8.7, and did not remedy these breaches within thirty days as required under the contract.  Section 10 the Credit Agreements defines the events that would give rise to a default.  Nowhere in this Section is there any mention of a requirement to furnish the aforementioned information to the banks or else risk defaulting under the contract.  Section 10 is also devoid of any cross-reference to Sections 8.2 and 8.7, nor is there any mention of a thirty-day time window to remedy a breach.  While Sections 8.2 and 8.7 may refer to such reporting requirements, they cannot be considered events of default unless they are explicitly mentioned in Section 10.  In fact, the Credit Agreements themselves require this interpretation, as an "event of default" is specifically defined under the Agreements as "any of the events specified in Section 10." (See 1999 Credit Agreement, Section 1 Definitions, at D.I. 19322.)  The failure to adhere to these

reporting requirements therefore does not constitute a grounds for default under the Credit Agreements.[124]

The Court now turns to the question as to whether or not Grace's failure to pay the post-petition interest and its failure to repay the principal when the loans matured constituted events of default entitling the Bank Lenders to the default interest rate. The Bank Lenders contend that this constituted an event of default under the Credit Agreements, and that they therefore have a state law contractual right to the default rate. Grace responds that by virtue of its bankruptcy, it was precluded from paying the interest post-petition or from repaying the principal when it became due.

The record indicates that prior to its bankruptcy petition, Grace was current with its payment obligations to the Bank Lenders.[125] After Grace filed for bankruptcy in 2001, it stopped making these timely payments, and as a result there has been a delay in the payment of principal and interest ever

---

[124] The Court notes that Section 10 does, however, require that the *Bank Lenders* give Grace notice of the acceleration of the loan in the event of a default. (See id., Section 10(B)(ii).) The record indicates that the Bank Lenders never provided Grace with any such notice. The Bank Lenders' demand for hypertechnical compliance with the Credit Agreements by Grace, therefore, is somewhat weakened in light of this fact.

[125] In Section III of their Appellate Brief, the Bank Lenders put forth as one of the issues presented on appeal that "1. The Bankruptcy Court erred in concluding that no defaults exist under the Credit Agreements on the basis that . . . (d) the Bank Lender Group agreed that Grace did not owe any pre-petition interest on the Bank Lenders' claims under the Credit Agreements." (Bank Lender Br. at 6.) This is, however, where consideration of this issue ended. The Bank Lenders did not pursue their objection regarding pre-petition interest any further in their brief. In fact, other sections of their brief solely reference alleged post-petition defaults. (See, e.g., Bank Lender Br. at 45, "Grace defaulted on its obligations dozens of times after it filed for bankruptcy in 2001[.]") As repeatedly explained above, mere mention of an issue on appeal without adequate explanation or briefing is not enough, and the Court will not make their argument for them. See Sw. Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997). The Bankruptcy Court found that: "It is undisputed that there were no prepetition defaults with respect to the obligations to the Bank Lenders and so no prepetition interest is owed." In re W.R. Grace & Co., Bankr. No. 01-1139, 2009 WL 1469831, at *2 (Bankr. D. Del. May 19, 2009). Absent the Bank Lenders' introduction of evidence to the contrary, this finding is therefore affirmed.

since. While this delay in payment will continue until the Joint Plan is confirmed, such a delay resulting from the filing of a bankruptcy petition does not automatically constitute an event of default entitling the Bank Lenders to the higher default rate of interest set under the Credit Agreements.[126]

When Grace filed for bankruptcy in 2001, its debtor–creditor relationship with the Bank Lenders was significantly altered. At this point, the Bankruptcy Code intervened and became applicable law which had to be considered by both parties to the contract moving forward. Section 363 of the Code "requires, as an element of basic fairness and due process, notice, a hearing and court approval before actions impacting vital interests [of the bankruptcy estate] may be taken." In re

---

[126] In support of their claim for the default rate, the Bank Lenders heavily rely on the case of In re Chicago, Milwaukee, St. Paul & Pac. R.R., 791 F.2d 524 (7th Cir. 1986), which held that an indenture trustee was entitled to accelerate payment when the debtor in question defaulted under the parties' contracts after declaring bankruptcy. Id. at 527. The Bank Lenders contend that the Bankruptcy Court "totally ignored" its reliance on this case. (See Bank Lender Br. at 54.) As an initial matter, this assertion is summarily incorrect and misstates the proceedings before the Bankruptcy Court. The record in fact indicates that the Bankruptcy Court did consider the holding of Chicago, but rejected it as unpersuasive authority and outside the Third Circuit's jurisdiction. (See Hearing Trans., 09/29/08, at 60, JA 036928) ("Counsel: I believe we cited that Chicago case in our brief. The Court: But I'm not in Chicago. Counsel: Correct, Your Honor. The Court: Okay. Counsel: We're not in the Seventh Circuit.") The Bankruptcy Court was properly within its discretion to do so, and this Court agrees with its reasoning. Nonetheless, the Court will address Chicago because the Bank Lenders continue to press the import of this case.

First, as the Bankruptcy Court made clear, Chicago is a *Seventh*, not *Third*, Circuit case and is therefore not binding upon either the Bankruptcy Court or this Court. Even more so, however, Chicago is a twenty-six year-old case based on the now defunct Bankruptcy Act, not the presently governing Bankruptcy Code. See Chicago, 791 F.2d at 525–26 ("In 1977 the railroad petitioned for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1952 ed.) (which has since been repealed but remains applicable to this proceeding[.]")). Today, the indenture trustee's declaration of default after the debtor filed its bankruptcy petition would violate the protection afforded by the § 362 automatic stay under the Bankruptcy Code. See In re Optel, Inc., 60 Fed. App'x. 390, 394–95 (3d Cir. 2003); In re Metro Square, Bankr. No. 4-88-2117, 1988 WL 86679, at *2 (Bankr. D. Minn. Aug. 10, 1988) ("[U]nder 11 U.S.C. § 362, the creditor is prevented from taking overt steps to accelerate the debt, including sending notices of default.") (internal citations omitted); In re Payless Cashways, Inc., 287 B.R. 482, 488 (Bankr. W.D. Mo. 2002). In fact, § 1124(2) of the Bankruptcy Code would allow the de-acceleration of the debt at issue in Chicago. See 11 U.S.C. § 1124(2). Thus, for the above cited reasons, this Court likewise declines to follow Chicago on this point of law.

NextWave Pers. Commc'ns, Inc., 244 B.R. 253, 264 (Bankr. S.D.N.Y. 2000).[127] This means that after Grace filed for bankruptcy, it could only use the available assets in its bankruptcy estate to continue making principal and interest payments in accordance with the terms of an implemented reorganization plan or pursuant to a court order issued after notice and a hearing according due process to all affected parties. See 11 U.S.C. § 363, see also NextWave, 244 B.R. at 275 ("It is fundamental in a Chapter 11 case that the pre-petition claims of all creditors, whether coming due pre- or post-petition, get paid only by court order or in accordance with a court-confirmed plan of reorganization."). But the Joint Plan has not yet been confirmed, and the Bank Lenders never applied to the Bankruptcy Court for a court order seeking compelled payment of the post-petition principal and interest. As such, the Bankruptcy Code precluded Grace from continuing to make these post-petition payments. It follows that because the Bankruptcy Code was the reason that Grace did not make the post-petition principal and interest payments, then Grace should not be held to have defaulted under its contractual arrangement with the Bank Lenders for this reason. As noted by the NextWave Court, "[i]t is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval." Id. at 276. To hold otherwise would punish Grace for seeking bankruptcy relief.

---

[127] The Bankruptcy Court's reliance on this case is a source of significant dispute between the parties because it was ultimately vacated for lack of subject matter jurisdiction. Vacation of a decision only affects its binding authority on subsequent courts—the internal discussion remains useful for persuasive authority purposes. See Brown v. Kelly, 609 F.3d 467, 476–77 (2d Cir. 2010); Gutter v. E.I. DuPont de Nemours & Co., No. Civ. A. 95-2152, 2001 WL 36086589, at *6 (S.D. Fla. 2001) ("[A] logical and well-reasoned decision, despite vacatur, is always persuasive authority, regardless of its district of origin or its ability to bind.") (internal citation omitted). In any event, NextWave was not binding upon the Bankruptcy Court in the first place because it was a decision from a bankruptcy court in the Southern District of New York. Thus, the use of this case as persuasive authority is entirely permissible under these circumstances, and this Court likewise gives effect to its persuasive reasoning.

Nonetheless, the Bank Lenders assert that Supreme Court precedent mandates that a debtor's "happenstance of bankruptcy" should not impair a creditor's state law rights. Butner v. United States, 440 U.S. 48, 55 (1979) (internal citation omitted). However, in Butner, the Supreme Court was careful to clarify the scope of its holding, narrowing its reach by stating that state law rights should not be impacted "[u]nless some federal interest requires a different result[.]" Id. In the context of bankruptcy, "Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which [may] adversely alter creditors' contractual and nonbankruptcy law rights." In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 344–45 (Bankr. D. Del. 1998) (citing In re Johns-Manville Corp., 36 B.R. 727, 735–37 (Bankr. S.D.N.Y. 1984)). Courts have routinely recognized various sections of the Bankruptcy Code as countervailing federal interests that can lawfully alter state law contract rights. See PPI Enters., 228 B.R. at 345 (providing examples of several Bankruptcy Code provisions that lawfully alter debtor–creditor contracts); In re Hudson Shipbuilders, Inc., 794 F.2d 1051, 1058 (5th Cir. 1986) (finding that federal bankruptcy law could override state contract law in the context of determining reasonableness of attorney's fees). Here, there are several such important federal interests: (1) the overarching bankruptcy principle rooted in § 362(a) that a debtor's bankruptcy filing should afford it a fresh start and grant it some temporary breathing room from its liabilities, based on state law or otherwise, until it can effectively reorganize; (2) the Bankruptcy Code's central objective of facilitating a debtor's reorganization, as evidenced by § 1123(a)(5)(G); and (3) the limits placed upon unsecured creditors in bankruptcy due to their unsecured status, found in § 502(b)(2) of the Bankruptcy Code. Thus, even if by some chance there was an event of default under the Credit Agreements, the interests of federal bankruptcy law at play here would nonetheless "require a different result" and could therefore permissibly alter any state law contractual rights that the Bank Lenders may have.

Under § 362(a) of the Code, a party filing for bankruptcy is automatically granted temporary relief from the assertion of any legal actions against it. See 11 U.S.C. § 362(a)(3); see also In re Atl. Bus. & Cmty. Corp., 901 F.2d 325, 327 (3d Cir. 1990). There is no question that the impact of this federal bankruptcy law can factually and legally alter prior contractual agreements between parties. See NextWave, 244 B.R. at 266 (stating that § 362 "ensures that contractual and State or Federal law rights and remedies . . . will be precluded [or] held in abeyance" in order for the "ultimate objectives" of Chapter 11 reorganization to be realized). However, as evidenced by the legislative history of this statutory provision:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. . . . [It] also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.

See H.R. Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 6296. The statements in the statute's legislative history amplify the underlying public policy in federal bankruptcy law that a debtor's bankruptcy estate should be maximized for the benefit of both the debtor and all of its creditors. This policy is particularly important in reorganization cases, where the automatic stay is utilized to maintain the status quo and avoid piecemeal liquidation while the debtor formulates a reorganization plan. See NextWave, 244 B.R. at 266. If the Court were to give effect to the Bank Lenders' claim that Grace's failure to make the post-petition payments constituted an event of default, then it would encroach upon these fundamental principles rooted in § 362(a).[128] Having determined that there has been no event of default, the Bank Lenders have not

---

[128] The Bank Lenders rely on AM-Haul Carting, Inc. v. Contractors Cas. & Sur. Co., 33 F. Supp. 2d 235 (S.D.N.Y. 1998) for the proposition that the § 362 automatic stay does not nullify a debtor's defaults on its obligations after bankruptcy. AM-Haul involved a dispute between a general contractor, subcontractor, and construction company. Id. at 238. The post-petition

satisfactorily explained how their request for a higher interest rate would not be detrimental to Grace and its other creditors by leaving the bankruptcy estate with fewer funds available to repay them. The underlying policy rationale of § 362(a) is an important federal interest here that the Court must consider and that, even in the event of a state law contractual default, could nonetheless compel a different result.

A second federal interest at play here is the Bankruptcy Code's central objective of facilitating a debtor's reorganization. The whole point of filing a Chapter 11 bankruptcy petition is to loosen the financial noose that has been placed around the debtor's neck so that it can reassess its available assets and liabilities and proceed forward as a viable entity able to properly satisfy all of its creditors and outstanding obligations. Section 1123(a)(5)(G) of the Code facilitates this central objective of reorganization, providing that a debtor's reorganization plan shall "provide adequate means for the plan's implementation, such as . . . curing or waiving any default." 11 U.S.C. § 1123(a)(5)(G). Although not explicitly defined, curing a default has been interpreted to mean the reversal of an event triggering the alleged default so as to return to pre-default conditions during the reorganization period. See NextWave, 244 B.R. at 268 ("The 'cure,' although not defined, is 'reversal' of the event that triggered the default and a return to a pre-default status quo.") (internal citations omitted); In re

_____

default in question was the subcontractor's failure to perform certain work on the construction project, as it was required to do under the contracts. Id. at 240. This case is distinguishable from AM-Haul. First, the contracts at issue significantly differ. This case involves complex financial loan contracts, not construction contracts between contractors and subcontractors. Moreover, AM-Haul did not deal with a massive Chapter 11 reorganization plan akin to Grace's Joint Plan. Most importantly, the default in AM-Haul was not an alleged failure to pay post-petition principal or interest payments, but rather a failure to perform physical work as required by the construction contract. There is nothing in the Bankruptcy Code that would have prevented the debtor in AM-Haul from performing physical work that it was required to do by contract, whereas here the ability to make post-petition payments would be affected by the Code. As such, the Court is not persuaded by the application of AM-Haul to the instant dispute.

Taddeo, 685 F.2d 24, 26–27 (2d Cir. 1982) (stating that "[c]uring a default commonly means taking care of the triggering event[.]"); In re Charter Commc'ns, 409 B.R. 649, 653 n.3 (Bankr. S.D.N.Y. 2009) (same).  Thus, even if a contractual default occurred here, it would have to be cured or waived in order for the Joint Plan to be properly implemented.  This means that the triggering event of default—for example, Grace's failure to pay post-petition interest—would be reversed and a return to the pre-default status quo would be required.  This statutory section therefore serves as another example of an important federal interest—the facilitation of a debtor's reorganization—that could mandate a different result here and lawfully alter any state law contractual rights that the Bank Lenders may have.[129]

Finally, § 502(b)(2) prohibits the allowance of unmatured interest as part of an allowed unsecured claim.  It is well-established that when a debtor files for bankruptcy, the accrual of interest

---

[129] The Bank Lenders also make an argument for the post-petition default interest rate predicated on § 1124(2)(A), which provides that a claim can only be unimpaired if the reorganization plan "cures any such default that occurred before or after the commencement of the case."  11 U.S.C. § 1124(2)(A).  The Bank Lenders argue that "[o]bviously, if a default must be cured, the default must necessarily exist."  (Bank Lender Br. at 48.)  In making this argument, however, the Bank Lenders undermine their other argument that federal bankruptcy law has no effect on their state law contractual rights under Butner.  Section 1124(2)(A) basically provides that even if there has been a default according to state contract law, federal bankruptcy law requires that the event be cured.  This statutory section is actually another example of a federal law provision that can lawfully affect otherwise applicable state law rights.

Moreover, the legislative history of § 1124(2) provides that: "The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away.  The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain."  S. Rep. No. 989, 95th Cong., 2d Sess. 120 (1978), U.S. Code Cong. & Admin. News p. 5906.  The statements in the legislative history nicely illuminate the present situation.  Under Grace's Joint Plan, the Bank Lenders will be "restored to their original position"—they will receive full payment of the principal, plus interest set at a rate higher than both the federal judgment rate and non-default rate under the Credit Agreements.  The rate of interest that the Bank Lenders will receive is also higher than the rate awarded to all other unsecured creditors in Class 9 under the Plan.  As such, the Bank Lenders are "fortunate indeed." Id.

154

on its loans is suspended, and any subsequent claims brought by unsecured creditors for the amount of this "unmatured interest" is prohibited under § 502(b) of the Bankruptcy Code.  See 11 U.S.C. § 502(b);[130] see also In re United Artists Theatre Co., 406 B.R. 643, 651 (Bankr. D. Del. 2009).  Thus, the general rule is that payment of *any* post-petition interest, whether at a default or non-default rate, on pre-petition unsecured claims is prohibited by the Bankruptcy Code.  See United Artists, 406 B.R. at 651.  Whereas there are exceptions to this general rule, none of them apply here.[131]  If interest on an unsecured claim is to be paid at all, it would only be "paid *on* an allowed claim . . . rather than *as* an allowed claim."  In re Dow Corning, 244 B.R. 678, 685 (Bankr. E.D. Mich. 1999).  Thus, if the Court were to allow Grace's failure to pay the post-petition interest to constitute an event of default,

---

[130] Section 502 states, in relevant part:

(a) A claim or interest . . . is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

* * *

(2) such claim is for unmatured interest[.]

11 U.S.C. § 502(a)(b)(2).

[131] There are two exceptions to the general rule that would allow creditors to proceed against the debtor for the post-petition interest: (1) when a creditor is oversecured under § 506(b); and (2) under § 726(a)(5), when the debtor in interest has sufficient funds on hand to pay the interest after having satisfied all other allowed claims.  Here, the § 506 exception does not apply because the Bank Lenders are *un*secured, not *over*secured, creditors of Grace.  The § 726(a)(5) exception, on the other hand, provides that if the debtor in question is solvent, then creditors can be paid the post-petition interest "at the legal rate."  11 U.S.C. § 726(a)(5).  The Bank Lenders claim that because Grace is solvent, this exception should apply and they should be entitled to the post-petition interest.  Grace's solvency, however, was never determined.  As such, this exception is inapplicable.

155

this would likewise eviscerate the federal bankruptcy interest of prohibiting payment of unmatured interest to unsecured creditors during the pendency of the debtor's bankruptcy. It is worth reiterating what exactly the Bank Lenders stand to receive here: an interest rate higher than both the federal judgment rate and the non-default rate under the contracts. This is crucial since, as unsecured creditors, the Bank Lenders could otherwise be subject to the general rule and possibly not recover *any* interest at all. Therefore, the § 502(b)(2) prohibition of payment of unmatured interest is a third example of an important federal interest which could—assuming the Bank Lenders could prove it—lawfully adversely affect creditor state law contractual rights. See PPI Enters., 228 B.R. at 345 (listing § 502(b)(2) as a Code provision that clearly alters creditor contractual and nonbankruptcy law rights).

Based on all the above, the Court finds that the Bank Lenders are not entitled to the default post-petition interest rate because: (1) no event of default giving way to the default rate has actually lawfully occurred here,[132] and therefore the Bank Lenders have no state law contractual right to the requested interest rate; and (2) even if state contract rights were present, they could lawfully be overridden under Butner in light of the significant federal interests involved here. Given that there

---

[132] The Bank Lenders also make the argument that, regardless of whether an event of default occurred under these circumstances, they are still entitled to a higher rate of interest because the principal loans matured during Grace's bankruptcy. The Bank Lenders state that a different Section of the Credit Agreements—Section 5.1(c)—governs when the loans have matured and provides a different interest rate (the Alternate Base Rate plus 2%) that applies irrespective of Section 10. However, this higher interest rate is not available merely because the loans have matured. Rather, the higher interest rate is available if Grace has *failed to repay* the loans when they matured. As a factual and legal matter, Grace could not continue to repay the principal during the course of its bankruptcy. To now require it to pay a higher interest rate as a result of its bankruptcy petition would effectively be punishing Grace for seeking the bankruptcy relief to which it is lawfully entitled. As such, this objection is overruled.

156

has been no event of default, there likewise is no entitlement to the post-petition default rate.[133]

Therefore, the Bank Lenders' claim of entitlement to the default interest rate is denied, and, in accordance with the terms of the Joint Plan, they will be repaid the full principle balance of their claims, plus interest at the rates set forth in the Term Sheet (6.09% from the 2001 Petition Date through December 31, 2005, and thereafter at a floating Prime Rate).

---

[133] On June 20, 2011, Appellants filed a Notice of Supplemental Authority with the Court (See Bankr. No. 11-199, Doc. 139). In this Notice, Appellants wished to inform the Court of a recent decision in the Southern District of New York, In re General Growth Properties, Inc., 451 B.R. 323 (Bankr. S.D.N.Y. 2011), that addresses very similar issues to those presently on appeal in this case. The Court takes note of Appellants' due diligence and careful attention here. Nonetheless, the Court finds General Growth Properties unpersuasive because there remain several key distinctions between that case and the one at hand. First, General Growth Properties held that a *secured* creditor was entitled to post-petition interest on its claim at the contractual default rate. Id. at 324. The Bank Lenders in the instant dispute hold *unsecured* claims. Second, in General Growth Properties, the clause in the contract including the event of default premised on the commencement of a voluntary bankruptcy case called for an immediate and automatic default and did not require the creditor to provide notice of the default to any party. As mentioned above, Section 10 of the Credit Agreements at issue here required the Bank Lenders to give Grace notice prior to calling the event of default and accelerating the debt. Id. Third, a significant portion of the court's analysis in General Growth Properties, including its citation to and reliance on Second Circuit precedent, was driven by the fact that the debtors in those cases were unquestionably solvent. Id. at 328. In fact, the debtor in General Growth Properties was *highly* solvent, and made such significant progress during the course of its reorganization that it was able to re-list its stock on the New York Stock Exchange even before emerging from bankruptcy. Id. at 325. This is certainly not the case here, where Grace's solvency remains an issue of hot dispute. Moreover, the General Growth Properties Court relied on several equitable considerations in arriving at its decision, including that the default rate would not constitute a "penalty" to the "exceedingly solvent" debtor, a lack of misconduct, and the fact that payment of the default interest would not inflict harm on other unsecured creditors or hamper the debtor's emergence from bankruptcy. Id. at 328–29. Such equitable considerations are not present in the instant case. Finally, the Court notes that the only case to discuss and rely General Growth Properties since it was filed, In re Sw. Hotel Venture, LLC, 460 B.R. 4, 35 (Bankr. D. Mass. 2011), did so in the context of pre-petition events of default. Thus, the Court acknowledges the similarity between the instant case and General Growth Properties, but finds the two cases distinguishable.

157

### b. Section 1124(1) and Alleged Impairment Under the Joint Plan

Under § 1124(1), the presumption of creditor impairment is only overcome if the debtor's reorganization plan does not adversely alter any of the creditor's legal, equitable, or contractual rights. See 11 U.S.C. § 1124(1); PPI Enters., 324 F.3d at 203; In re Nickels Midway Pier, LLC, 452 B.R. 156, 164 (D.N.J. 2011). Having determined that the Bank Lenders have no right to the post-petition default interest rate in the first place, it follows that the Joint Plan cannot impair any of the Bank Lenders' legal, equitable, or contractual rights in violation of § 1124. It is only logical that there can be no impairment if there are no existing rights to impair.

Additionally, the Third Circuit in PPI Enterprises specifically provided that once a debtor files its bankruptcy petition, a creditor is only entitled to its rights under the Bankruptcy Code. PPI Enters., 324 F.3d at 205. As such, any alleged impairment would have to "result[ ] from what the *plan* does, not what the [Bankruptcy Code] does." Id. at 204 (quoting In re Am. Solar King Corp., 90 B.R. 808, 819–20 (Bankr. W.D. Tex. 1988)) (emphasis in original). Applying this point of law to the instant case, any alleged impairment that the Bank Lenders may have experienced would have to be a consequence of the Joint Plan rather than application of various provisions of the Bankruptcy Code. The Joint Plan itself, however, does not alter any of the Bank Lenders' alleged rights. Instead, if the Court were to find any impairment here at all (which it does not), such impairment would solely stem from operation of the Bankruptcy Code, most notably the § 502(b)(2) prohibition against payment of unmatured, post-petition interest. In fact, the Court notes that the Third Circuit in PPI Enterprises found no impairment to the creditor's claim based on the application of a different subsection of the same exact statutory provision, § 502(b). Id. at 204 ("[W]e hold that where § 502(b)(6) alters a creditor's nonbankruptcy claim, there is no . . . impairment under § 1124(1)."). It is unlikely that the Third Circuit meant to sift the statutory grains of sand here so finely—if it found no impairment on

158

the basis of application of subsection (b)(6) to a creditor's claim, then it stands to reason that there likewise would be no impairment from the application of subsection (b)(2). Thus, the Court finds that where the Bankruptcy Code alters any alleged nonbankruptcy claims that the Bank Lenders may have, there is no alteration of legal, equitable, or contractual rights for the purposes of § 1124(1) impairment under PPI Enterprises. As such, the Bank Lenders' claims of impairment doubly fail for this reason.

### c.      Solvency and Impairment

A significant point of contention between the parties is Grace's solvency. The Bank Lenders contend that Grace is presumed to be solvent because equity will retain an interest under the Joint Plan since Grace's shareholders will still receive their shareholder interests. On this point, the Bankruptcy Court found that a presumption of post-petition default interest is payable to the Bank Lenders only if solvency has been established. See In re W.R. Grace & Co., Bankr. No. 01-1139, 2009 WL 1469831, at *5 (Bankr. D. Del. May 19, 2009). On appeal, the Bank Lenders now allege that the Bankruptcy Court violated Third Circuit precedent in PPI Enterprises "when it held that the Bank Lenders' unsecured claims, while not being paid the full amount of interest due on them, were nevertheless not impaired because Grace had not been established solvent as a matter of fact." (Bank Lender Br. 20.) As an initial matter, this Court has already determined that the Bank Lenders are not entitled to the default rate of interest under the Credit Agreements. It follows that they therefore *are* being paid the full amount of interest—6.09% converted to floating Prime in 2006—owed on their general unsecured claims under the Joint Plan. This finding alone should end the inquiry. Nonetheless, due to the significant debate between the parties surrounding this issue, the Court pauses to opine on two points that are relevant to the Bank Lenders' argument.

First, the Court will briefly comment on the issue of solvency. The Bankruptcy Court

ultimately found that a determination of Grace's solvency could not be made as a matter of fact,[134]

and that the Bank Lenders' arguments for a presumption of solvency were not supported by the record

or operation of law.  Contrary to the Bank Lenders' assertions that solvency "is not something that

has to be proven by creditors" and that "it is automatic and taken as a given" under the present

circumstances (Bank Lender Br. at 57), the law is clear that the burden was on them, as the objecting

party, to prove solvency.  See In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003) (internal

citations omitted).  The Bankruptcy Court found that the Bank Lenders did not satisfy their burden

and that there was insufficient evidence to render Grace solvent.  Specifically, a review of the record

indicates that, among other actions, the Bankruptcy Court heard extensive testimony from witnesses

on behalf of both parties regarding Grace's solvency, conducted a careful review of relevant caselaw,

and considered Grace's potential solvency under three different market accounting tests used to

determine debtor solvency.  Most notably, the Bankruptcy Court oversaw numerous estimation trials

between the parties that sought to determine Grace's assets and liabilities, and the Bank Lenders

failed to establish Grace's solvency during these proceedings.[135] After consideration of all the

aforementioned evidence, the Bankruptcy Court held that Grace's solvency could not be established

---

[134] The Bank Lenders claim that the Bankruptcy Court erroneously adopted a presumption
of insolvency by relying on Sierra Steel, Inc. v. Totten Tubes, Inc., 96 B.R. 275, 277 (9th Cir.
B.A.P. 1989).  The Bank Lenders contend that Sierra Steel dealt with a preference action, not a
Chapter 11 reorganization plan, and therefore the Bankruptcy Court's reliance on this case was
improper.  A careful reading of the Bankruptcy Court's Opinion indicates that it did not rely on
Sierra Steel to establish a presumption of insolvency, but rather merely cited to it to support its
finding that a determination of solvency is a question of fact, not law.  Thus, the Bank Lenders'
objection on this point is without merit.

[135] As part of what appears to be a tactical litigation strategy, the Bank Lenders withdrew
from the estimation litigation.  Nonetheless, the record indicates that the Bankruptcy Court
repeatedly informed interested parties, including the Bank Lenders, that they would need to
present evidence if they wished to pursue any claims based on Grace's solvency.  Despite
repeated invitations and opportunities, the Bank Lenders never did so.

because a final determination of Grace's liabilities remains unknown. Rather than rehash what was already properly done in the first place, this Court notes that the Bankruptcy Court, which oversaw administration of Grace's bankruptcy estate for over ten years prior to rendering its decision, was in the best possible position to consider this evidence. The record clearly reflects that the Bankruptcy Court properly and carefully considered all testimony and evidence before it prior to making its decision. No abuse of discretion on its part is immediately apparent to this Court. The Bankruptcy Court's findings on the issue of solvency are therefore affirmed.[136]

Second, the Bankruptcy Court did not run afoul of PPI Enterprises. It is true that in that case the Third Circuit found that "to be unimpaired, the claim must receive postpetition interest." PPI Enters., 324 F.3d at 206, 207 (agreeing with bankruptcy court's analysis in In re PPI Enterprises (U.S.), Inc., 228 B.R. 339, 352 (Bankr. D. Del. 1998)). The Bank Lenders attempt to use this

---

[136] The Bank Lenders also claim that the Bankruptcy Court improperly conflated the issues of plan feasibility and solvency. The Bankruptcy Court found that while a determination of Grace's solvency could not yet be rendered, it nonetheless held that the Joint Plan was feasible. The Bank Lenders contend that these two conclusions are "irreconcilable." (Bank Lender Br. at 40.)

The issues of solvency and plan feasibility are different, but nonetheless often interrelated. In order to confirm a reorganization plan, § 1129(a)(11) of the Code requires that the debtor establish that its plan "present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success." Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 45 (E.D. Pa. 1996). Bankruptcy courts can consider a wide array of factors in determining whether or not a plan is feasible, including whether the reorganized debtor will emerge from bankruptcy as a solvent entity. See In re Magnatrax Corp., Bankr. No. 03-11402, 2003 WL 22807541, at *7 (Bankr. D. Del. Nov. 17, 2003); In re Duval Manor Assoc., 191 B.R. 622, 632 (Bankr. E.D. Pa. 1996). Plan feasibility, however, only concerns a reorganized debtor's solvency *after* it undergoes reorganization and is set to emerge from bankruptcy. Whether or not the debtor is solvent prior to confirmation of the plan is irrelevant to the feasibility inquiry. Thus, it is possible that Grace could emerge from bankruptcy as a solvent entity after having undergone reorganization. Indeed, that is the goal here. A determination of Grace's solvency prior to this point, however, is unnecessary to render the Plan feasible. As such, the Bankruptcy Court's decisions regarding solvency and plan feasibility are reconcilable, and the Bank Lenders' objection on this point is without merit.

language to stand for the proposition that a claim will be considered impaired unless the creditor is paid post-petition interest *at the default rate*. This interpretation is not plausible, however, because PPI Enterprises did not address a creditor's right to a default interest rate specified in the parties' contracts.

Moreover, the Bank Lenders claim that PPI Enterprises applies equally in solvent and insolvent debtor cases. But PPI Enterprises said nothing about insolvent debtors. Rather, the Third Circuit favorably cited to a footnote in a bankruptcy court decision which stated that "a solvent debtor must . . . pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired.'" In re Rocha, 179 B.R. 305, 307 n.1 (Bankr. M.D. Fla. 1995). Therefore, PPI Enterprises at most stands for the proposition that a claim must receive *some* form of post-petition interest in a *solvent* debtor case to qualify as unimpaired. The Third Circuit did not provide that *insolvent* debtors must *always* pay post-petition interest, let alone at a contractual default rate, to their unsecured creditors. Thus, the Bankruptcy Court was correct to find that "[o]ur research has indicated, at best, a presumption of postpetition default interest payable to unsecured creditors only when solvency has been determined as a matter of fact[.]" In re W.R. Grace & Co., Bankr. No. 01-1139, 2009 WL 1469831, at *5 (Bankr. D. Del. May 19, 2009). Its holding is therefore in line with—and not contrary to—the Third Circuit's holding in PPI Enterprises. As stated above, solvency has not been conclusively established here as a matter of fact.

Even if the Court were to assume that Grace was solvent,[137] for purposes of this discussion

<hr/>

[137] Additionally, PPI Enterprises does not support the Bank Lenders' definition of solvency in this case. The Bank Lenders define solvency as "not balance sheet solvency," but "equity retaining value because it is only in that instance that an increase in one creditor's distributions will not diminish other creditors' recoveries[.]" (Bank Lender Br. 30.) PPI Enterprises, however, did not define solvency, and certainly did not hold that a debtor whose equity retains value under its reorganization plan impairs its creditors and must pay them post-

only, it still would not make a difference because PPI Enterprises does not stand for the proposition that unsecured creditors must receive post-petition interest at the contractual default rate in order to render their claims unimpaired.  Rather, PPI Enterprises can at most be applied here to require the Bank Lenders to receive some form of post-petition interest, regardless of whether or not that interest is at the contractual rate of interest.  Other cases, including the Bank Lenders' oft-cited Chicago, support this interpretation.  See Chicago, 791 F.2d at 528 (providing that if the debtor is *solvent*, then "the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights");  In re Gencarelli, 501 F.3d 1, 7 (1st Cir. 2007) ("Let us be perfectly clear.  This is a *solvent* debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law.");  In re Dow Corning, 456 F.3d 668, 672–73 (6th Cir. 2006) (discussing contractual provisions for insurance in a solvent debtor cases) (emphasis added).  Here, the Joint Plan is consistent with the Third Circuit's language in PPI Enterprises: even though the Bank Lenders have not established a right to the contractual default rate, they will nonetheless receive some post-petition interest—at a rate that is higher than both the non-default and federal judgment rate—in a case where solvency has not been established.  This is all that PPI Enterprises requires.

For all the above reasons, the Court therefore overrules the Bank Lenders' objections on the

---

petition interest.  In fact, the Third Circuit agreed with the bankruptcy court's analysis below in PPI Enterprises, which had stated that, "[i]n large Chapter 11 cases, it is possible to have numerous leases rejected, the resulting claims capped pursuant to § 502(b)(6), and value retained by interest holders.  Thus, Congress clearly contemplated value being given to equity holders even where creditors' nonbankruptcy law rights are materially adversely affected by the Code." PPI Enterprises, 228 B.R. 339, 346 (Bankr. D. Del. 1998), aff'd 324 F.3d 197, 207 (3d Cir. 2003).  As such, the Bank Lenders' reliance on this case to support its definition of solvency as equity retaining value is misplaced.

grounds that the Bankruptcy Court erred in concluding that: (1) no defaults exist under the Credit Agreements; (2) the Bank Lenders are not entitled to contractual default rate under the Credit Agreements; (3) the legal rate of interest is the federal judgment rate; (4) there was not enough evidence to find that Grace is solvent under these circumstances; and (5) the Joint Plan leaves the Bank Lenders' claims in Class 9 unimpaired under § 1124 of the Bankruptcy Code. The Bankruptcy Court's findings on these grounds are therefore affirmed.

### 2. AMH's Claims

#### a. Entitlement to Post-Petition Interest

Under Grace's Joint Plan, claims in Class 7 either fall into the traditional property damage category in Class 7A, or the American ZAI property damage category in Class 7B. Claims in Class 7A are further delineated as "resolved" claims or "unresolved" claims. Resolved claims are those that have already been settled through a settlement agreement reached by the parties or an appropriate court order, while unresolved claims are those that still remain in dispute. Both types of claims are subject to slightly different distribution procedures for payment,[138] but the Plan ultimately calls for all claims in Class 7A to be paid their full allowed amount. AMH's claims are traditional property damage claims and therefore fall within Class 7A. Moreover, its claims are unresolved because AMH has not yet reached an agreement with Grace.

AMH contends that this categorization of its claims is incorrect. Rather, AMH believes that its claims in Class 7A should be categorized as impaired because Class 7A claimants are not entitled to recover interest on their claims, thereby affecting their legal rights. In order to be impaired by the

---

[138] Section 3.1.7(b) of the Joint Plan provides that resolved claims in Class 7A are to be paid in accordance with the appropriate settlement agreements, stipulations, or orders that have been put in place. Unresolved claims in Class 7A are to be paid pursuant to the procedures set forth in the Class 7A CMO.

Joint Plan on these grounds, AMH would first need to show that it was entitled to the interest in some way. The general rule in bankruptcy is that "unsecured creditors are not entitled to recover post-petition interest." In re Wash. Mut., Inc., Bankr. No. 08-12229, 2011 WL 4090757, at *29 (Bankr. D. Del. Sept. 13, 2011) (citing United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372–73 (1988)). An unsecured creditor can only circumvent this rule if the debtor at issue is found to be solvent. Id.

In the instant case, however, the issue of solvency was never determined, despite the Bankruptcy Court's willingness to do so. See In re W.R. Grace & Co., 446 B.R. 96, 107 (Bankr. D. Del. 2011) (stating that no party chose to pursue litigation regarding debtor solvency). Thus, the Court applies the general rule here, and finds that, as an unsecured creditor, AMH has no direct right to the post-petition interest, and its claims are therefore not impaired.[139]

Even if AMH could somehow show that it was entitled to the post-petition interest, its argument would still fail because its claims are not "materially and adversely" affected by the Joint Plan. In re Polytherm Indus., Inc., 33 B.R. 823, 828 (D. Wisc. 1983). Rather, the Plan provides that *all* claims in Class 7A will be paid 100% of the allowed amount. Moreover, the Class 7A Deferred Payment Agreement actually provides for payment of interest for all property damage claims that have been allowed against the trust. (See Deferred Payment Agreement (Class 7A PD), Ex. 27, JA 000859.) Therefore, AMH's objection further fails on these grounds. As such, the Court affirms the

---

[139] AMH also asserts that Class 7A should be categorized as an impaired class because the Joint Plan denies it the ability to pursue its claims in its preferred forum in South Carolina. The Court already discussed this matter, *supra*, when addressing AMH's objection to the structure of the PD Trust. Given that the Court has already found that AMH was not denied a choice of forum since it willingly submitted itself to the Bankruptcy Court's jurisdiction, AMH's impairment argument on these grounds is rendered moot and the Court need not opine on it any further here.

Bankruptcy Court's finding that AMH was properly categorized as a Class 7A unimpaired claimholder.

### b.  The Effect of Impairment on Voting Rights

The distinction between impaired and unimpaired claims is important because only impaired classes have a right to vote to accept or reject a reorganization plan.  See Polytherm, 33 B.R. at 828. Unimpaired claimholders, on the other hand, are "conclusively presumed to have accepted the plan, and [their] participation in or approval of the reorganization plan is not necessary for the plan to gain confirmation by the bankruptcy court."  In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 290 (2d Cir. 1992) (internal citations and quotations omitted).

Moreover, § 524(g) has additional requirements in place for voting procedures under Chapter 11 reorganization plans related to debtor asbestos liability.  Specifically, in order to accept the debtor's reorganization plan, the statute requires that all classes that are affected by the trust's distribution procedures must vote to accept the plan by a majority of at least 75%.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

AMH alleges that its placement in an unimpaired class negatively impacts its voting rights. This contention, however, is without merit.  Sections 6.1 and 6.3 of the Joint Plan provide that all impaired classes are entitled to vote on acceptance or rejection of the Plan, while all unimpaired classes are conclusively presumed to have voted to accept the Plan.  The Plan recognizes, however, that Class 7 is actually one class split into two subclasses, with Class 7A categorized as an unimpaired class and Class 7B categorized as an impaired class.  Section 524(g) would be violated if the two subclasses were treated differently for voting purposes.  Cognizant of this fact, the Plan Proponents crafted the Joint Plan so that the votes of all claimants in Class 7 would be solicited and tabulated as one, single class.  Therefore, even though Class 7A is categorized as an impaired class, the terms of

the Joint Plan provide that it is still entitled to vote on the Plan's acceptance or rejection. Having already determined above that AMH's claims are properly categorized in Class 7A, AMH would thus still be allowed to vote. As such, its voting rights have not been negatively impacted.[140] To the contrary, the Class 7 voting rights indicate that the Plan Proponents and Bankruptcy Court meticulously scrutinized the terms of Plan to make sure that it complied with all provisions of the Bankruptcy Code. Thus, AMH's objection to the Joint Plan on these grounds is overruled.

## I.     The Libby Claimants' Right to Trial by Jury Claims

The Libby Claimants assert that the Bankruptcy Court erred in confirming the Joint Plan because its present structure deprives them of their constitutional and statutory rights to a jury trial. As described above, the Joint Plan provides two forms of claims processing: Expedited Review and Individual Review. If a claimant is dissatisfied with the outcome of these two procedures, he can seek further review through mediation and non-binding arbitration. If the claimant is still dissatisfied after exhausting these options, he can then elect to have his claims liquidated in the tort system by jury trial. However, if a claimant elects to proceed to jury trial, his potential recovery under the Joint Plan is limited to the lesser of the amount of the jury verdict or the Maximum Value established by the TDP. The Libby Claimants allege that this "lesser-of" limitation on their recovery places an undue burden on the exercise of a constitutional right, as well as violating their statutory rights under 28

---

[140] In a separate but related argument, AMH argues Class 7A was improperly "lump[ed] together" with Class 7B for voting purposes, and that this "classification scheme" also negatively impacts its voting rights. First, the Court notes that claim classification and vote solicitation are two entirely distinct concepts under the Bankruptcy Code, and therefore the underlying premise of AMH's claim is incorrect. Regardless, it makes no difference whether Classes 7A and 7B were lumped together for voting purposes because Class 7A, independent of Class 7B, voted overwhelmingly in favor of the Plan. Thus, even if Class 7A would have voted separately upon acceptance or rejection of the Joint Plan, AMH's claims would still have been subsumed by a majority vote of Class 7A in favor of the Plan.

U.S.C. § 1411.  The Court considers each argument separately below.

### 1.     Rights Under the Seventh Amendment to the United States Constitution[141]

The Seventh Amendment to the United States Constitution guarantees the right to a jury trial

in suits at common law.[142]  "The heart of the [Seventh Amendment] is to decide what constitutes the

province of the jury as trier of the facts[.]"  Pierre v. E. Air Lines, 152 F. Supp. 486, 488 (D.N.J.

1957).   In Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), the Supreme Court of the United

States stated that suits at common law refer to "suits in which legal rights [are] to be ascertained and

determined, in contradistinction to those where equitable rights alone [are] recognized[.]"  Id. at 41

(internal citations and quotations omitted).  The notion of "legal rights" within the meaning of the

Seventh Amendment encompasses actions seeking monetary damages.  See Curtis v. Loether, 415

U.S. 189, 195–96 (1974) (noting that damages are the "traditional form of relief offered in the courts

---

[141] The Libby Claimants also allege that the Joint Plan violates their constitutional rights under the Montana Constitution.  Normally, federal courts may abstain in favor of state court adjudication if there is an unresolved question of state law which only the state courts could authoritatively construe, and which may avoid the unnecessary decision of a federal constitutional issue.  R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941); Conover v. Montemuro, 477 F.2d 1073, 1079 (3d Cir. 1973).  It is a well-established rule, however, that when a state constitutional provision essentially mirrors the portion of the federal Constitution at issue in a case, then the federal court need not abstain from deciding the case.  See Wisconsin v. Constantineau, 400 U.S. 433, 439 (1971); Stephens v. Tielsch, 502 F.2d 1360, 1362 (9th Cir. 1974) ("[I]t would entail wasteful duplication of effort to send cases back for state adjudication in the circumstances present here. Litigants would have two bites at the apple—first in state court, then in federal court—both on essentially the same constitutional claim.").  The Supreme Court of Montana has held that the right to a jury trial under the Montana Constitution is "the same as that guaranteed by the Seventh Amendment."  Linder v. Smith, 193 Mont. 20, 23, 629 P.2d 1187, 1189 (Mont. 1981) (internal citations omitted).  Thus, because the state and federal constitutional provisions are virtually identical, this Court need not abstain from deciding this case on Pullman abstention grounds.

[142] U.S. CONST. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States than according to the rules of the common law.").

of law"); <u>Dairy Queen, Inc. v. Woods</u>, 369 U.S. 469, 476–77 (1962) (stating that a complaint seeking

monetary relief is "unquestionably legal" in nature); <u>In re G-I Holdings</u>, 323 B.R. 583, 601–02

(Bankr. D.N.J. 2005) (same).  While this Court has not previously ruled on the issue, it hereby agrees

with and adopts the view of sister courts within the Third Circuit that have concluded that the claims

of "asbestos claimants are legal in nature, and thus, they carry with [them] the Seventh Amendment

guarantee of a jury trial" for the purpose of "liquidating their respective claims[.]" <u>G-I Holdings</u>, 323

B.R. at 605, 607 (internal quotations omitted).[143]  Thus, while the Court acknowledges that Appellants

have a constitutional right to a jury trial within this context, it finds that the Libby Claimants have not

satisfactorily established that this constitutional right is infringed upon by the Joint Plan.

The Libby Claimants do not object to the Joint Plan because its structure and procedure for

the liquidation of personal injury claims does not allow them to pursue their constitutional right to

---

[143] Although the facts of <u>G-I Holdings</u> are very similar to the instant case, the two cases differ as to what exactly a jury may consider under the respective plans. The debtor corporation in <u>G-I Holdings</u> proposed a scheme in which all asbestos personal injury claims would be liquidated through the application of a medical matrix.  <u>G-I Holdings</u>, 323 B.R. at 588.  Similar to Grace's Expedited Review procedure, the matrix provided seven Scheduled Disease Categories, each with a set recovery amount, established by a central committee as an expeditious method for resolving asbestos personal injury claims.  <u>Id.</u> at 590–91. The <u>G-I Holdings</u> scheme allowed claimants to obtain jury trial review of the committee's decision in an Article III court.  <u>Id.</u> at 595. However, the only issues which could be contested and reviewed by a jury were the disallowance of claims based on the failure to meet certain medical criteria, and the categorizations assigned to claims.  <u>Id.</u>  Moreover, the committee's decision could only be set aside if it was found to be arbitrary or capricious.  <u>Id.</u>  Thus, if a dispute arose during discovery or application of the matrix that did not address categorization or disallowance of a claim, that issue could not be appealed to a jury.  Therefore, the <u>G-I Holdings</u> Court found that the scheme did in fact violate the asbestos claimants' Seventh Amendment rights.  <u>Id.</u> at 607.

In contrast, the Joint Plan in the instant litigation allows a jury to consider all disputes on appeal, not just certain issues.  The jury can make its own findings de novo, rather than being limited to determining whether a committee acted arbitrarily or capriciously in making its decision.  Most significantly, a claimant under the Joint Plan is not restricted from having a jury determine the amount of his recovery.  Thus, based on these crucial differences between the two plans, the Court finds that <u>G-I Holdings</u> is distinguishable from the case at hand.

a jury trial. In fact, they acknowledge that they ultimately can obtain a jury verdict if they are dissatisfied with their categorizations or amounts awarded under Expedited Review, Individual Review, arbitration, and mediation. The Libby Claimants instead argue that the "cap" imposed by the asbestos trust—the lesser of the jury verdict or the Maximum Value established by the TDP—serves as a constructive limitation upon their constitutional right to a jury trial because a jury might not be the ultimate determinant of their award amount. The Libby Claimants do not cite to any legal authority to support this argument.

The general view of the federal courts, however, is that the *measuring* of damages by a jury constitutes a matter of "practice" rather than of "right," and that there "is no violation of the constitutional guarantee of a jury trial in the *limitation* of the amount of damages." Pierre, 128 F. Supp. at 488–89 (emphasis added.) The federal courts regularly uphold limitations on monetary relief in various analogous areas of federal litigation, primarily through the use of jury verdict caps[144] and

---

[144] The litigation related to the September 11th Victim Compensation Fund ("9/11 Fund") is particularly analogous to the instant case. Under the 9/11 Fund, victims of the terrorist highjackings and their families could file claims for compensation without having to prove fault or show a duty on the part of any defendant. In re Sept. 11 Litigation, 280 F. Supp. 2d 279, 286 (S.D.N.Y. 2003). Congress appointed a Special Master to determine the amount of victims' compensation, which was capped at $250,000 for non-economic damages and subject to various formulas and schedules for economic damages. Id. at 286, 287. Moreover, punitive damages were unavailable. Id. If claimants were dissatisfied with the amount granted to them by the Special Master, they could request a hearing to prove entitlement to a higher amount. Colaio v. Feinberg, 262 F. Supp. 2d 273, 282 (S.D.N.Y. 2002). If claimants remained dissatisfied after the hearing, they could then opt to pursue their claims in the normal tort litigation process, where the aggregate of their damages would be capped at the limits of the defendants' liability insurance. Id. Although the 9/11 Fund was not directly challenged on Seventh Amendment grounds, the district court held that its structure was "entitled to judicial respect" and "d[id] not infringe on [the] plaintiffs' constitutional and statutory rights." Id. at 290. In short, the Court notes the similarities between the structures of the Grace asbestos trust and the 9/11 Fund, and takes notice of the fact that this analogous fund was found to be constitutional by the Southern District of New York.

The federal courts have also regularly upheld caps on jury verdict amounts directly on Seventh Amendment grounds. This is particularly evident in the capping of jury verdicts in

fixed rules of compensation.[145]  Their justification for doing so is rooted in the Re-Examination

_____

medical malpractice actions.  See Davis v. Omitowoju, 883 F.2d 1155, 1159–65 (3d Cir. 1989) (providing an extensive historical and legal analysis of the Seventh Amendment regarding caps on jury verdicts and ultimately finding that the cap in question did not violate the Constitution); see also Gasperini v. Ctr. for Humanity, Inc., 518 U.S. 415, 429 n.9 (1996) (recognizing that the courts of appeals regularly find that district court application of statutory caps on medical malpractice jury verdicts does not violate the Seventh Amendment);  Smith v. Botsford Gen. Hosp., 419 F.3d 513, 519 (6th Cir. 2005) (finding that Michigan's cap on jury verdicts in medical malpractice actions does not violate the Seventh Amendment); Boyd v. Bulala, 877 F.2d 1191, 1196 (4th Cir. 1989) (finding that Virginia's statutory cap on damages in medical malpractice actions does not run afoul of the Seventh Amendment); Estate of McCall v. United States, 663 F. Supp. 2d 1276, 1299 n.37 (N. D. Fla. 2009) (noting that Seventh Amendment constitutional challenges to jury verdict caps in medical malpractice cases in Florida are rejected on a regular basis by the federal courts).

Aside from medical malpractice actions, the federal courts have also routinely recognized and upheld the constitutionality of jury verdict caps and fixed rules of compensation in a wide array of federal legislation, including, *inter alia,* limitations on: compensation for victims of natural disasters, wrongful death awards, personal injury awards, product liability awards, civil rights violations, and violations of international air transportation laws and regulations. See, e.g., Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1202 (9th Cir. 2002) (holding that a cap on Title VII compensatory damages does not violate the Seventh Amendment); Estate of Sisk v. Manzanares, 270 F. Supp. 2d 1265, 1277–78 (D. Kan. 2003) (finding that capping award amounts in wrongful death cases does not "reexamine" a jury's verdict); EEOC v. CEC Enterm't, Inc., No. Civ. A. 98-698, 2000 WL 1339288, at *21–22 (W.D. Wis. Mar. 14, 2000) (upholding jury verdict cap in employment discrimination setting); Franklin v. Mazda Motor Corp., 704 F. Supp. 1325, 1330–35 (D. Md. 1989) (finding that a cap on personal injury damages resulting from a defective automobile does not violate the Seventh Amendment); Pierre v. E. Air Lines, 152 F. Supp. 486, 489  (D.N.J. 1957) ("This court opines that there is no conflict between the provision of limitation of liability in the Warsaw Convention and the VIIth Amendment to the Constitution.").

[145] Legislative rules enacted by Congress that establish set levels and schedules of compensation are frequently utilized in the federal judicial system.  The Seventh Amendment only requires that a jury make the factual findings regarding a plaintiff's particular grievance. Pierre, 152 F. Supp. at 488.  Therefore, as long as the jury is the trier of facts in a given case, the court may apply a legislatively-enacted rule that controls the plaintiff's ultimate remedy without violating the Seventh Amendment.  Bulala, 877 F.2d at 1196 ("If a legislature may completely abolish a cause of action without violating the right of trial by jury, we think it permissibly may limit damages recoverable for a cause of action as well.") (internal citation omitted).  A common example is a congressionally-enacted statute authorizing the doubling or trebling of jury awards. The federal courts have found that a jury's factual findings are not disturbed in such cases, despite the fact that the jury did not set the ultimate amount of recovery.  See Campos-Orrego v. Rivera, 175 F.3d 89, 95–96 (1st Cir. 1999) (finding that a court's doubling of a jury's award in

Clause of the Seventh Amendment.[146]  The Third Circuit has held that such limits on compensation are constitutional because they do not require courts to "reexamine" jury verdicts within the meaning of the Seventh Amendment nor to impose their own factual determinations regarding what a proper award may be, but rather merely mandate that courts implement a legislative policy to reduce the amount recoverable to that which the legislature deems reasonable.  Davis v. Omitowoju, 883 F.2d 1155, 1162 (3d Cir. 1989).  Thus, "[w]here it is the legislature which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that such a legislative enactment offends either the terms, the policy or the purpose of the Seventh Amendment."  Id. at 1165.

In the instant case, when Congress enacted § 524(g), it made a policy decision to allow debtor corporations in asbestos-related bankruptcy proceedings to reorganize their corporate structure to be able to satisfy their current and future asbestos liabilities.  See In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2004).  In doing so, it acted with the dual intent of benefitting both the debtor corporations, by allowing them to proceed forward as economically-viable entities, and the claimants, by ensuring that all are entitled to receive some level of compensation.  140 CONG. REC. S. 4523 (Apr. 20, 1994).  Congress then authorized the appointment of legal representatives to oversee the management of the trust and ensure that the goals of § 524(g) are achieved.

Vested with this legislative authority, the legal representatives in the Grace litigation established the current structure of the Joint Plan, which allows for the determination of claimant compensation by a jury.  By the same token, however, the legal representatives also established the

---

an employment discrimination case did not violate the Seventh Amendment).

[146] U.S. CONST. amend. VII (". . . no fact tried by a jury, shall be otherwise *reexamined* in any Court of the United States[.]") (emphasis added).

challenged de facto cap on an individual's compensation. They made this well-reasoned decision, no doubt, to ensure that there would be enough money available for all present and future claimants' recovery—a decision directly in accordance with the legislative goals of § 524(g). Thus, the current structure of the Joint Plan would not require a "reexamination" of a jury's verdict in contravention of the Seventh Amendment. Rather, it merely involves implementation of a legislative policy. It is accordingly constitutionally sound on Seventh Amendment grounds.[147]

Furthermore, the Libby Claimants are not required to participate in the asbestos trust pursuant to the Joint Plan. The benefit of the Joint Plan is that participants avoid unpredictable piecemeal litigation, thereby ensuring the availability of more funds for claimant compensation. In return for receiving the benefit of ensured compensation, plan participants are restricted to the structure of the TDP. The election to participate in the Joint Plan is, however, entirely voluntary. Claimants are not restricted from instead opting to bring an individualized lawsuit against Grace. Although the lawsuit would be stayed for a period of time due to the § 524(g) injunction, this temporary delay would not result in a Seventh Amendment violation since the case would still ultimately be tried before a jury. Thus, there is nothing preventing the Libby Claimants from exercising their Seventh Amendment rights through an independent jury trial in the tort system outside the context of the asbestos trust. The Libby Claimants may not, however, reap the benefits of *both* the Joint Plan and an independent jury trial—either they must wait to pursue an independent jury trial with the mere possibility of obtaining a larger jury verdict and the potential of an award less than the trust's Maximum Value, or

---

[147] While a damage cap might raise a constitutional red flag if its fixed sum is so low as to be arbitrary or irrational, this would implicate due process concerns rather than the Seventh Amendment. Regardless, this is not at issue in the present case. The cap imposed by Grace's trust allows the Libby Claimants to obtain up to the Maximum Value of their claim—an amount determined to be fair after years of careful consideration by medical, government, and legal experts who sought to ensure uniformity of compensation and fund availability for all claimants.

they may elect to participate in the Joint Plan and its benefit of ensured, but limited, compensation. Under both options, the Appellants can pursue a jury verdict, thereby eliminating any Seventh Amendment concerns.

Finally, the Libby Claimants' argument runs contra to § 524(g)'s explicit requirement to treat all "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). One of Congress' primary intentions in creating § 524(g) was to ensure uniform treatment of all claimants. If the Libby Claimants were not subject to the de facto cap on jury verdicts and judgments under the TDP, they would actually receive *preferential* treatment under the Plan in comparison to other similarly situated claimants within Class 6. Moreover, § 524(g) was also designed to ensure that present claimants do not exhaust all of the debtor's assets before future claimants have even manifested injuries. H.R. REP. NO. 103-835, at 41 (1994), reprinted in 1994 U.S.C.C.A.N. 3349; 140 CONG. REC. S4523 (Apr. 20, 1994) (statements of Senator Brown and Graham); see also In re Grossman's, Inc., 607 F.3d 114, 126–27 (3d Cir. 2010) (discussing legislative history of § 524). If the Libby Claimants were exempt from the cap on damages, not only would this result in non-uniform treatment among claimants, but it would also rapidly deplete available funds in the trust set aside for other current and future claimants. This treatment is exactly what § 524(g) was designed to prevent.

For all the above reasons, the Court finds that the Joint Plan does not violate the Libby Claimants' constitutional right to a trial by jury.

### 2.     Statutory Rights Pursuant to Section 1411(a)

In conjunction with their constitutional claim, the Libby Claimants also assert that they have a statutory right to a jury trial pursuant to 28 U.S.C. § 1411(a). Section § 1411(a) states that causes of action arising under "[T]itle 11 do not affect any right to trial by jury that an individual has under

applicable non-bankruptcy law with regard to a personal injury or wrongful death tort claim." 28 U.S.C. § 1411(a). As described in detail below, the Court finds that the Libby Claimants' statutory right to a jury trial has not been violated.

The Libby Claimants have three options available to them when deciding what course of action to follow regarding their recovery—none of which infringe upon their statutory rights to pursue a jury verdict. Under the first option, the Libby Claimants may elect to participate in the Joint Plan, and may choose to accept a set award established by the structure of the plan under Expedited Review, Individual Review, arbitration, or mediation. Although § 1411(a) provides that Title 11 actions should not *affect* the right to a jury trial in personal injury or wrongful death cases, this does not of course mean that such cases *must* be tried before a jury. See In re Dow Corning Corp., 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997). For example, parties in a personal injury case may accept a settlement in lieu of going to trial, even though they have a right to pursue a jury verdict regarding their claims. Id. Similar to reaching a settlement, if a claimant under the Joint Plan in the instant litigation chooses this first option, he does so in lieu of a jury trial. Such a decision is entirely voluntary, and thus cannot be said to violate one's statutory right to a jury trial. Under the second option, a Libby Claimant can elect to participate in the Joint Plan, but may reject the proposed award and instead opt to pursue his claim through a jury trial in standard tort litigation. Once again, the individual is not precluded from having a jury hear his claims. The third and final option available to the Libby Claimants is the pursuit of a separate jury trial outside the context of the Joint Plan. This third option obviously does not run afoul of the jury trial right since the claimant himself opts to directly pursue a jury verdict. Therefore, the Court finds that none of the three options available to the Libby Claimants regarding their recovery violate their § 1411 statutory right to a jury trial.

Finally, the Court provides some clarity on an issue raised by both parties—the apparent

conflict between § 524(g) and § 1411(a). When briefing the Court on this issue, Grace argued that when two statutes such as § 524(g) and § 1411(a) conflict with one another, the statute that is later in time and more specific should control, which in the instant case is § 524(g). On the other hand, the Libby Claimants argued that § 1411(a) should control because it expressly provides for jury trial rights, whereas § 524(g) is silent on this point. At first glance, these two statutory provisions are seemingly in conflict. However, closer scrutiny reveals that the two provisions can be aligned with one another and, if possible, should be read in harmony. See Morton v. Mancari, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); J.E.M. Agric. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 143–44 (2001) (same).

Section 1411(a) has been interpreted to be a statute that is "strictly procedural in nature" and that "come[s] into play only when a right to trial is established." Dow Corning, 215 B.R. at 360. G-I Holdings established that asbestos injury claims carry with them the guarantee of a jury trial for the purpose of claims liquidation in a bankruptcy proceeding. 323 B.R. 583, 607 (Bankr. D.N.J. 2005). Thus, the Libby Claimants' right to a jury trial has been established and the requirements of § 1411(a) "come into play" at this point. Section 1411(a) provides that no part of Title 11 may affect an individual's right to a jury trial in personal injury and wrongful death claims. 28 U.S.C. § 1411(a). In the context of the instant litigation, this means that § 524(g) of Chapter 11 may not affect the jury trial right. At no point does § 524(g) explicitly mention the requirement of a jury trial. Rather, as described extensively above, § 524(g) provides authority for the creation of an asbestos personal injury trust to operate through various mechanisms to pay similar claims in substantially the same manner. 11 U.S.C. § 524(g)(2)(B)(ii)(V). Thus, so long as the "mechanisms" authorized by § 524(g) do not overrun the jury trial right guaranteed by § 1411(a), neither statutory provision has been

176

violated. Therefore, both § 524(g) and § 1411(a) can be read in harmony with one another, and the requirements of both statutory provisions remain intact in the present case.

Based upon this Court's conclusions that the Libby Claimants' have not been deprived of either the constitutional or statutory rights to a jury trial, the Bankruptcy Court's holding on this point is affirmed.

### J.      The Fair and Equitable Test and The Absolute Priority Rule

Section 1129(a) of the Bankruptcy Code lists sixteen conditions that must be satisfied prior to a reorganization plan's confirmation under Chapter 11.[148]  Satisfaction of these conditions is mandatory, with the exception of subsection (a)(8), which addresses acceptance of the plan by impaired classes. Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 46–47 (Bankr. E.D. Pa. 1996); In re Yasparro, 100 B.R. 91, 93 (Bankr. M.D. Fla. 1989).  This subsection is not mandatory because the Bankruptcy Code provides that even if an impaired class rejects the plan under section (a), the plan may nonetheless still be confirmed through the "cram-down" provisions of section (b) of the statute.  Id.; see also In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010) (Section 1129(b) provides circumstances under which a reorganization plan can be "crammed down the throats of objecting creditors") (internal citations and quotations omitted).

---

[148] Section 1129(a)(1) states that a court can only confirm a reorganization plan if it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1).  Montana and the Crown objected to confirmation of the Plan on the ground that it violates this statutory provision. Section 1129(a)(1), however, is an "umbrella" statutory section that ensures compliance with other more specific sections of the Code.  In particular, § 1129(a)(1) is predominantly aimed at ensuring compliance with § 1122 and § 1123, discussed *supra*, which address classification of claims and contents of the plan.  See In re TCI 2 Holdings, LLC, 428 B.R. 117, 132 (Bankr. D.N.J. 2010); In re G-I Holdings, Inc., 420 B.R. 216, 258–60 (D.N.J. 2009); In re Texaco, Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988).  The Court has already discussed any objections raised pursuant to these particular statutory sections, *supra*, and therefore finds that Montana and the Crown's § 1129(a)(1) objections are also overruled.

Section 1129(b) sets forth the fair and equitable test, which requires that a reorganization plan be fair and equitable to each non-accepting class of impaired claims or interests under the plan. Section 1129(b) provides, in relevant part, that:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). Subsection (b)(2) of the statute goes on to set forth the nonexclusive requirements for meeting the fair and equitable test. One of these requirements is that the reorganization does not violate the absolute priority rule. The absolute priority rule is "a judicial invention that predated the Bankruptcy Code. It arose from the concern that because a debtor proposed its own reorganization plan, the plan could be 'too good a deal' for that debtor's owners." In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005) (quoting Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444 (1999)). In its simplest terms, the absolute priority rule requires that "creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests—such as those of equity holders—may share in the assets of the reorganized entity."[149] Yasparro, 100 B.R. at 95.

---

[149] The absolute priority rule is codified in § 1129(b)(2), which states, in relevant part:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

* * * *

(B) With respect to a class of unsecured claims:
    (i) the plan provides that each holder of a claim of such class receive or retain

Several Appellants—specifically Montana, the Crown, BNSF, AMH,[150] and Garlock—contend that the Joint Plan runs afoul of the fair and equitable test of § 1129(b), and therefore also violates the absolute priority rule incorporated within that statutory section. These arguments, however, are all without merit because the fair and equitable test does not apply under the circumstances present in this case.

It is a well-known legal rule in Chapter 11 reorganization litigation that "[u]nder § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown[.]" In re Dow Corning Corp., 244 B.R. 678, 693 (Bankr. E.D. Mich. 1999) (internal citation omitted). There is, however, no opportunity for a cramdown in this case. A cramdown would only be possible if the plan could not be confirmed because an entire class of impaired creditors had voted against confirmation of the plan. See In re Exide Techs., 303 B.R. 48, 78 (Bankr. D. Del. 2003); Corestates Bank, 202 B.R. at 47; In re Winters, 99 B.R. 658, 663 (Bankr. W.D. Pa. 1989). Nothing is being "crammed down the throats of the objecting creditors" here because all impaired classes entitled to vote—Class 6 (personal injury claimants), Class 7B (American ZAI claims), Class 8 (Canadian ZAI claims), and Class 10 (Equity Interests)—all voted overwhelmingly to accept the Joint Plan. Phila.

---

on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property[.]

11 U.S.C. § 1129(b)(2)(B)(i–ii).

[150] The Court recognizes that Appellant AMH has a slightly different claim than the other objecting parties because its claims fall within Class 7A, a subclass that is deemed unimpaired, but still entitled to vote under the terms of the Joint Plan due to the status of its counterpart, Class 7B, as an impaired class. Regardless, Class 7 as a whole voted in favor of the Joint Plan, and therefore the fair and equitable test also does not apply to AMH's claims.

Newspapers, 599 F.3d at 304. Specifically, Montana, the Crown, and BNSF all have indirect claims for indemnity and/or contribution arising from Grace's asbestos liability. It has already been established, *infra*, that these claims are properly classified within Class 6.[151] Class 6 voted 99.51% in number and 99.39% in dollar amount in favor of the Joint Plan. It is inconsequential that these Appellants object to the Plan on an individual basis because application of the fair and equitable test only depends on how an impaired class *as a whole* voted. See Winters, 99 B.R. at 663 ("Only after it is apparent that an impaired *class* objects is it necessary to determine whether or not the plan is capable of confirmation[.]") (emphasis in original); see also In re United Marine, Inc., 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) (a "lone dissenter" cannot rely on § 1129(b) to support its objection to the reorganization plan). As such, the fair and equitable requirements of § 1129(b) do not apply here because the impaired classes and interests in this case all voted to accept the Plan.

Given that § 1129(b) does not apply to this case, the absolute priority rule likewise does not come into play here. The requirements of the absolute priority rule are subsumed within the rest of the cramdown requirements set forth in § 1129(b). See Armstrong, 432 F.3d at 512 (describing the codification of the absolute priority rule as one of the requirements of 1129(b)); In re PWS Holding Corp., 228 F.3d 224, 237 (3d Cir. 2000) (discussing the absolute priority rule as part of the many requirements set forth by § 1129(b)); Yasparro, 100 B.R. at 94 ("Section 1129(b)(2)(B) includes the

---

[151] Montana, the Crown, and BNSF argue that their claims are distinct from other claims in Class 6, and that had they been classified as their own class under the terms of the Joint Plan, this class would have been impaired and voted against the Plan's confirmation. This argument, however, is unfounded. First, it is a *classification* argument governed by § 1122, and *not* the § 1129(b) fair and equitable requirement. Moreover, it is an entirely baseless claim since there is no separate class for these creditors' claims under the terms of the Joint Plan. The Court refuses to rule on the basis of a mere hypothetical that in no way adequately portrays the present structure of the Plan. Having already decided that Montana, the Crown, and BNSF's claims are properly classified in Class 6, *supra*, the Court need not opine on this matter any further here.

absolute priority rule.").  The absolute priority rule, therefore, only applies to confirmation of a plan that attempts to cram down an impaired class that voted against acceptance of the Plan.  This is not an issue here.

Therefore, the Court finds that neither the fair and equitable test nor the absolute priority rule are violated under these circumstances.  Accordingly, Appellants' objections on these points are overruled.[152]

---

[152] In their appellate brief, Montana and the Crown argue that the fair and equitable test has been violated because, *inter alia*, the Trust Advisory Committee ("TAC") "wields considerable control and influence over the trustees and the governance of the trust" that is "fundamentally unfair and inequitable" and an "impermissible conflict of interest." (Montana Br. at 46.) Although its objection is improper because the fair and equitable test does not apply here, the Court nevertheless pauses to comment on this particular objection.

The TAC is a committee of attorneys enlisted for the purpose of protecting the rights of present personal injury claimants.  It has been a feature of Chapter 11 asbestos litigation since the <u>Johns Manville</u> case.  The TAC is a separate entity from the PI FCR—the individual appointed by the Bankruptcy Court for the purpose of representing the interests of future personal injury claimants.  The TAC is also distinct from the U.S. Trustee(s) appointed to represent the trust.  In fact, given that the Trustees are not usually attorneys with vast experience in asbestos litigation, the TAC was created with the intent to advise them and to further facilitate administration of the trust.

As the Bankruptcy Court properly found, Appellants' objection on these grounds is entirely speculative.  The record and the parties' appellate briefs are devoid of any evidence that the TAC has or will at some point engage in any improper conduct.  Moreover, the Joint Plan has specific procedures in place to protect the parties' interests and avoid conflicts of interest.  For example, the TAC and PI FCR are only involved in matters related to the general administration and implementation of the trust.  The Trustees, not the TAC or PI FCR, determine whether a particular claim satisfies payment criteria and how those claims should be paid.  The Trustees, in turn, hold fiduciary duties to all Trust beneficiaries.  Furthermore, the TAC and PI FCR have identical consent rights, and both are limited.  Neither may withhold consent unreasonably, and both must explain in written detail their objections to any course of action within thirty days.  If a dispute remains as to consent rights, the issue is submitted to ADR and, in special circumstances, can proceed straight to the Bankruptcy Court.  Finally, all TAC decisions are subject to oversight by the court.

Based on all the above, the Court finds that not only are the procedures associated with the TAC fair and equitable, but are also devoid of a conflict of interest.  There simply is no possibility for the TAC—one of many entities representing claimants' interests here—to wield considerable control and influence over governance of the trust.  As such, Appellants' argument on these grounds is unfounded.

**J.     Garlock's Bankruptcy Standing**

On June 5, 2010, Garlock filed its own petition for Chapter 11 bankruptcy.  As a result, it was granted an automatic stay against litigation until it could successfully reorganize pursuant to 11 U.S.C. § 362.  Additionally, since its bankruptcy petition relates to outstanding asbestos liabilities, Garlock received injunctive relief pursuant to a § 524(g) channeling injunction similar to the one in the instant litigation.  Having filed for bankruptcy, Garlock left the realm of tort litigation and entered the enclosed sphere of bankruptcy proceedings.  As such, Garlock is presently immune from having asbestos personal injury claims filed against it.  Given its current status, the Bankruptcy Court found that Garlock lacked standing to object to Grace's Joint Plan.  Nevertheless, Garlock contends that it satisfies the requirements for standing in the instant litigation, and therefore is entitled to substantively challenge the Joint Plan.

Standing is a "threshold question in every federal case, determining the power of the court to entertain suit." Warth v. Seldin, 422 U.S. 490, 498 (1975).  There are two types of standing in the context of bankruptcy litigation: (1) bankruptcy standing; and (2) appellate standing.  In re Global Techs., Inc., 645 F.3d 201, 209 (3d Cir. 2011) ("GIT").  Bankruptcy standing refers to a party's standing to object to confirmation of a plan before the bankruptcy court in the first instance, while appellate standing addresses the party's standing to challenge the substance of the bankruptcy court's decision on appeal.  Id.  Given that the Bankruptcy Court in the instant litigation found that Garlock lacked standing to challenge the Joint Plan in the first place, the Court need only address the implications of Garlock's bankruptcy standing in its discussion.

The Third Circuit recently clarified the scope of bankruptcy standing in GIT, providing that a party challenging a reorganization plan in bankruptcy court must meet both the constitutional requirements for standing under Article III of the U.S. Constitution, as well as the statutory standing

requirements put forth by the Bankruptcy Code in 11 U.S.C. § 1109(b). Id. at 210. In so holding, the Third Circuit found that "Article III standing and standing under the Bankruptcy Code are effectively coextensive." Id. at 211 (internal citations omitted); see also In re Black, Davis, and Shue Agency, Inc., Bankr. No. 1-06-bk-00051, 2011 WL 4619886, at *4 (Bankr. M.D. Pa. Sept. 29, 2011) (citing GIT); In re Alcide, 450 B.R. 526, 535 (Bankr. E.D. Pa. 2011) ("The logical import of the Court of Appeals' statement is that a party that has constitutional standing is a party in interest under the Bankruptcy Code[.]").

In order to have constitutional standing under Article III of the Constitution, a party must first satisfy three requirements. See Bennett v. Spear, 520 U.S. 154, 167 (1997); Ne. Fl. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fl., 508 U.S. 656, 663 (1993). Specifically, the party seeking constitutional standing must show that it has: (1) suffered an "injury in fact" that is "real and immediate" and not merely "conjectural or hypothetical," City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (citations omitted); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); (2) that the injury is fairly traceable to the defendant's conduct, Allen v. Wright, 468 U.S. 737, 751 (1984); United States v. Hays, 515 U.S. 737, 743 (1995); and (3) that a favorable federal court decision is likely to redress the injury. Linda R.S. v. Richard D., 410 U.S. 614, 617–18 (1973); Warth v. Seldin, 422 U.S. 490, 505–06 (1975); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 45–46 (1976).

Similarly, § 1109(b) of the Bankruptcy Code governs the parties' standing to litigate their claims, and provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). In GIT, the Third Circuit adopted the Seventh Circuit's definition of a "party

in interest" to mean "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." GIT, 645 F.3d at 210 (adopting In re James Wilson Assoc., 965 F.2d 160, 169 (7th Cir. 1992)). Since the Third Circuit's adoption of this definition, courts have found that "a party in interest in a bankruptcy case must have some legally protected interest that either has been adversely affected (thereby warranting judicial relief) or that is in actual danger of being adversely affected (if relief is not granted)." In re Alcide, 450 B.R. 526, 535 (Bankr. E.D. Pa. 2011) (internal citations omitted).

In regards to the first element, Garlock alleges that, as a former, current, and potentially future co-defendant with Grace, it has suffered an injury in fact because its alleged rights to contribution and set-off would need to be asserted against the PI Trust rather than Grace itself, and that these claims would be less valuable under the terms of the Plan than they would be outside the context of bankruptcy. The objection is premised on the notion that Garlock would be entitled to seek contribution[153] from Grace for any tort judgments rendered in joint and several liability jurisdictions in which it paid more than its share of liability and for which Grace is also liable. Moreover, Garlock also claims that any set-off[154] rights it may have against Grace would be adversely affected because,

---

[153] Contribution is a legal principle determining how judgment is allocated among joint tortfeasors. The methods of allocation are governed by state law, and generally arise in joint and several liability jurisdictions. "Contribution comes into force when one joint tortfeasor has discharged a common liability or paid more than its share of such liability, in which case the joint tortfeasor is entitled to reimbursement from the other tortfeasors to the extent that its payment exceeded its own liability." Exxonmobile Oil Corp. v. Lucchesi, No. Civ. A. 03-1625, 2004 WL 1699203, at *3 (E.D. Pa. July 29, 2004).

[154] Set-off is also a legal principle related to apportionment of judgments among joint tortfeasors. Set-off "provides that in a tort action where two or more tortfeasors are deemed to be liable for plaintiff's injuries, non-settling tortfeasors are entitled to a reduction of the final judgment award." Weisbrot v. Schwimmer, No. Civ. A. 97-2711, 2007 WL 2683642, at *3 (D.N.J. Sept. 7, 2007) (internal citations omitted).

upon confirmation of the Joint Plan, Garlock would need to direct such claims against the PI Trust.

The Court, however, disagrees. When Garlock filed its own bankruptcy petition in June of 2010, it removed itself from the tort system and was granted § 362 injunctive relief. Most recently, on November 28, 2011, Garlock filed its own Joint Plan of Reorganization. (See Debtor's Joint Plan of Reorganization, Bankr. No. 10-31607 (Bankr. W.D.N.C.), Doc. No. 1664 ("Garlock's Plan").) In the terms of its own Plan, Garlock, just like Grace, has adopted § 524(g) as the primary statutory vehicle for litigation relief and corporate reorganization. Under § 524(g), and the terms of Garlock's Plan, all of Garlock's asbestos liabilities—both current and future—will be channeled to a trust akin to Grace's trust in the instant case.[155] This trust will assume Garlock's liabilities, and these claims

---

[155] In making its argument, Garlock asserts that its standing in the instant litigation is not affected by its own bankruptcy filing because Garlock has not yet established its own asbestos trust, and, if it chooses to utilize a trust mechanism, may create a non-consensual trust that "actually litigates claims in the tort system." (Garlock Reply Br. 18.) Moreover, Garlock claims that, upon reorganization, it may choose to resolve its current asbestos liabilities but pass its future liabilities back into the tort system, or, in the alternative, may resolve its future asbestos liabilities but pass its current liabilities back into the tort system. Given the recent filing of Garlock's own reorganization plan, this argument is now both moot and without merit.

First, by filing for § 524(g) injunctive relief, the very terms of the statute require that a trust be implemented in conjunction with the channeling injunction. See 11 U.S.C. § 524(g)(2)(B)(I) ("[T]he injunction is to be implemented in connection with a trust[.]"). The two are not divisible from one another. Thus, when Garlock sought injunctive relief from its asbestos liability under the terms set forth in § 524(g), the statute clearly required that a trust be implemented at this point in time as well. Section 7.3 of Garlock's Plan directly addresses the creation and management of Garlock's own Asbestos Trust. (Garlock's Plan 20–22.) This Section provides that claims asserted against Garlock will be processed "in accordance with this Plan, the GST Asbestos Trust Agreement, the Claims Resolution Procedures, the CMO, and the Confirmation Order[.]" (Id. at 20.) Section 7.3 is noticeably devoid of any mention of a non-consensual trust that would actually litigate claims in the tort system. Rather, the terms governing Garlock's Trust appear to be vastly similar to the terms governing Grace's PI Trust.

Second, Garlock's Plan recognizes both current and future asbestos claims. These claims have been classified in Class 4 and Class 5, respectively. Section 2.2 of the plan provides that both Classes 4 and 5 will be assumed by the trust, and will be processed and paid in accordance with the procedures set forth in Garlock's Plan. (Id. at 7, 8.) There is no mention that either current or future claims will be unresolved by Garlock's Plan and instead passed through back into the tort system.

will be settled in accordance with the terms set forth in Garlock's own plan of reorganization. Given its exit from the tort system and the filing of its own reorganization plan, Garlock will no longer be at risk of paying any joint and several jury verdicts, and therefore will have no reason to seek contribution or set-off from Grace or any other co-defendant. Thus, armed with the protective shield of its own asbestos trust and channeling injunction, Garlock has insulated itself from both its own liability, as well as any shared liability between it and Grace.

Moreover, if for some reason Garlock should return to the tort system and suffer a judgment for which it must pay a portion of Grace's liability, then this scenario would be accounted for under the present terms of Grace's Joint Plan. Any such claim by Garlock would fall within the definition of an Indirect PI Trust Claim under the terms of the Joint Plan, and would be paid according to the TDP.[156] However, the Court notes that any such claim is merely conjectural at this point in time.

---

Finally, one of the primary purposes of creating the trust and channeling injunction under § 524(g) is to "relieve[ ] the debtor of the uncertainty of future asbestos liabilities." In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2005). There would be no point in Garlock receiving the protections afforded by § 524(g) merely so that it could resolve its current obligations without addressing its future asbestos liability. In fact, it is unlikely that Garlock could successfully reorganize if it failed to account for its future liabilities, and it is highly doubtful that any bankruptcy court would approve a reorganization plan that runs directly contra to this underlying principle. Garlock seems to have recognized this point because in its newly-minted Plan, all future asbestos claims are classified in Class 5. (Garlock's Plan 8.)

As such, Garlock's claims are meritless, and the foundation of its argument here is undermined by the terms set forth in its new reorganization plan.

[156] Section 1.1(144) of the Plan further defines Indirect PI Trust Claims as:

any Claim . . . or Demand against the Debtors . . . held by any Entity . . . who has been, is, or may be a defendant in an action seeking damages for . . . personal injuries . . . to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products for which the Debtors have liability . . . [and] on account of alleged liability of the Debtors for payment, repayment, reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action[.]

Garlock has presently made no claims against Grace's PI Trust, see In re ACandS, Inc., Bankr. No. 02-12687, 2011 WL 4801527, at *1 (Bankr. D. Del. Oct. 7, 2011), nor has it introduced any concrete evidence depicting a plausible scenario of how it could now return to the tort system and suffer such a judgment in the foreseeable future. Such hypothetical claims and demands would depend on Garlock being found liable alongside Grace, as well as it having paid Grace's liability to claimholders or future demand holders. This is extremely unlikely given the fact that Garlock is well underway with its own Chapter 11 reorganization. In short, Garlock has not identified how it has suffered any injury here, let alone one that is "real and immediate" and not merely "conjectural or hypothetical" at this point in time. Lyons, 461 U.S. at 102.

The second and third elements of constitutional standing require that the party's injury be fairly traceable to the defendant's conduct, and that a favorable decision could likely redress the injury. See Pa. Prison Soc'y v. Cortes, 622 F.3d 215, 228 (3d Cir. 2010) (citing Friends of the Earth, Inc. v. Laidlaw Envt'l Serv. (TOC), Inc., 528 U.S. 167, 180–81 (2000)). These two elements are "closely related," and therefore "often overlap." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 142 (3d Cir. 2009) (citing Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals,

---

(Joint Plan § 1.1(144).) The Joint Plan outlines the procedures for payment of these Indirect PI Trust Claims in Section 5.6 of the TDP, which provides in relevant part, that:

> Indirect PI Trust Claims . . . shall be . . . paid by the PI Trust . . . if the holder of such claim [ ] establishes to the satisfaction of the Trustees that the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation . . . To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant[.]

(TDP § 5.6, Ex. 4, JA 000305–306.) See also In re W.R. Grace & Co., 446 B.R. 96, 117 n.30 (Bankr. D. Del. 2011).

<u>Inc.</u>, 913 F.2d 64, 73 (3d Cir. 1990)). The Third Circuit has held that under these two elements, "[i]t is sufficient for the plaintiff to establish that a 'substantial likelihood that the requested relief will remedy the alleged injury in fact.'" <u>Toll Bros.</u>, 555 F.3d at 143 (quoting <u>Vt. Agency of Natural Res. v. U.S. ex rel. Stevens</u>, 529 U.S. 765, 771 (2000)). Garlock fails to satisfy the requirements of both of these elements as well. Not only is there no sufficient injury here caused by Grace upon which to premise standing, but "there is not even a scintilla of likelihood of injury [that such an] injury would or [even] could be relieved by [a] ruling . . . from this [C]ourt." <u>In re Pittsburgh Corning, Corp.</u>, 453 B.R. 570, 581 n.16 (relying on the language of <u>GIT</u> to show that Garlock "has not shown a specific, identifiable trifle of injury") (internal quotations omitted).

In a similar vein, Garlock also has not satisfied § 1109(b)'s definitional requirements of a "party in interest" under the Bankruptcy Code. It does not fall within any of the examples provided by the Code as an example of a "party in interest."[157] Moreover, under the new Third Circuit definition, Garlock has not identified any legally protected interest that could be affected by confirmation of Grace's Joint Plan. <u>GIT</u>, 645 F.3d at 201. As previously mentioned, when Garlock filed its own bankruptcy petition, the rules of the game changed significantly. Now, Garlock will resolve its asbestos liability in accordance with the terms of its own new reorganization plan, and without the ability to pursue Reorganized Grace as a co-defendant in the tort system. Garlock cannot now assert "some legally protected interest that either has been adversely affected (thereby warranting judicial relief), or that is in actual danger of being adversely affected." <u>Alcide</u>, 450 B.R. at 535. To the extent that Garlock could somehow obtain an Indirect Claim against Grace in the future—thereby

---

[157] Section 1109(b) lists examples of a party in interest as: "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee[.]" 11 U.S.C. § 1109(b). Importantly, Garlock is not considered a creditor here because it has not yet filed a contribution or set-off claim against the PI Trust.

establishing the requisite legally protected interest—the Joint Plan will pay this claim in accordance with the TDP. Garlock has introduced no evidence that the TDP would be unable to properly handle its claim in such a scenario.[158] As such, Garlock likewise fails to establish that it has standing under the requirements set forth by the Bankruptcy Court.

Based on the above, the Court finds that Garlock lacks bankruptcy standing to challenge the confirmation of Grace's Joint Plan. If a party has no standing to appear in a suit, then the court need not consider the merits of its claims. See Sierra Club v. Morton, 405 U.S. 727, 741 (1972). Therefore, the Court need not reach any other issues presented in Garlock's appellate briefing, and the Bankruptcy Court's finding on this point is affirmed.[159]

### L.     The Anti-Assignment Provisions in Insurance Policies

At differing points in time prior to Grace's bankruptcy petition, insurance companies AXA Belgium, GEICO, and Republic[160] all issued high level excess general liability insurance coverage to Grace.[161] It is undisputed that each policy contained an anti-assignment provision that purported

---

[158] In fact, the evidence is to the contrary. The record indicates that prior to Garlock's bankruptcy petition, it was able to obtain substantial contribution in the amount of $625,950 in aggregate payments from various asbestos personal injury trusts based on three judgments that Garlock suffered in Maryland state court. (See Payments to Garlock on Indirect Claims as of July 31, 2009, Garlock Ex. 73, JA 017469).

[159] In making its finding, the Bankruptcy Court held that: "Any objections raised by Garlock that the Joint Plan in this case alters its state court rights and remedies is [*sic*] moot because Garlock is no longer in the tort system and claims against it will not be addressed there. However, to the extent that other objectors raised similar issues, we address them [in conjunction with Garlock] below." In re W.R. Grace & Co., 446 B.R. 96, 121 n.40 (Bankr. D. Del. 2011). Thus, any findings that the Bankruptcy Court may have made in regards to Garlock under these circumstances are likewise affirmed.

[160] GEICO and Republic have jointly briefed and presented their claims. Thus, the Court considers their arguments together.

[161] Each insurance company individually issued three high level excess general liability insurance policies to Grace.

to preclude Grace from assigning its rights and interests under the policies without garnering the insurers' consent to do so. AXA Belgium furthers claims that its policies contained provisions that required Grace to "cooperate" with it and prohibited settlements without its consent. (AXA Belgium Br. 10.) After Grace filed for bankruptcy in 2001, the Plan Proponents created an Asbestos Insurance Transfer Agreement ("the Transfer Agreement") as part of Grace's reorganization. Under the Transfer Agreement, Grace will assign all of its rights to and under the insurance policies to the PI Trust.[162] The Transfer Agreement also states that all asbestos insurance entities, including the three objecting insurers, are to be bound by the assignment.[163] GEICO, Republic, and AXA Belgium were not involved in the creation of the Transfer Agreement, and none of them consented to such an assignment. All three insurers objected to the assignment at the Confirmation Hearing. The Bankruptcy Court nonetheless authorized the assignment in its Confirmation Order confirming the

---

[162] Section 1 of the Transfer Agreement states, in pertinent part:

(a) [T]he Insurance Contributors hereby irrevocably transfer, convey, and grant the Asbestos PI Trust all of their Asbestos Insurance Rights, including, without limitation, any and all rights to Proceeds (the "Transfer"). The Transfer is made free and clear of all Encumbrances, liens, security interests, and claims or causes of action[.]

(See Asbestos Insurance Transfer Agreement ("Transfer Agreement") § 1(a), Exhibit 6, JA 025985.)

[163] Section 7.15 of the Joint Plan provides the following:

(e) Each Asbestos Insurance Entity shall be bound by any Final Order, and related Court findings and conclusions that, under the Bankruptcy Code, the transfer of Asbestos Insurance Rights under the Asbestos Insurance Transfer Agreement is valid and enforceable against each Asbestos Insurance Entity notwithstanding applicable non-bankruptcy law or any anti-assignment provision in or incorporated into any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement or Asbestos Insurance Settlement Agreement.

(Joint Plan § 7.15(e).)

190

Joint Plan. The Bankruptcy Court's decision to do so was rooted in the language of § 1123 of the Bankruptcy Code, which provides that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . transfer of all or any part of the property to the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B). In support of this decision, the Bankruptcy Court relied on the Third Circuit's decision in In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2005) and this Court's decision in In re Federal-Mogul Global, Inc., 402 B.R. 625 (D. Del. 2009) (Rodriguez, J., sitting by designation). The insurers now request that this Court deny affirmation of the Joint Plan on the grounds that the anti-assignment provisions in the insurance contracts were not complied with, and that applicable state insurance and contract law was thereby violated.[164] In response, Appellee[165] urges that the Bankruptcy Court's decision should be upheld because the clear import of § 1123(a) is that this statutory section preempts any nonconforming state law.

The Court notes that the recent decision of Federal-Mogul[166] is directly analogous to this

---

[164] GEICO and Republic assert that, in the event that state law would apply to the current dispute, New York law would govern. The Court is not, however, interpreting the underlying insurance contracts here. Rather, the only issue presently before the Court is a federal question: whether anti-assignment provisions in party contracts that prohibit the assignment of insurance rights to a trust are superseded by the federal Bankruptcy Code? Even if state contract law were to be considered here, the Court nonetheless would not need to engage in a lengthy choice-of-law analysis given its present holding.

[165] In regards to the insurance dispute, Debtor Grace is joined by the Official Committee of Asbestos Claimants and the Legal Representative for Future Asbestos Claimants in its response to the insurers' claims on appeal.

[166] The Court notes that Federal-Mogul is currently pending on appeal before the Third Circuit. Oral argument on the case was heard on November 9, 2011. As of the date of the filing of this Memorandum Opinion, no decision regarding Federal-Mogul has yet been rendered by the Third Circuit.

case.[167]  The debtor in that case, Federal-Mogul Global Corporation ("FMC") also filed for Chapter 11 bankruptcy due to overwhelming debt it had accrued as a result of its asbestos liabilities.  402 B.R. 625, 628 (D. Del. 2009).  FMC's reorganization plan included an asbestos personal injury trust and § 524(g) injunction, much akin to the trust and channeling injunction in the case at hand.  Id. at 629.  Under the terms of FMC's plan, the debtor sought to assign the proceeds of several of its insurance policies to the asbestos personal injury trust.  Id. The insurers objected on the grounds that anti-assignment provisions in their policies prevented FMC from making the assignment.  Id.  U.S. District Court Judge Rodriguez, sitting by designation, held that § 1123(a)(5)(B) of the Bankruptcy Code expressly preempted the anti-assignment provisions in the insurance policies, which thereby permitted the transfer of the insurance rights to the § 524(g) trust.  Id. at 645.  In arriving at this decision, Judge Rodriguez engaged in an extensive, thorough, and exemplary discussion and review of the constitutional history of the preemption doctrine, analogous and distinguishable federal caselaw both within the Third and other Circuits, the legislative history and statutory interpretation of several applicable provisions of the Bankruptcy Code, maxims of statutory construction, and public policy concerns.  The Court credits and fully agrees with Judge Rodriguez's careful analysis of this issue.[168]

---

[167] In fact, the Court notes that the debtors in both Federal-Mogul and the instant litigation filed the same briefs before this Court and the Third Circuit, any semantic differences notwithstanding. (See Grace Br., Case No. 11-199, Doc. No. 84; FMC Br., Case No. 09-2230 (3d Cir.), Doc. No. 00319934031.)   Moreover, GEICO and Republic liberally borrow from the insurers' briefs in Federal-Mogul.  (See GEICO/Republic Br., Case No. 11-199, Doc. No. 19; Hartford Insurance Br., Case No. 09-2230 & 09-2231 (3d Cir.), Doc. No.00319954413.)

[168] The Court likewise notes that every other court that has considered this and largely similar issues have also found that anti-assignment provisions in insurance policies are preempted by § 1123(a)(5)(B) of the Bankruptcy Code.  See Combustion Eng'g, 391 F.3d 190, 218 n.27 (3d Cir. 2004); In re Kaiser Aluminum Corp., 343 B.R. 88, 95 (D. Del. 2006); In re Congoleum Corp., Bankr No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008); In re Pittsburgh Corning Corp., 417 B.R. 289, 313–14 (Bankr. W.D. Pa. 2006); In re W. Asbestos Co., 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004); In re Babcock & Wilcox Co., Bankr. Nos. 00-10992-

Rather than rehash what has already been properly decided, this Court hereby expressly incorporates Judge Rodriguez's decision and analysis in <u>Federal-Mogul</u>, 402 B.R. 625 (D. Del. 2009), parties and semantics notwithstanding, to the instant case. The Court therefore finds that § 1123(a)(5)(B) of the Bankruptcy Code expressly preempts the anti-assignment provisions in GEICO, Republic, and AXA Belgium's insurance policies, and that the transfer of these insurance rights and proceeds to the Asbestos PI Trust is permissible.

## M.    Residual Bank Lender Issues

The Bank Lenders raise various additional objections to confirmation of the Joint Plan. Most especially, they attempt to invoke two provisions of the Bankruptcy Code, §§ 1129(a)(7) and 1129(b), as support for their claim for the post-petition interest set at the default rate under the parties' Credit

---

95, 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004); <u>OneBeacon Am. Ins. Co. v. A.P.I., Inc.</u>, No. Civ. A. 06-167, 2006 WL 1473004 (D. Minn. May 25, 2006).

Additionally, as recently as January 24, 2012, the Court of Appeals for the Ninth Circuit recognized the preemption of state law contractual rights in a bankruptcy setting in <u>In re Thorpe Insulation Co.</u>, No. Civ. A. 10-56542, 2012 WL 178998, at *14 (9th Cir. Jan. 24, 2012). In <u>Thorpe</u>, the Ninth Circuit found that the anti-assignment clauses in the appellants' contracts were expressly preempted by § 541(c) of the Code. <u>Id.</u> The Ninth Circuit went on to find, however, that even if *express* preemption were not involved in this case, the anti-assignment provisions would nonetheless be *impliedly* preempted by § 524(g). <u>Id.</u> at *15. In so holding, the Ninth Circuit stated:

> Section 524(g) was specifically designed to allow companies with large asbestos-related liabilities to use Chapter 11 to transfer those liabilities, along with substantial assets, to a trust responsible for paying future asbestos claims. . . . Part of the "cornerstone" of the reorganization is contribution by the insurers to the trust.. . . For such reasons we hold that the anti-assignment provisions contained in the contracts between Appellants and Appellees stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law.

<u>Id.</u> Thus, <u>Thorpe</u> further supports the increasing trend of the federal court system in preempting state law rights that purport to limit a debtor's rights in bankruptcy.

Agreements. The Court already addressed both these statutory sections elsewhere in this Memorandum in regard to other Appellants' objections. As previously noted, § 1129(a)(7) governs the best interests of the creditors test, while §1129(b) encompasses the fair and equitable test and the absolute priority rule. The Court need not dwell on either objection, however, since the Third Circuit has made clear that both statutory sections only require payment of post-petition interest to unsecured creditors when the debtor in question is both impaired and solvent. In re PPI Enters. (U.S.), Inc., 324 F. 3d 197, 205 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand post-petition interest under the 'fair and equitable' test of § 1129(b)(2). 'Unimpaired' creditors have no such rights."); see also Debentureholders Protective Comm. of Cont'l Inv.Corp. v. Cont'l Inv. Corp., 679 F.2d 264, 269 (1st Cir. 1982). Given that the Court already found that the Bank Lenders are not impaired by the Joint Plan and affirmed the Bankruptcy Court's finding regarding their failure to establish Grace's solvency, their objections based on §§ 1129(a)(7) and 1129(b) are without merit. Nevertheless, the Court will briefly discuss the Bank Lenders' objections based on these Code provisions only in so much as they correlate to other remaining issues presented on appeal.

1.    **The Best Interests of the Creditors Test and Legal Rate of Interest Objections**

As previously discussed, the best interests of the creditors test requires that every creditor in a Chapter 11 reorganization plan receive at least the liquidation value under Chapter 11 as it would in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A)(i–ii); see also In re Armstrong World Indus., Inc., 348 B.R. 136, 165–66 (D. Del. 2006). In terms of the Bank Lenders' objections, if this case were to be liquidated under Chapter 7, then § 726(a)(5) of the Code would govern their post-petition interest claims. Section 725(a)(5) provides that a creditor shall receive interest on its claim "at the legal rate from the date of the filing of the petition." 11 U.S.C. § 726(a)(5); see also In re Coram

Healthcare Corp., 315 B.R. 321, 345–46 (Bankr. D. Del. 2004). The statute itself does not define this terminology. There are, however, currently three approaches to determining the legal rate of interest. First is the state law approach, which provides that "if a contract exists between the debtor and creditor that establishes an interest rate on the outstanding balance" then that serves as the legal rate. In re Beguelin, 220 B.R. 94, 99 (9th Cir. B.A.P. 1998); In re Carter, 220 B.R. 411, 415 (Bankr. D.N.M. 1998); In re Schoeneberg, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993). The second is the use of a specific state statute that sets the legal rate of interest. See Beguelin, 220 B.R. at 99 (citing In re Shaffer Furniture Co., 68 B.R. 827, 831 (Bankr. E.D. Pa. 1987)). The third approach is the federal judgment rate approach, under which the legal rate is established pursuant to 28 U.S.C. § 1961. In re Godsey, 134 B.R. 865, 867 (Bankr. M.D. Tenn. 1991). The majority approach taken by most courts today is the federal judgment rate approach. See Beguelin, 220 B.R. at 99; In re Cardelucci, 285 B.R. F.3d 1231, 1235 (9th Cir. 2002); In re Best, 365 B.R. 725, 727 (Bankr. W.D. Ky. 2007); In re Country Manor of Kenton, 254 B.R. 179, 183 (Bankr. N.D. Ohio 2000); In re Dow Corning, Corp., 237 B.R. 380, 394 (E.D. Mich. 1999).

The Bankruptcy Court here favored this approach as well. The Bank Lenders now contend that this was erroneous and that the state law approach should apply, which they claim would entitle them to the default interest rate under the Credit Agreements. This objection is overruled.[169] The Bankruptcy Court was properly within its discretion to select the federal judgment rate approach, as the Third Circuit has not addressed the issue and various courts have put forth persuasive reasoning for using this approach.

In any event, it does not matter which of the three approaches would properly apply here

---

[169] The Court likewise overrules the Bank Lenders' objection that the default interest dispute was not ripe in 2009.

because none of the three approaches would award the Bank Lenders the contractual *default* rate of interest. As discussed at length above, the Bank Lenders are not entitled to the default interest rate since no event of default occurred here in the first place. At the time of Grace's bankruptcy petition in 2001, the federal judgment rate was 4.19%. It has been recognized that the federal judgment rate is the *minimum* that must be paid to unsecured creditors under a plan to satisfy the best interests of the creditors test. See In re Wash. Mut., Inc., Bankr. No. 08-12229, 2011 WL 57111, at *37 (Bankr. D. Del. Jan. 7, 2011) (citing In re Coram Healthcare, Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004)). But under the Term Agreement, the Bank Lenders will actually receive a rate—6.09% converted to a floating adjusted rate tied to the Prime—that is higher than the federal judgment rate. The Bank Lenders have not shown any equitable considerations as to why they would be entitled to a higher interest rate. See Coram Healthcare, 315 B.R. at 347 (recognizing that equitable considerations may be relevant to legal rate of interest analysis). Thus, the Court finds nothing erroneous in the Bankruptcy Court's decision to utilize the federal judgment rate as the appropriate measure here.

### 2.    The Absolute Priority Rule Objections

As stated above in reference to other Appellants' objections, the absolute priority rule requires a Chapter 11 reorganization plan to be fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i–ii); Bank of Am. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441–42 (1999); In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005). In the context of equity, the absolute priority rule has been interpreted to mean that unsecured creditors must be paid the full amount of their allowed claims before equity can retain value under the plan. See Armstrong,

434 F.3d at 512; In re Yasparro, 100 B.R. 91, 95 (Bankr. M.D. Fla. 1989) ("The absolute priority rule . . . requires that creditors . . . receive payment in full before lesser interests—such as those of equity holders—may share in the assets of the reorganized entity."); In re Haskell Dawes, Inc., 199 B.R. 867, 869 (Bankr. E.D. Pa. 1996). As discussed at length above, § 502(b) of the Bankruptcy Code precludes unmatured (*i.e.*, post-petition) interest from becoming part of a creditor's allowed claim because interest stops accruing on claims at the date of the filing of the bankruptcy petition. See In re Oakwood Home Corps., 449 F.3d 588, 599 (3d Cir. 2006); In re Country Manor of Kenton, Inc., 254 B.R. 179, 182 (Bankr. N.D. Ohio 2000) ("[U]nmatured interest (*i.e.*, postpetition interest) does not, under any circumstance, become a part of that creditor's allowed claim.").

The Bank Lenders contend that the absolute priority rule is violated under the present circumstances because Grace's shareholders will retain value under the Joint Plan. The Court finds no such violation for several reasons. First, the rule only applies to unsecured creditors that are impaired by the terms of the plan, and the Court already determined that the Bank Lenders are not impaired. Second, the Bank Lenders will be paid the full amount of their allowed claims. Allowed claims do not include claims for unmatured, post-petition interest. As such, the Bank Lenders' allowed claims only consist of the principal and interest that was due as of the Petition Date. The Joint Plan will pay the Bank Lenders this amount in full prior to the shareholders receiving value under the Plan. The absolute priority rule is therefore not called into question under these circumstances.[170]

---

[170] The Bank Lenders spend a significant portion of their argument discussing In re Dow Corning, 456 F.3d 668 (6th Cir. 2006). The Dow Corning Court found that, under the facts of that case, the absolute priority rule required the unsecured creditors to receive payment of the post-petition interest. Id. at 679. That case, however, is distinguishable. The debtor's solvency in that case was undisputed, id. at 678, whereas here, Grace's solvency remains unknown. Application of the absolute priority rule is a more contentious matter and fact-specific inquiry

**3.    The Fair and Equitable Test and the Authority of the Committee to Bind the Bank Lenders**

Section 1129(b) provides that a reorganization plan cannot be confirmed unless it does not "discriminate unfairly, and is fair and equitable" with respect to impaired classes of creditors that have rejected the plan. 11 U.S.C. 1129(b)(1).  "[T]he decision for or against confirmation is placed squarely within the discretion of the judges and encompasses all their intrinsic perceptions of fairness and equity." In re Horwitz, 167 B.R. 237, 241 (Bankr. W.D. Okla. 1994).  When determining what rate of interest is fair and equitable to creditors, courts have considerably wide discretion and should consider the circumstances of each case individually.  See Coram Healthcare, 315 B.R. at 346 ("[T]he specific facts of each case will determine what rate of interest is 'fair and equitable.'"); In re Dow Corning Corp., 244 B.R. 678, 692 (Bankr. E.D. Mich. 1992) ("Given the case-specific nature of the fairness inquiry, then, it may well be that postpetition contractual interest is a matter which the Code leaves to the discretion of the courts.") (internal citation omitted).

The Bank Lenders contend that, regardless of whether they are impaired or not, the equities of this case lead to the conclusion that the Joint Plan is not fair and equitable to them. Upon a consideration of the equities of this particular case, the Court still finds that the rate of interest that

---

when a debtor is insolvent or its solvency remains unknown.  The Sixth Circuit even acknowledged this in its Opinion, stating that:

> Since solvent bankruptcy estates are somewhat of a rarity, it comes as no surprise that the majority of courts to consider whether to award default interest have done so in the context of an insolvent debtor.  In those cases, bankruptcy courts have concluded that default interest need not be awarded in every instance for a plan to pass muster under § 1129(b)(1).  Instead, bankruptcy courts analyze whether § 1129(b) requires the payment of default interest on a case-by-case basis.

Id. at 678–79.  Thus, given the unknown nature of Grace's solvency at this point in time, Dow Corning is not directly applicable, and does not serve as a roadblock to plan confirmation under the circumstances at hand.

the Bank Lenders will receive under the Joint Plan is fair and equitable. The Bank Lenders have not established Grace's solvency, nor have they shown the Court why they are entitled to anything higher than the federal judgment rate of interest. Moreover, Grace claims that it repeatedly relied on the interest rate agreed upon in the Term Sheet when it adjusted its internal books and records, filed disclosures with the SEC, submitted monthly operating reports to the Bankruptcy Court, and as a baseline when it entered into settlements with other parties. The Bank Lenders did not make their demand for the higher interest rate known until after the Term Sheet was signed by all parties and finalized. Therefore, the Court finds that the fair and equitable test has been satisfied based on the facts and circumstances of this case. The Bank Lenders will receive the rate of interest specified in the Term Sheet—fairness and equity do not entitle them to anything more.

The Bank Lenders also assert that the fair and equitable test is violated because they are not bound by the terms of the 2005 and 2006 Letter Agreements. Specifically, they claim that these Agreements were entered into by the Committee, not the Bank Lenders, and that they therefore should not be bound by contracts to which they were not parties. The Bankruptcy Court rejected this argument, finding that Mr. Maher was authorized to act on behalf of and bind all general unsecured creditors in his capacity as Committee Chairperson and Administrative Agent for the Bank Lenders. See W.R. Grace & Co., Bankr. No. 01-1139, 2009 WL 1469831, at *6 n.3 (Bankr. D. Del. 2009). This Court agrees with the Bankruptcy Court. Testimony and evidence introduced at the Confirmation Hearing indicates that Mr. Maher made it clear that he was acting on behalf of all general unsecured creditors, including the Bank Lenders, when he entered into negotiations with Grace. The record also indicates that the 2005 Letter Agreement was modified for the sole benefit of the Bank Lenders to reflect increasing short-term interest rate trends in the market. A review of the record supports the notion that Mr. Maher only sought this modification to benefit the Bank

199

Lenders because no other general unsecured creditors in Class 9 had their post-petition rates increased at this time. Indeed, the express language of the 2006 Letter Agreement makes this crystal clear: "[T]he Debtors agree to further amend the Joint Plan to modify the treatment of the Class of General Unsecured Creditors to provide that commencing January 1, 2006 the current 6.09% fixed, compounded quarterly, post-petition interest rate accruing for the Holders of Debtor's *pre-petition bank credit facilities* shall change to a floating Adjusted Base Rate, compounded quarterly." (Letter Agreement, dated Feb. 27, 2006 ("2006 Letter Agreement"), Ex. 18 to B.D.I. 22443, JA 010084–86.) If the modification was sought to benefit the Bank Lenders in the first place, it is logical to assume that they would be bound by it. To find otherwise would be fallacy.[171] The Bankruptcy Court's finding is therefore affirmed.

### 4.    Dissolution of the Unsecured Creditors Committee[172]

Section 11.8 of the Joint Plan provides that the Committee may continue to exist and have the authority to participate in any appeals of an order confirming the Joint Plan that was in progress prior

---

[171] The Bank Lenders' reliance on In re Kensington Int'l, Ltd., 368 F.3d 289 (3d Cir. 2004) is likewise misplaced. In Kensington, the Third Circuit did not make a blanket statement that a creditor's committee does not retain authority to bind individual committee members. Rather, the holding of Kensington was specific to the facts of that case, and dealt with whether a district court judge must recuse himself from presiding over several bankruptcy cases, originally including the case at hand. The Third Circuit's discussion in relation to creditor committees dealt with the imputation of knowledge in the possession of counsel to the committee, not whether the committee chairperson generally had the authority to negotiate and act of behalf of the committee as a whole. The two cases that the Third Circuit cited as support in Kensington further support this notion, as they only discussed fiduciary duties owed to individual creditors versus an entire committee. See In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992); In re Levy, 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985).

[172] The Committee asserts this claim independently and separately from the Bank Lenders.

200

to the Effective Date of the Plan.[173]  This Section further provides that the Committee shall cease to exist to provide its services or take actions in connection with any appeals if such actions are solely on behalf of certain creditors, rather than in the best interests of general unsecured creditors in Class 9 as a whole.[174]  The Bankruptcy Court approved this Plan provision.  On appeal, the Committee asserts that it should not be dissolved on the Effective Date of the Plan because the Bank Lenders may still have pending claims and the Committee should be entitled to take an active role in the litigation on their behalf.

---

[173] Section 11.8 states, in relevant part:

On the Effective Date, except as set forth below, . . . the Unsecured Creditors' Committee . . . shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and those committees shall be deemed dissolved. . . . Further, after the Effective Date, the Unsecured Creditors' Committee . . . shall continue in existence and have standing and capacity to (i) object to any proposed modification of the Plan, (ii) object to or defend the Administrative Expense Claims of Professionals employed by or on behalf of the Debtors or their estates, (iii) participate in any appeals of the Confirmation Order (if applicable), (iv) prepare and prosecute applications for the payment of fees and reimbursement of expenses, and (v) continue any adversary proceeding [ ], claim objection, appeal, or other proceeding that was in progress prior to the Effective Date.

(Joint Plan §11.8.)

[174] This "exception clause" provides that:

Nothing in . . . the foregoing sentence[s] shall be deemed to confer standing and capacity on the Unsecured Creditors' Committee . . . to provide services or take action in connection with an adversary proceeding, claim objection, appeal or other proceeding that was in progress prior to the Effective Date where such services are for the benefit of an individual creditor or creditors and do not serve the direct interests of the creditor or equity interest class which such Entity is appointed to represent.

(Joint Plan §11.8.)

The Court disagrees. At this point, all other general secured creditors are satisfied with their distribution from the Joint Plan and the Bank Lenders remain the only creditors in Class 9 that continue to pursue objections on appeal. The Committee astutely points out that in <u>Kensington</u>, the Third Circuit stated that "it is established that a Creditor's Committee owes a fiduciary duty to the unsecured creditors as a whole, not to the individual members" of the class. <u>Kensington</u>, 368 F.3d at 315. It cites to <u>Kensington</u> as support for its proposition that the Committee must continue to exist. What it has failed to realize, however, is that its citation to <u>Kensington</u> actually has the opposite effect here: if the Court permits the Committee to exist post-Effective Date, then the Committee may actually violate its fiduciary duty since at this point in time it would only continue to serve the interests of the Bank Lenders. Moreover, the record indicates that a majority of the Bank Lenders have retained their own very capable counsel to represent their legal interests, and nothing prevents the remaining Bank Lenders from likewise doing so. The Committee has provided no evidence that this independent representation by outside counsel has been ineffective in any way. To the contrary, it seems as though the Committee's work has been duplicative as a result of the Bank Lenders' well-qualified counsel.

While the Court credits the laudable work that the Committee has performed on behalf of all general unsecured creditors to date, it agrees with the Bankruptcy Court that there is no statutory basis for its continued existence after the Joint Plan becomes effective. The Committee's objection on this ground is therefore overruled.

## V.    CONCLUSION

For the foregoing reasons, the Settlement Agreement reached between Grace and the CNA Companies, as well as the Joint Plan, are affirmed. Having made this determination, the findings of the Bankruptcy Court and its judgment are also hereby affirmed, and the Joint Plan is confirmed in its entirety.

An appropriate Order follows.